

1  H. CHRISTIAN L'ORANGE (State Bar No. 71730)
   S. FEY EPLING (State Bar No. 190025)
2  DRINKER BIDDLE & REATH LLP
   50 Fremont Street, 20th Floor
3  San Francisco, California 94105-2235
   Telephone: (415) 591-7500
4  Facsimile: (415) 591-7510
   Email: Fey.Epling@dbr.com
5
   Attorneys for Plaintiff
6  THE LINCOLN NATIONAL LIFE INSURANCE
   COMPANY
7

**FILED**

JAN 03 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**BY FAX**

ORIGINAL

8              UNITED STATES DISTRICT COURT

9             SOUTHERN DISTRICT OF CALIFORNIA

10  THE LINCOLN NATIONAL LIFE          Case No. 08 CV 0023 IEG NLS
    INSURANCE COMPANY,
11                                     **TABLE OF EXHIBITS IN SUPPORT OF**
                    Plaintiff,         **COMPLAINT FOR DECLARATORY**
12                                     **JUDGMENT**
         v.
13
    H. THOMAS MORAN, II, Court-
14  Appointed Receiver of LYDIA CAPITAL,
    LLC,
15
                    Defendant.
16

17

18

19

20       In accordance with Civil Local Rule 5.1(e), Plaintiff, THE LINCOLN

21  NATIONAL LIFE INSURANCE COMPANY, submits the following compilation of

22  exhibits in support of its Complaint for Declaratory Judgment.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

SF1\393361\1

**TABLE OF EXHIBITS TO COMPLAINT FOR DECLARATORY JUDGMENT**

| | | |
|---|---|---|
| **Exhibit 1** | Application for Insurance | Page 1 - 11 |
| **Exhibit 2** | Trust Agreement | Page 12 - 18 |
| **Exhibit 3** | Bankruptcy Petition | Page 19 - 45 |
| **Exhibit 4** | Amendment to Application for Insurance | Page 46 |
| **Exhibit 5** | Insurance Policy of Insured – Roy K. Black | Page 47 - 79 |
| **Exhibit 6** | Complaint filed in *SEC v. Lydia Capital, LLC, et al.*, Civ. Action No. 1:07-10712-RGS. | Page 80 - 88 |
| **Exhibit 7** | Amended Complaint filed in *SEC v. Lydia Capital, LLC, et al.*, Civ. Action No. 1:07-10712-RGS. | Page 89 - 121 |

Respectfully Submitted,

Dated: January 3, 2008

S. FEY EPLING

DRINKER BIDDLE & REATH LLP
Attorneys for Plaintiff.
THE LINCOLN NATIONAL LIFE
INSURANCE COMPANY

*Of Counsel*

STEPHEN C. BAKER
MICHAEL J. MILLER
JASON P. GOSSELIN
DRINKER BIDDLE & REATH LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996
Telephone: (215) 988-2700

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

SF1\393361\1

2

TABLE OF EXHIBITS IN SUPPORT OF COMPLAINT FOR DECLARATORY JUDGMENT          CASE NO.

# EXHIBIT 1

**JP JEFFERSON PILOT FINANCIAL**

Please check appropriate underwriting company:
☐ Jefferson Pilot Life Insurance Company, Service Office PO Box 21008, Greensboro, NC 27420-1008
☐ Jefferson Pilot Financial Insurance Company, Service Office PO Box 515, Concord, NH 03302-0515

## APPLICATION FOR LIFE INSURANCE — PART I

**PROPOSED INSURED**

| 1. Name of Proposed Insured  ☐ Male  ☐ Female (First, Middle, Last) | 2. Date of Birth (mm/dd/yy) | 3. Place of Birth State, Country | 4. Social Security Number |
|---|---|---|---|
| | | | 5. Driver License # & State |

| 6. Home Address (Street, City, State, Zip Code) | 7. Years At This Address |
|---|---|

| 8. Employer | 9. Business Address (Street, City, State, Zip Code) |
|---|---|

| 10. Occupation/Duties | 11. Home Telephone | 12. Business Telephone | 13. Citizen of (Country) |
|---|---|---|---|

**PROPOSED ADDITIONAL INSURED** - Complete for Survivorship Life Policy or Term Rider on Spouse, Other Insured or Individual Life Policy.

| 14. Name of Proposed Insured  ☐ Male  ☐ Female (First, Middle, Last) | 15. Date of Birth (mm/dd/yy) | 16. Place of Birth (State, Country) | 17. Social Security Number |
|---|---|---|---|
| | | | 18. Driver License # & State |

| 19. Home Address (Street, City, State, Zip Code) | 20. Years At This Address |
|---|---|

| 21. Employer | 22. Business Address (Street, City, State, Zip Code) |
|---|---|

| 23. Occupation/Duties | 24. Home Telephone | 25. Business Telephone | 26. Citizen of (Country) |
|---|---|---|---|

## COVERAGE INFORMATION

27. Plan of Insurance (If Ensemble®, also complete Question 32)  28. Amount of Insurance: $

29. ☐ Death Benefit Option  ☐ Level  ☐ Increasing  ☐ Specified Amount plus premiums less withdrawals  ☐ Death Benefit Qualification Test - For IRS purposes, premiums will be tested using the Guideline Premium Test unless  ☐ Cash Value Accumulation Test is checked (not available on all products). Cannot be changed after issue.

30. Additional  ☐ Waiver of Premium
Benefits:  ☐ Accidental Death Benefit $_____     ☐ Term on Spouse/Other Insured Rider $_____
☐ Guaranteed Insurability $_____     ☐ Children's Rider $_____ units
☐ Waiver of Specified Premium $_____     ☐ Complex Child's Supplement
☐ Accelerated Benefit Rider     ☐ Other _____
☐ Supplemental Coverage     ☐ Other _____
Additional Specified Amount Rider $_____

31. Automatic Premium Loan  ☐ Yes  ☐ No   [ This question applies to whole Life Insurance products only ]

32. Complete only if applying for Variable Life Insurance with Jefferson Pilot Financial Insurance Company. Submit Premium Allocation and Disclosure Form for Variable Universal Life with Application.

(i) Monthly insurance and administrative charges will be deducted from the General Account and divisions of the Separate Account on a pro rata basis unless the box is checked below (not available on all VUL products).

(ii) Deduct all charges from the _____ division (any single division or the General Account may be reached).

JP-EOA-L (2/05)

Exhibit 1

**III. Suitability**

| | Yes | No |
|---|---|---|
| 1. Have you, the Proposed Insured(s) and the Owner, if other than the Proposed Insured(s), received a current Prospectus dated _____ for the policy applied for and have you had sufficient time to review it? | ☐ | ☐ |
| 2. Do you understand that the amount and duration of the death benefit may increase or decrease depending on the investment performance of funds in the Separate Account? | ☐ | ☐ |
| 3. Do you understand that the cash values may increase or decrease depending on the investment performance of the funds held in the Separate Account? | ☐ | ☐ |
| 4. With this in mind, do you believe that the policy applied for is in accord with your insurance objective and your anticipated financial needs? | ☐ | ☐ |

**CASH VALUES MAY INCREASE OR DECREASE IN ACCORDANCE WITH THE EXPERIENCE OF THE SEPARATE ACCOUNT. THE DEATH BENEFIT MAY BE VARIABLE OR FIXED UNDER SPECIFIED CONDITIONS.**

**IV. OWNER INFORMATION (Complete if Different than Proposed Insured(s))**

33. (i) Owner Name (First, Middle, Last) _____ (ii) Citizen of (Country) _____

34. Owner Address _____

35. Owner Social Security or Tax I.D.# _____   36. Relationship to Proposed Insured(s) _____   37. Trust Date (only if Trust is Owner) _____

**V. BENEFICIARY DESIGNATION**

| 38. Primary Beneficiary(ies) | 39. Social Security or Tax ID # | 40. Relationship(s) to Proposed Insured(s) |
|---|---|---|
| | | |
| 41. Contingent Beneficiary(ies) | 42. Social Security or Tax ID # | 43. Relationship(s) to Proposed Insured(s) |
| | | |
| 44. Beneficiary for Spouse/Other Insured Term Rider | | 45. Relationship to Spouse/Other Insured |
| 46. Social Security or Tax ID # | | |

**VI. BILLING INSTRUCTIONS**

47. Payment with Application $ _____   Was the Conditional Receipt Given? ☐ Yes ☐ No

48. Planned Premium $ _____   49. ☐ Lump Sum $ _____   ☐ 1035 Exchange

50. Premiums to be Paid: ☐ Annually   ☐ Semi-Annually   ☐ Quarterly   ☐ Monthly   ☐ List Bill
☐ DRAFT/PAC   ☐ PDF (Complete Insert Here)   ☐ Other: _____

51. Premium Bill to be Sent to: ☐ Proposed Insured at   ☐ Other (Care Of: Name and Mailing Address)
☐ Home Address
☐ Business Address at
☐ Proposed Additional Insured at   ☐ Other (Care Of: Name And Mailing Address)
☐ Home Address
☐ Business Address at
☐ Owner at address listed in #34

52. Special Instructions _____

**Complete each question for the Proposed Insured and any Additional Insured.**

| VII. PERSONAL FINANCE | Proposed Insured | Additional Insured |
|---|---|---|
| 53. Annual Earned Income | a) $ | b) $ |
| 54. Annual Unearned Income (if none, please indicate $0) | a) $ | b) $ |
| 55. Total Assets | a) $ | b) $ |
| 56. Total Liabilities | a) $ | b) $ |
| 57. Net Worth | a) $ | b) $ |
| 58. In the last 5 years have you filed for bankruptcy? If "YES", COMPLETE the Financial Supplement. | a) ☐ Yes ☐ No | b) ☐ Yes ☐ No |

**VIII. LIFE INSURANCE IN FORCE**

| | Proposed Insured | Additional Insured |
|---|---|---|
| 59. Have you ever applied for life, health or disability insurance and been declined, postponed or charged an increased premium? | a) ☐ Yes ☐ No | b) ☐ Yes ☐ No |
| 60. Do you have any applications pending with any other life insurance company now? | a) ☐ Yes ☐ No | b) ☐ Yes ☐ No |

If answered "YES" to question 59-60, please give details here for each Proposed Insured.

Proposed Insured:

Additional Insured:

61. a) Are you considering stopping premium payments, surrendering, replacing, lapsing or assigning to the insurer or reducing your benefits under an existing policy or contract? ☐ Yes ☐ No
    b) Are you considering using or borrowing funds from your existing policies or contracts to pay premiums due on the new or applied for policy? ☐ Yes ☐ No

If yes to either question, please complete and submit required replacement forms and complete Question 62.

62. List all insurance in force on any Proposed Insured. If none, check this box ☐

| Insured Name & Company | Face Amount | Policy Number | Issue Year | Replacement or Change in Policy? | Check here if 1035 Exchange |
|---|---|---|---|---|---|
| | | | | ☐ Yes ☐ No | ☐ |
| | | | | ☐ Yes ☐ No | ☐ |
| | | | | ☐ Yes ☐ No | ☐ |
| | | | | ☐ Yes ☐ No | ☐ |

**Complete each question for the Proposed Owner, the Proposed Insured (if other than Owner) and any Additional Insured.**

| | Proposed Insured (if other than Owner) | Additional Insured | Proposed Owner |
|---|---|---|---|
| 63. Have you been involved in any discussion about the possible sale or assignment of this policy to a life settlement, viatical or other secondary market provider? | a) ☐ Yes ☐ No | b) ☐ Yes ☐ No | c) ☐ Yes ☐ No |
| 64. Have you in the past two years sold a policy to a life settlement, viatical or other secondary market provider? | a) ☐ Yes ☐ No | b) ☐ Yes ☐ No | c) ☐ Yes ☐ No |

If answered "YES" to any part of question 63 or 64, please give details for each "YES" answer.

LIFO7783-2/2005

Page 3 of 10
3/06

| IX. GENERAL RISK INFORMATION | Proposed Insured | Additional Insured |
|---|---|---|
| 65. In the past 3 years, have you smoked a cigarette, cigar or pipe, chewed tobacco or used tobacco or nicotine in any form? | a) ☐ Yes ☐ No | b) ☐ Yes ☐ No |
| If Yes - last used (form) ___ Month, Year | | |
| 66. Do you plan to travel or reside outside the US or Canada within the next 12 months? | a) | b) ☐ Yes ☐ No |
| 67. Are you a member of, or applied to be a member of, or received a notice of required service in, the armed forces, reserves or National Guard? | a) | b) ☐ Yes ☐ No |
| If Yes - please list branch of service, rank, duties, mobilization category and current duty station. | | |
| 68. In the past 3 years, have you engaged in, or in the future do you plan to engage in, flying in non-commercial aircraft, racing of any kind, skin or scuba diving, parachuting or sky diving, hang gliding, mountain, rock or technical climbing? | a) | b) ☐ Yes ☐ No |
| If Yes - complete Aviation/Avocation Supplement. | | |
| 69. Have you ever been convicted of a felony or misdemeanor (except for a minor traffic violation)? | a) | b) ☐ Yes ☐ No |
| 70. In the past 5 years, have you been convicted of (i) two or more moving violations, (ii) driving under the influence of alcohol or other drugs, or (iii) had your drivers license suspended or revoked? | a) | b) ☐ Yes ☐ No |
| 71. Have you ever been diagnosed by or received treatment from a medical professional for Acquired Immunodeficiency Syndrome (AIDS)? | a) | b) ☐ Yes ☐ No |

If answered "Yes" to questions 65-71, please give details here to each Proposed Insured:

**Proposed Insured:**

**Additional Insured:**

## X. MEDICAL INFORMATION

**Proposed Insured:**

72. Name/address/phone number of your personal physician? (If none, indicate "None.")

a. Date and reason last consulted?

b. Treatment or medication prescribed?

73. Height ___ ft. ___ in.    Weight ___ lbs.

Has your weight changed by more than 10 pounds during the past 12 months?    ☐ Yes ☐ No

If Yes - by how many pounds? ___    ☐ Gain ☐ Loss

**Additional Insured:**

74. Name/address/phone number of your personal physician and/or health care facility? (If none, indicate "None.")

a. Date and reason last consulted?

b. Treatment or medication prescribed?

75. Height ___ ft. ___ in.    Weight ___ lbs.

Has your weight changed by more than 10 pounds during the past 12 months?    ☐ Yes ☐ No

If Yes - by how many pounds? ___    ☐ Gain ☐ Loss

**Medical Information questions continue on next page.**

LR-6121-A - 8/05

Page 4 of 10
8/05

Exhibit

## X. MEDICAL INFORMATION

| | | Proposed Insured | | Additional Insured |
|---|---|---|---|---|
| 76. Have you ever had, or been told by a medical professional to seek treatment because of any of the following: | | | | |
| a. Chest pain, high blood pressure, heart attack, heart murmur, disease of the heart or blood vessels? | | ☐ Yes ☐ No | | ☐ Yes ☐ No |
| b. Cancer, tumor, leukemia, blood disorder (excluding HIV status), melanoma, or lymphoma? | | ☐ Yes ☐ No | | ☐ Yes ☐ No |
| c. Diabetes or high blood sugar? | | ☐ Yes ☐ No | | ☐ Yes ☐ No |
| d. Shortness of breath, asthma, sleep apnea, emphysema, tuberculosis, or other lung disease? | | ☐ Yes ☐ No | | ☐ Yes ☐ No |
| e. Disease of the nervous system, stroke, seizure, paralysis? | | ☐ Yes ☐ No | | ☐ Yes ☐ No |
| f. Mental or nervous disorder, depression, anxiety? | | ☐ Yes ☐ No | | ☐ Yes ☐ No |
| g. Hepatitis, cirrhosis, or other disease of the liver or pancreas? | | ☐ Yes ☐ No | | ☐ Yes ☐ No |
| h. Ulcer, colitis, or other disorder of the stomach or intestines? | | ☐ Yes ☐ No | | ☐ Yes ☐ No |
| i. Disease or disorder of the kidneys, bladder or prostate, or a sexually transmitted disease (excluding HIV status)? | | ☐ Yes ☐ No | | ☐ Yes ☐ No |
| j. Arthritis, disease or injury of the muscles, bones, or joints? | | ☐ Yes ☐ No | | ☐ Yes ☐ No |
| k. Any other health impairment, congenital deformity or medically or surgically treated condition not mentioned above? | | ☐ Yes ☐ No | | ☐ Yes ☐ No |
| 77. Have you ever used or experimented with cocaine, marijuana, or other non-prescription stimulants, depressants, or narcotics? | | ☐ Yes ☐ No | | ☐ Yes ☐ No |
| 78. Have you ever been treated, or advised to receive treatment, for use of alcohol or drugs? | | ☐ Yes ☐ No | | ☐ Yes ☐ No |
| 79. In the past 30 days, have you taken any medication or non-prescription drug? | | ☐ Yes ☐ No | | ☐ Yes ☐ No |
| 80. Are you now planning to seek medical advice or treatment for any reason? | | ☐ Yes ☐ No | | ☐ Yes ☐ No |

**Proposed Insured**

| 81. Family Member | Age if Living | Present Health | Age at Death | Cause of Death |
|---|---|---|---|---|
| Father | | | | |
| Mother | | | | |
| Brothers | | | | |
| Sisters | | | | |

**Additional Insured**

| 82. Family Member | Age if Living | Present Health | Age at Death | Cause of Death |
|---|---|---|---|---|
| Father | | | | |
| Mother | | | | |
| Brothers | | | | |
| Sisters | | | | |

If answered "Yes" to questions 76, 78, 78-80, please give complete details including date of last treatment and name/address, phone numbers of all doctors and medical providers.

**Proposed Insured**

**Additional Insured**

## XI. SERVICE OFFICE ENDORSEMENTS (Attach an additional sheet of paper, if necessary)

## AGREEMENT AND ACKNOWLEDGEMENT

I, the Owner, declare that my tax identification or social security number as shown is correct. I also certify that I am not subject to backup withholding.

Each of the undersigned declares that:

1. This Application consists of: a) Part I Application; b) Part II Medical Application, if required; c) any amendments to the application; d) attached thereto; and d) any supplements; all of which are required by the Company for the plan, amount and benefits applied for.

2. Unless otherwise provided by the Conditional Receipt, the Company will have no liability under this application unless and until: a) it has been received and approved by the Company at its Service Office; b) the policy has been issued and delivered to the policy owner; c) the first premium has been paid to and accepted by the Company; and d) at the time of delivery and payment, the facts concerning the insurability of each person proposed for insurance are as stated in this application.

3. No agent, broker or medical examiner has the authority to make or modify any Company contract or to waive any of the Company's requirements.

4. Corrections, additions or changes to this application may be made by the Company. Any such changes will be shown under "Service Office endorsement". Acceptance of a policy issued with such changes will constitute acceptance of the changes. No change will be made in classification (including age at issue), plan, amount, or benefits unless agreed to in writing by the Applicant.

5. I ACKNOWLEDGE receipt of the Notices on the Medical Information Bureau and Fair Credit Reporting Act.

6. I HAVE READ, or have had read to me, the completed Application for Life Insurance before signing below. All statements and answers in this application are correctly recorded, and are full, complete and true. I UNDERSTAND that any false statements or material misrepresentations may result in the loss of coverage under the policy.

## STATE DISCLOSURES

Any person who, with intent to defraud or knowing that he/she is facilitating fraud against an insurer, submits an application or files a claim containing a false or deceptive statement may be guilty of insurance fraud.

## TO BE COMPLETED BY AGENT ONLY

(i) Do you know or have you any reason to believe that replacement of insurance is involved?  ☐ Yes  ☐ No
If a replacement is involved, I certify that only company approved sales materials were used in this sale and that copies of all sales materials were left with the applicant.

(ii) I declare that I asked the Proposed Insured(s) each question on the application. The answers have been recorded by me exactly as stated and I know of nothing affecting the insurability of the Proposed Insured(s) which is not fully recorded in this application.

(iii) I declare that I have accurately answered any questions contained in the Agent's Report conducted by me in connection with this application.

(iv) I declare that I have provided each Proposed Insured and Owner with the Notices on the Medical Information Bureau and Fair Credit Reporting Act as well as a copy of the Privacy Practices Notice.

(v) I verified the Owner/Applicant's identity by viewing the individual's photograph on a driver's license, passport or other official document and have transcribed the number of such identification below. If applicant is a business or trust entity, I viewed documentation confirming the entity's legal status and state of formation.
☐ Yes  ☐ No    Driver's License, Passport or other ID: _____

(vi) I declare I have not been involved in any discussion of the possible sale or assignment of the policy to a life settlement provider or other secondary market provider. If otherwise, please explain: _____

(vii) I have verified that this policy will not replace a policy that has already been sold to a life settlement, viatical or other secondary market provider. If otherwise, please explain: _____

Exhibit 1
Page 6

## AUTHORIZATION

Each of the undersigned declares that:

I authorize any licensed physician, medical practitioner, hospital, clinic or any other medically related facility, insurance support organizations, insurance company, Medical Information Bureau (MIB), state motor vehicle division, consumer reporting agency, employer, financial source or government agency that has any records or knowledge of:

Proposed Insured/Patient

Date of Birth

Proposed Additional Insured/Patient

Date of Birth

or the proposed insured's health, including but not limited to transaction records, employment records, financial records, and complete medical records (including information regarding insurance, demographics, referral documents and records from other facilities), motor vehicle information, or if other, indicate here, _____ to give all such information to Jefferson Pilot Life Insurance Company or Jefferson Pilot Financial Insurance Company (the Company), their licensed representatives and/or their reinsurers, MediConnect.net Inc, QIS, or if other, indicate here, _____.

I understand that an authorization for release or disclosure of psychotherapy notes may not be combined with an authorization for release or disclosure of any other information (a separate Authorization Page must be completed for release or disclosure of psychotherapy notes);

I understand that the information obtained may be used by the Company to determine eligibility for insurance, or to administer my coverage. The Company may not give the information to any person or entity except: 1) a reinsurer or other insurers to whom I have applied or may apply; 2) MIB; or 3) any other person or entity who performs business or legal services in connection with the administration of my insurance coverage. I understand that some of these people or entities may not be covered by federal or state privacy regulations and that the information they receive may be redisclosed; however the Company contractually requires them to protect the information we disclose to them. Information may be disclosed as allowed by law or regulation.

I have received a Privacy Practices Notice which details the method I must use to exercise my right to access, correct, and amend any information gathered about me or my children which relates to this application. I understand that I can provide written revocation of this Authorization to the Company at any time, except: 1) if the Company has taken action in reliance on the Authorization; or 2) the Company is using the Authorization in connection with a contestable claim under my policy.

## AUTHORIZATION - CONTINUED

This is not authorization to release HIV-related information unless an HIV Consent Form with authorization for optional release of information to my personal physician has been signed by me.

I understand that if I refuse to sign this authorization to release my complete medical record, the Company may not be able to process my application.

I agree that a copy of this authorization shall be as valid as the original and this authorization shall be valid for 24 months from the date shown below. I may have a copy upon request.

☐ I elect to be interviewed if an Investigative Consumer Report is prepared.

### SIGNATURE SECTION

Signed at _____ this _____ day of _____ , _____
                                                        (month)              (year)

_____
Signature of Proposed Insured
(Parent or Guardian if under 15 years of age)                                                  Age

_____
Signature of Owner (if other than Proposed Insured)

_____                          _____
Signature of Licensed Agent, Broker or Registered Representative          Name of Licensed Agent, Broker or Registered Representative
                                                                                                        (Please Print)

### APPLICABLE TO VARIABLE LIFE ONLY

I have reviewed the Application, New Account Form and Premium Allocation and Disclosure Form and find the transaction suitable.

_____                          _____
Signature of Registered Principal of Broker/Dealer                          Name of Registered Principal of Broker/Dealer (Please Print)

**JEFFERSON PILOT FINANCIAL**

Jefferson Pilot Life Insurance Company, PO Box 21008, Greensboro, NC 27420-1008
Jefferson Pilot Financial Insurance Company, PO Box 515, Concord, NH 03302-0515
(hereinafter referred to as "the Company")

**AGENT'S REPORT** Date _____ (Completed Form Must Accompany Application for Life Insurance)

**GENERAL INFORMATION**

1. (i) Name of Owner/Applicant _____ (ii) Name of Insured _____
2. (a) How long and how well have you known the Proposed Insured(s) and Owner? _____
3. Are you related to the Proposed Insured(s)?  ☐ Yes  ☐ No   If "Yes", Give details
4. Is the Proposed Insured(s) and Owner read and understand the English Language?  ☐ Yes  ☐ No   If "No", how was the application completed?
5. If ReComp program was used, have you completed the required paperwork?  ☐ Yes  ☐ No
6. Answer only if Proposed Insured is under age 16.
   a. Father's Life Insurance:   Amount in Force $ _____   Amount Applied for $ _____
   b. Mother's Life Insurance:   Amount in Force $ _____   Amount Applied for $ _____
   c. Are siblings also being insured?  ☐ Yes  ☐ No   If "No", please explain.

**BUSINESS FINANCES** (Complete only if this is business insurance)
6. Type of business:   ☐ Corporation   ☐ Partnership   ☐ Sole Proprietorship   ☐ Other
7. Proposed Insured is:   ☐ Employee   ☐ Owner or ____ % of business
8. Total Business Assets:   Total Business Liabilities:   Total Business Net Worth:
9. Net Income (Profit) for the past 2 years:   Last year $ _____   Previous year $ _____
10. Is application signed by authorized officer or partner other than Proposed Insured?  ☐ Yes  ☐ No
    If "Yes", please explain.
11. Are applications being submitted on other business associates?  ☐ Yes  ☐ No
12. What insurance does the business maintain on the lives of each corporate officer/ key person/ partner and the amount of business insurance in each?

| Name | Title | % of Ownership | Amount In Force | Amount Applied For |
|------|-------|----------------|-----------------|--------------------|
|      |       |                | $               | $                  |
|      |       |                | $               | $                  |
|      |       |                | $               | $                  |

**AGENT INFORMATION**
13. Agents who participated in this application.

| Full Name of Agent entitled to Commission | Agent Number | % Comm. Share | Agent's Phone Number (include area code) | Agent's Fax Number (include area code) |
|-------------------------------------------|--------------|---------------|------------------------------------------|----------------------------------------|
|                                           |              |               |                                          |                                        |
|                                           |              |               |                                          |                                        |

**JEFFERSON PILOT FINANCIAL**

Please check appropriate underwriting company:
□ Jefferson Pilot Life Insurance Company, PO Box 21008, Greensboro, NC 27420-1008
□ Jefferson Pilot Financial Insurance Company Service Office, P.O. Box 515, Concord, NH 03302-0515
("Hereafter referred to as "the Company")

## AUTHORIZATION FOR RELEASE OF INFORMATION

I (the undersigned) authorize any licensed physician, medical practitioner, hospital, clinic or any other medically related facility, insurance support organizations, insurance company, Medical Information Bureau (MIB), or other organization, institution or person that has any records or knowledge of:

Proposed Insured/Patient _____    Date of Birth _____

Address _____

of the proposed insured's health, including but not limited to transaction records, employment records, financial records, and complete medical records (including information regarding insurance, demographics, referral documents and records from other facilities) or if other, indicate here: _____

to give all such information to Jefferson Pilot Life Insurance Company or Jefferson Pilot Financial Insurance Company (the Company), their licensed representatives and/or their reinsurers, MediConnect.net Inc, GIS, or if other, indicate here: _____

I understand that an authorization for release or disclosure of psychotherapy notes may not be combined with an authorization for release or disclosure of any other information (a separate authorization must be completed for release or disclosure of psychotherapy notes).

I understand that the information obtained may be used by the Company to determine eligibility for insurance, or to administer my coverage. The Company may not give the information to any person or entity except: 1) a reinsurer, or other insurers to whom I have applied or may apply, 2) MIB or 3) any other person or entity who performs business or legal services in connection with the administration of my insurance coverage. I understand that some of these people or entities may not be covered by federal or state privacy regulations and that the information they receive may be redisclosed, however the Company contractually requires them to protect the information we disclose to them. Information may be disclosed as allowed by law or regulation.

I understand this consent may be revoked in writing at any time, except to the extent: 1) the Company has taken action in reliance on this Authorization, or 2) the Company is using this Authorization in connection with a contestable claim under my policy with that Company. If written revocation is not received, this Authorization will be considered valid for a period of time not to exceed 24 months (12 months in Kansas) from the date of signing. To initiate revocation of this Authorization direct all correspondence to the address above.

I understand that if I refuse to sign this Authorization to release my complete medical record, the Company may not be able to process my application.

I agree that a copy of the Authorization shall be as valid as the original. I may have a copy upon request.

☐ I elect to be interviewed if an investigative Consumer Report is prepared.

SIGNATURE: _____     DATE: _____

Proposed Insured/patient or legal representative (Next-of-kin or legal guardian to sign only if patient is a minor, legally incompetent, or deceased)

PRINT NAME: R. Kent BLACK

Relationship to proposed insured/patient or personal/legal representative signing for proposed insured/patient _____

# EXHIBIT 2

# TRUST AGREEMENT

## ARTICLE 1
## NAME OF TRUST

This Trust shall be known as the BLACK IRREVOCABLE TRUST or "Trust" where appropriately designated herein.

## ARTICLE 2
## GRANTOR

The Grantor of the Trust is Roy K. Black of Carlsbad, CA.  Grantor is a married man/woman, being married to Maureen Black.

## ARTICLE 3
## TRUSTEE AND SUCCESSOR TRUSTEE

The Initial Trustee of this Trust is Dawson & Ozanne and is the attorney of the Grantor. Any Trustee under this Trust Agreement may, by written instrument, signed and acknowledged, resign his or her office. The resigning Trustee shall have the right to nominate and appoint a successor Trustee. If the Trustee is unable or unwilling to appoint a successor Trustee, then the Grantor shall have the right to nominate and appoint a successor Trustee in the event the Trustee is unable, unwilling or ceases to serve for any reason. In no event shall the Grantor be appointed or act as Trustee. No successor Trustee shall be liable for any act, omission or default of a predecessor Trustee. Unless requested in writing by an adult beneficiary or other interested person within sixty (60) days of the assumption of the office of Trustee, no successor Trustee shall have any duty to investigate or review any action of a predecessor Trustee, and the successor Trustee may accept the accounting records of the predecessor Trustee showing assets on hand without further investigation and without incurring any liability to any person claiming or having an interest in this Trust.

## ARTICLE 4
## BENEFICIARY

The designated beneficiary ("Beneficiary") of this Trust is Anthony Black and is also the Son of the Grantor. The Trustee shall hold, manage, invest and reinvest the trust estate, shall collect the income therefrom, and shall pay any part or all of the income and principal to whomever the Beneficiary from time to time may direct in writing. The Beneficiary shall also mean any person to whom the Beneficiary assigns (his/her) beneficial interest in this Trust. Any income not so paid or applied shall be accumulated and added to the principal of this Trust at least annually.

Exhibit 2
Page 12

From:DAWSON AND O'ZANE          17607369006          11/17/2006 15:36 #114 P.011/016

Upon the death of the Grantor, the Trustee is directed to distribute the then remaining trust estate to the Beneficiary, or if the Beneficiary is deceased, to the personal representative of the Beneficiary's estate.

## ARTICLE 5
## IRREVOCABILITY

This Trust Agreement and the trusts created under this Trust Agreement are irrevocable and shall not be amendable by the Grantor or any other person.

## ARTICLE 6
## TRUST ESTATE

The Grantor does hereby transfer, convey, assign and deliver to the Trustee all of the property shown on Schedule 1 attached hereto, together with such other monies, securities and other assets as the Trustee hereafter may hold or acquire hereunder. All assets of this Trust coming within the possession or control of the Trustee shall be collectively known as the "trust estate." The trust estate shall be HELD IN TRUST for the purposes and upon the terms and conditions hereinafter set forth.

## ARTICLE 7
## GENERAL PROVISIONS

No bond is required of the Trustee or any successor Trustee herein or hereafter named. No account and report is required of the Trustee or the successor Trustee, however, this does not preclude a Trustee or successor Trustee from requesting judicial review. The Trustee shall be entitled to receive reasonable compensation for the services performed and the Trustee shall be reimbursed for expenses directly related to on behalf of the trust estate.

## ARTICLE 8
## TRUSTEE POWERS

By way of illustration and not of limitation and in addition to any inherent, implied or statutory powers granted to trustees generally, the Trustee is specifically authorized and empowered with respect to any property, real or personal, at any time held under any provision of this Trust Agreement: to allot, allocate between principal and income, assign, borrow, buy, care for, collect, compromise claims, contract with respect to, continue any business of the Grantor, convey, convert, deal with, dispose of, enter into, exchange, hold, improve, incorporate any business of the Grantor, invest, lease, manage, mortgage, grant and exercise options with respect to, take possession of, pledge, receive, release, repair, sell, sue for, to make distributions or divisions in cash or

Exhibit 2
Page 13

From:DAWSON AND OZANNE          17607309025          11/1? ?006 15:36 #114 P.012/016

In kind or partly in each without regard to the income tax basis of such asset and in general, to exercise all the powers in the management of the trust estate which any individual could exercise in the management of similar property owned in his or her own right, upon such terms and conditions as to the Trustee may seem best, and to execute and deliver any and all instruments and to do all acts which the Trustee may deem proper or necessary to carry out the purposes of this Trust, without being limited in any way by the specific grants of power made, and without the necessity of a court order.

Without limiting the generality of any provision elsewhere in this Trust Agreement contained, the Grantor specifically authorizes the Trustee to retain as owner, for as long as he or she, in his or her discretion, deem appropriate, any policies of insurance on the life of the Grantor transferred to the Trustee at any time and to purchase from time to time and in his or her discretion, one or more policies of insurance on the life of the Grantor. The Grantor authorizes the Trustee to pay all costs (including premiums) or other charges of maintaining such policies in force as an expense of administering the trust estate and if it is deemed necessary or advisable, to exercise their power to borrow money for that purpose; however, unless there shall be sufficient funds in the trust estate for the purpose the Trustee shall be under no obligation to exercise the authority granted in this Subdivision to the Trustee to pay such costs or other charges with respect to any such policy of insurance. All said costs or other charges shall, if at all, be paid from the net income of the trust estate and from principal to the extent that net income shall be insufficient for the purpose. The Trustee is authorized to exercise in such manner as the Trustee deems will best serve the interests of the beneficiaries, any option, election or other power which an absolute owner of any such policy would have with respect to that policy. In furtherance, and not by way of limitation, of the broad grant of authority to the Trustee by the provision of this subdivision, the Trustee shall have, with respect to any policy of life insurance at any time held as part of the trust estate, the sole and exclusive right exercisable by the Trustee from time to time and in his or her discretion:

1.  to designate beneficiaries thereof (including a Trustee) and to change any such designation;

2.  to apply for and obtain by conversion or otherwise one or more other policies of insurance on the life of the Grantor and/or the Grantor's spouse;

3.  to receive dividends thereon;

4.  to take paid up insurance in a reduced face amount or to take extended insurance and, if it is deemed advisable to do so, to apply the policy reserves for the purpose;

5.  to demand, collect and receive from the insurer all proceeds thereof;

6.  to exercise all options, rights, privileges and elections (including the right to elect modes of settlement and the privilege of conversion) exercisable thereunder or allowed by the insurer;

Exhibit 2
Page 14

7. to sell, transfer, assign, pledge or otherwise dispose of the policy;

8. to borrow upon the policy from the insurer or from any other person for any purpose (including the payment of premiums or other charges) and to pledge or hypothecate the policy for any loan;

9. to make any payment to effect a "roll out" of (or otherwise acquire a third party's interest in) any policy with respect to which the Trustee has entered into a "split dollar" arrangement and the Trustee is hereby expressly authorized to enter into any such arrangement; and

10. to take any other action with respect to the policy that the Trustee deems to be in the best interest of the trust estate and the beneficiaries thereof.

The Trustee is hereby authorized to make all necessary proofs of death under such policies, to execute and deliver any and all receipt and releases for the net proceeds thereof, to institute any action, suit or proceeding to collect such proceeds, and to pay from the trust estate all the expenses thereof, including court costs and counsel fees and to do and perform any and all other acts which the Trustee deems necessary or advisable to collect such proceeds; provided however, that the Trustee shall not be under any obligation or duty to institute such action, suit or proceeding unless it shall be advisable in the opinion of their counsel and unless the Trustee shall have either adequate funds with which to pay the expenses of such action, suit or proceeding or indemnification to their satisfaction against such expenses.

## ARTICLE 9
## CONSTRUCTION

In this instrument, in all matters of interpretation, whenever necessary to give effect to any provision of this instrument, the masculine shall include the feminine and neuter and vice versa, the singular shall include the plural, and the plural shall include the singular.  This Trust Agreement shall extend to and be binding upon the heirs, personal representatives, executors, administrators, successors and assigns of the undersigned Grantor and upon the Trustee acting hereunder.

## ARTICLE 10
## STATE LAW TO GOVERN

This Trust Agreement and the trusts created hereby shall be construed, regulated and governed by and in accordance with the laws of the State of California.

IN WITNESS WHEREOF, this Trust Agreement has been duly executed this _16th November_, 2006, by the persons signing below.

Exhibit 2
Page 15

From: DAWSON AND OZANNE          17607308025          11/17/2006 15:37 #114 P.014/016

I hereby accept the duties as
Trustee

_____ as
Trustee

_____ as Grantor
Social Security #

Exhibit 2
Page 16

From:DAWSON AND OZANNE            17607309025            11/17 2006 15:37 #114 P.015/016

STATE OF _California_   )
                        ) ss.
COUNTY OF _San Diego_   )

The foregoing instrument was acknowledged before me on the _16th_ day of _November_, 2006, by _Roy Black_ as Grantor; _____ is known by me personally or his identity has been

_Emily Vallarta_
Notary Public

STATE OF _____   )
                   ) ss.
COUNTY OF _____  )

The foregoing instrument was acknowledged before me on the _____ day of _____, 2006, by _____, as Trustee; _____ is personally known to me or her identity has been satisfactorily proven to me.

Notary Public _____
Commission Expires: _____

Exhibit 2
Page 17

From:DAWSON AND OZANNE          17607309025          11/17 2006 15:37 #114 P.016/016

# CALIFORNIA ALL-PURPOSE
# CERTIFICATE OF ACKNOWLEDGMENT

State of _California_ )

County of _San Diego_ )

On _Nov 17, 06_ before me, _Khan Chao, Notary Public_
(here insert name and title of the officer)

personally appeared _Dimetri Reyzin, Esq._

~~personally known to me~~ (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_Khan Chao_
Signature of Notary Public

(Seal)

---

## ADDITIONAL OPTIONAL INFORMATION

### INSTRUCTIONS FOR COMPLETING THIS FORM

Any acknowledgment completed in California must contain verbiage exactly as appears above in the notary section or a separate acknowledgment form must be properly completed and attached to that document. The only exception is if a document is to be recorded outside of California. In such instances, any alternative acknowledgment verbiage as may be printed on such a document so long as the verbiage does not require the notary to do something that is illegal for a notary in California (i.e. certifying the authorized capacity of the signer). Please check the document carefully for proper notarial wording and attach this form if required.

### DESCRIPTION OF THE ATTACHED DOCUMENT

(Title or description of attached document)

(Title or description of attached document continued)

Number of Pages _____ Document Date_____

(Additional information)

### CAPACITY CLAIMED BY THE SIGNER

☐ Individual (s)
☐ Corporate Officer

_____(Title)
☐ Partner(s)
☐ Attorney-in-Fact
☐ Trustee(s)
☐ Other_____

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appears at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they, is/are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  ❖ Indicate title or type of attached document, number of pages and date.
  ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document.

CAIA version 4-Nip  Association of Professional Notaries & CTA 916-604-5470  www.notarychao.com

Exhibit 2
Page 18

# EXHIBIT 3

(Official Form 1) (12/03) West Group, Rochester, NY

| FORM B1 | **United States Bankruptcy Court** | **Voluntary Petition** |
|---|---|---|
| | SOUTHERN District of CALIFORNIA | |

| Name of Debtor (If Individual, enter Last, First, Middle):<br>**BLACK, ROY KEITH** | Name of Joint Debtor (Spouse)(Last, First, Middle): |
|---|---|
| All Other Names used by the Debtor in the last 6 years<br>(include married, maiden, and trade names):<br>**NONE** | All Other Names used by the Joint Debtor in the last 6 years<br>(include married, maiden, and trade names): |
| Last four digits of Soc. Sec. No./Complete EIN or other Tax I.D. No.<br>(If more than one, state all) | Last four digits of Soc. Sec. No./Complete EIN or other Tax I.D. No.<br>(If more than one, state all) |
| Street Address of Debtor (No. & Street, City, State & Zip Code): | Street Address of Joint Debtor (No. & Street, City, State & Zip Code): |
| County of Residence or of the<br>Principal Place of Business: **San Diego** | County of Residence or of the<br>Principal Place of Business: |
| Mailing Address of Debtor (if different from street address):<br>**SAME** | Mailing Address of Joint Debtor (if different from street address): |
| Location of Principal Assets of Business Debtor<br>(if different from street address above): **NOT APPLICABLE** | |

**Information Regarding the Debtor (Check the Applicable Boxes)**

**Venue**  (Check any applicable box)
- ☒ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.
- ☐ There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

| **Type of Debtor**   (Check all boxes that apply) | | **Chapter or Section of Bankruptcy Code Under Which the Petition is Filed**   (Check one box) |
|---|---|---|
| ☒ Individual(s)<br>☐ Corporation<br>☐ Partnership<br>☐ Other_____ | ☐ Railroad<br>☐ Stockbroker<br>☐ Commodity Broker<br>☐ Clearing Bank | ☒ Chapter 7  ☐ Chapter 11  ☐ Chapter 13<br>☐ Chapter 9  ☐ Chapter 12<br>☐ Sec. 304 - Case ancillary to foreign proceeding |
| **Nature of Debts**   (Check one box)<br>☒ Consumer/Non-Business  ☐ Business | | **Filing Fee** (Check one box)<br>☒ Full Filing Fee attached |
| **Chapter 11 Small Business**    (Check all boxes that apply)<br>☐ Debtor is a small business as defined in 11 U.S.C. § 101<br>☐ Debtor is and elects to be considered a small business under 11 U.S.C. § 1121(e) (Optional) | | ☐ Filing Fee to be paid in installments (Applicable to individuals only) Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form No. 3. |

**Statistical/Administrative Information**    (Estimates only)

- ☒ Debtor estimates that funds will be available for distribution to unsecured creditors.
- ☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors.

THIS SPACE IS FOR COURT USE ONLY

| Estimated Number of Creditors | 1-15 | 16-49 | 50-99 | 100-199 | 200-999 | 1000-over |
|---|---|---|---|---|---|---|
| | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |

| Estimated Assets | $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | More than $100 million |
|---|---|---|---|---|---|---|---|---|
| | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

| Estimated Debts | $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | More than $100 million |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |

Case # : 05-01354-JH7
Debtor.: ROY KEITH BLACK
Judge..: JOHN HARGROVE
Trustee: JAMES KENNEDY
341: 03/25/05   @ 01:15pm
Chapter: 7

Filed : February 23, 2005   13:30:10
Deputy : K DURAN
Receipt: 183308
Fee amount : $209.00

FILED & ORDERED
Clerk, U.S. Bankruptcy Court
Southern District of California

Exhibit 3
Page 19

(Official Form 1) (12/03) West Group, Rochester, NY

| **Voluntary Petition**<br>(This page must be completed and filed in every case) | **Name of Debtor(s):**<br>ROY KEITH BLACK | **FORM B1, Page 2** |
|---|---|---|
| **Location Where Filed:**<br>NONE | **Case Number:** | **Date Filed:** |
| **Name of Debtor:**<br>NONE | **Case Number:** | **Date Filed:** |
| **District:** | **Relationship:** | **Judge:** |

## Signatures

### Signature(s) of Debtor(s) (Individual/Joint)

I declare under penalty of perjury that the information provided in this petition is true and correct.

[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
Signature of Debtor

X _____
Signature of Joint Debtor

Telephone Number (if not represented by attorney)

_____
Date    2 - 16 - 05

### Signature of Attorney

X _____
Signature of Attorney for Debtor(s)

Jack I. Mann, Esq. 062001
Printed Name of Attorney for Debtor(s)

Law Offices of Jack I. Mann
Firm Name

1901 First Avenue, Suite 405
Address

San Diego CA 92101

619-238-5500    2/16/05
Telephone Number    Date

### Signature of Debtor (Corporation/Partnership)

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
Signature of Authorized Individual

_____
Printed Name of Authorized Individual

_____
Title of Authorized Individual

_____
Date

### Exhibit A

(To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under Chapter 11)

☐ Exhibit A is attached and made a part of this petition

### Exhibit B

(To be completed if debtor is an individual whose debts are primarily consumer debts)

I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter.

X _____    2/16/05
Signature of Attorney for Debtor(s)    Date

### Exhibit C

Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health and safety?

☐ Yes, and exhibit C is attached and made a part of this petition.
☒ No

### Signature of Non-Attorney Petition Preparer

I certify that I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110, that I prepared this document for compensation, and that I have provided the debtor with a copy of this document.

_____
Printed Name of Bankruptcy Petition Preparer

_____
Social Security Number

_____
Address

_____

Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document:

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

X _____
Signature of Bankruptcy Petition Preparer

_____
Date

A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both 11 U.S.C. § 110; 18 U.S.C. § 156.

Exhibit 3
Page 20

FORM 6a (6/90) West Group, Rochester, NY

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF CALIFORNIA

In re *ROY KEITH BLACK*

Case No. _____
Chapter  7

_____ / Debtor

## SUMMARY OF SCHEDULES

Indicate as to each schedule whether that schedule is attached and state the number of pages on each. Report the totals from Schedules A, B, D, E, F, I, and J in the boxes provided. Add the amounts from Schedules A and B to determine the total amount of the debtor's assets. Add the amounts from Schedules D, E and F to determine the total amount of the debtor's liabilities.

| NAME OF SCHEDULE | Attached (Yes/No) | No. of Sheets | AMOUNTS SCHEDULED | | |
| --- | --- | --- | --- | --- | --- |
| | | | ASSETS | LIABILITIES | OTHER |
| A-Real Property | Yes | 1 | $          0.00 | | |
| B-Personal Property | Yes | 3 | $     30,035.00 | | |
| C-Property Claimed as Exempt | Yes | 1 | | | |
| D-Creditors Holding Secured Claims | Yes | 1 | | $    20,350.37 | |
| E-Creditors Holding Unsecured Priority Claims | Yes | 1 | | $          0.00 | |
| F-Creditors Holding Unsecured Nonpriority Claims | Yes | 2 | | $   127,086.08 | |
| G-Executory Contracts and Unexpired Leases | Yes | 1 | | | |
| H-Codebtors | Yes | 1 | | | |
| I-Current Income of Individual Debtor(s) | Yes | 1 | | | $     1,243.00 |
| J-Current Expenditures of Individual Debtor(s) | Yes | 1 | | | $     9,360.00 |
| Total Number of Sheets in All Schedules ► | | 13 | | | |
| Total Assets ► | | | $     30,035.00 | | |
| Total Liabilities ► | | | | $   147,436.45 | |

Exhibit 3
Page 21

FORM B6 (6/90) West Group, Rochester, NY

In re ROY KEITH BLACK _____ / Debtor     Case No. _____
                                                                        (if known)

## DECLARATION CONCERNING DEBTOR'S SCHEDULES

### DECLARATION UNDER PENALTY OF PERJURY BY AN INDIVIDUAL DEBTOR

I declare under penalty of perjury that I have read the foregoing summary and schedules, consisting of ___14___ sheets, and that they are true and correct to the best of my knowledge, information and belief.

Date: __2 – 16 – 05__     Signature _____

                                        ROY KEITH BLACK

Exhibit 3
Page 22

FORM 6A (6/90) West Group, Rochester, NY

In re **ROY KEITH BLACK** _____/ Debtor    Case No._____
                                                                      (If known)

# SCHEDULE A-REAL PROPERTY

Except as directed below, list all real property in which the debtor has any legal, equitable, or future interest, including all property owned as a cotenant, community property, or in which the debtor has a life estate. Include any property in which the debtor holds rights and powers exercisable for the debtor's own benefit. If the debtor is married, state whether the husband, wife, or both own the property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the debtor holds no interest in real property, write "None" under "Description and Location of Property."

Do not include interests in executory contracts and unexpired leases on this schedule. List them in Schedule G-Executory Contracts and Unexpired Leases.
If an entity claims to have a lien or hold a secured interest in any property, state the amount of the secured claim. See Schedule D. If no entity claims to hold a secured interest in the property, write "None" in the column labeled "Amount of Secured Claim."

If the debtor is an individual or if a joint petition is filed, state the amount of any exemption claimed in the property only in Schedule C-Property Claimed as Exempt.

| Description and Location of Property | Nature of Debtor's Interest in Property | Husband—H Wife—W Joint—J Community—C | Current Market Value of Debtor's Interest, in Property Without Deducting any Secured Claim or Exemption | Amount of Secured Claim |
|---|---|---|---|---|
| None | | | | None |
| | | | | |

| | | | |
|---|---|---|---|
| No continuation sheets attached | **TOTAL $** (Report also on Summary of Schedules.) | | **0.00** |

Exhibit 3
Page 23

FORM B6B (10/89) West Group, Rochester, NY

In re ROY KEITH BLACK _____ / Debtor    Case No. _____
                                                                        (if known)

# SCHEDULE B-PERSONAL PROPERTY

Except as directed below, list all personal property of the debtor of whatever kind. If the debtor has no property in one or more of the categories, place an "X" in the appropriate position in the column labeled "None." If additional space is needed in any category, attach a separate sheet properly identified with the case name, case number, and the number of the category. If the debtor is married, state whether husband, wife, or both own property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the debtor is an individual or a joint petition is filed, state the amount of any exemptions claimed only in Schedule C-Property Claimed as Exempt.

Do not list interests in executory contracts and unexpired leases on this schedule. List them in Schedule G-Executory Contracts and Unexpired Leases. If the property is being held for the debtor by someone else, state that person's name and address under "Description and Location of Property."

| Type of Property | None | Description and Location of Property | Husband–H Wife–W Joint–J Community–C | Current Market Value of Debtor's Interest, in Property Without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 1.  Cash on hand. | | Cash<br>Location: In debtor's possession | | $ 900.00 |
| 2.  Checking, savings or other financial accounts, certificates of deposit, or shares in banks, savings and loan, thrift, building and loan, and homestead associations, or credit unions, brokerage houses, or cooperatives. | X | | | |
| 3.  Security deposits with public utilities, telephone companies, landlords, and others. | X | | | |
| 4.  Household goods and furnishings, including audio, video, and computer equipment. | | Household Goods and Furnishing<br>Location: In debtor's possession | | $ 5,000.00 |
| 5.  Books, pictures and other art objects, antiques, stamp, coin, record, tape, compact disc, and other collections or collectibles. | X | | | |
| 6.  Wearing apparel. | | Clothing<br>Location: In debtor's possession | | $ 500.00 |
| 7.  Furs and jewelry. | X | | | |
| 8.  Firearms and sports, photographic, and other hobby equipment. | X | | | |
| 9.  Interests in insurance policies. Name insurance company of each policy and itemize surrender or refund value of each. | X | | | |
| 10. Annuities. Itemize and name each issuer. | X | | | |
| 11. Interests in IRA, ERISA, Keogh, or other pension or profit sharing plans. Itemize. | X | | | |
| 12. Stock and interests in incorporated and unincorporated businesses. Itemize. | X | | | |
| 13. Interests in partnerships or joint ventures. Itemize. | X | | | |

Page  1  of  3

Exhibit 3<br>Page 24

FORM B6B (10/89) West Group, Rochester, NY

In re ROY KEITH BLACK _____ / Debtor     Case No. _____

(If known)

# SCHEDULE B-PERSONAL PROPERTY

(Continuation Sheet)

| Type of Property | N o n e | Description and Location of Property | Husband—H Wife—W Joint—J Community—C | Current Market Value of Debtor's Interest, in Property Without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 14. Government and corporate bonds and other negotiable and non-negotiable instruments. | X | | | |
| 15. Accounts Receivable. | X | | | |
| 16. Alimony, maintenance, support, and property settlements to which the debtor is or may be entitled. Give particulars. | X | | | |
| 17. Other liquidated debts owing debtor including tax refunds. Give particulars. | X | | | |
| 18. Equitable or future interests, life estates, and rights or powers exercisable for the benefit of the debtor other than those listed in Schedule of Real Property. | X | | | |
| 19. Contingent and non-contingent interests in estate of a decedent, death benefit plan, life insurance policy, or trust. | X | | | |
| 20. Other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims. Give estimated value of each. | X | | | |
| 21. Patents, copyrights, and other intellectual property. Give particulars. | X | | | |
| 22. Licenses, franchises, and other general intangibles. Give particulars. | X | | | |
| 23. Automobiles, trucks, trailers and other vehicles. | | 2002 Jaguar X-Type Location: In debtor's possession | | $ 23,635.00 |
| 24. Boats, motors, and accessories. | X | | | |
| 25. Aircraft and accessories. | X | | | |
| 26. Office equipment, furnishings, and supplies. | X | | | |
| 27. Machinery, fixtures, equipment and supplies used in business. | X | | | |
| 28. Inventory. | X | | | |
| 29. Animals. | X | | | |
| 30. Crops - growing or harvested. Give particulars. | X | | | |
| 31. Farming equipment and implements. | X | | | |

Page  2  of  3 

Exhibit 3
Page 25

FORM B6B (10/89) West Group, Rochester, NY

In re *ROY KEITH BLACK* _____ / Debtor    Case No. _____
                                                                              (if known)

## SCHEDULE B-PERSONAL PROPERTY

(Continuation Sheet)

| Type of Property | N o n e | Description and Location of Property | Husband—H Wife—W Joint—J Community—C | Current Market Value of Debtor's Interest, in Property Without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 32. Farm supplies, chemicals, and feed. | X | | | |
| 33. Other personal property of any kind not already listed. Itemize. | X | | | |
| | | | Total → | $ 30,035.00 |

(Report total also on Summary of Schedules.)
Include amounts from any continuation sheets attached.

Page __3__ of __3__

Exhibit 3
Page 26

FORM B6C (6/90) West Group, Rochester, NY

In re   ROY KEITH BLACK                                                    / Debtor     Case No. _____
                                                                                                    (if known)

## SCHEDULE C-PROPERTY CLAIMED AS EXEMPT

Debtor elects the exemptions to which debtor is entitled under:

(Check one box)

☐ 11 U.S.C. § 522(b) (1):  Exemptions provided in 11 U.S.C. § 522(d). Note: These exemptions are available only in certain states.

☒ 11 U.S.C. § 522(b) (2):  Exemptions available under applicable nonbankruptcy federal laws, state or local law where the debtor's domicile has been located for the 180 days immediately preceding the filing of the petition, or for a longer portion of the 180-day period than in any other place, and the debtor's interest as a tenant by the entirety or joint tenant to the extent the interest is exempt from process under applicable nonbankruptcy law.

| Description of Property | Specify Law Providing each Exemption | Value of Claimed Exemption | Current Market Value of Property Without Deducting Exemptions |
|---|---|---|---|
| Cash | Calif. C.C.P. §704.080(b)(1) | $ 900.00 | $ 900.00 |
| Furniture and Furnishings | Calif. C.C.P. §704.020(a) | $ 5,000.00 | $ 5,000.00 |
| Clothing | Calif. C.C.P. §704.020(a) | $ 500.00 | $ 500.00 |
| 2002 Jaguar X-Type | Calif. C.C.P. §704.010 | $ 2,300.00 | $ 23,635.00 |

Page No. __1__ of __1__

Exhibit 3
Page 27

FORM B6D (12/03) West Group, Rochester, NY

In re ROY KEITH BLACK _____ / Debtor        Case No._____
                                                                    (if known)

# SCHEDULE D-CREDITORS HOLDING SECURED CLAIMS

State the name, mailing address, including zip code, and last four digits of any account number of all entities holding claims secured by property of the debtor as of the date of filing of the petition. List creditors holding all types of secured interests such as judgment liens, garnishments, statutory liens, mortgages, deeds of trust, and other security interests. List creditors in alphabetical order to the extent practicable. If all secured creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column marked "Codebtor," include the entity on the appropriate schedule of creditors and complete Schedule H - Codebtors. If a joint petition is filed, state whether husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Report the total of all claims listed on this schedule in the box labeled "Total" on the last sheet of the completed schedules. Report this total also on the Summary of Schedules.

☐ Check this box if debtor has no creditors holding secured claims to report on this Schedule D.

| Creditor's Name and Mailing Address Including Zip Code | Codebtor | Date Claim was Incurred, Nature of Lien, and Description and Market Value of Property Subject to Lien  H—Husband  W—Wife  J—Joint  C—Community | Contingent | Unliquidated | Disputed | Amount of Claim Without Deducting Value of Collateral | Unsecured Portion, if any |
|---|---|---|---|---|---|---|---|
|  |  | Car Lease 2002 Jaguar X-Type |  |  |  | $ 20,350.37 | $ 0.00 |
| Account No: |  | Value: $ 23,635.00 |  |  |  |  |  |
| Account No: |  | Value: |  |  |  |  |  |
| Account No: |  | Value: |  |  |  |  |  |
|  |  | Value: |  |  |  |  |  |

No continuation sheets attached

|  | Subtotal $ | 20,350.37 |
|---|---|---|
|  | (Total of this page) |  |
|  | Total $ | 20,350.37 |
|  | (Use only on last page. Report total also on Summary of Schedules) |  |

Exhibit 3
Page 28

FORM B6D (12/03) West Group, Rochester, NY

In re *ROY KEITH BLACK* _____ / Debtor

Case No._____
(if known)

## SCHEDULE D-CREDITORS HOLDING SECURED CLAIMS

State the name, mailing address, including zip code, and last four digits of any account number of all entities holding claims secured by property of the debtor as of the date of filing of the petition. List creditors holding all types of secured interests such as judgment liens, garnishments, statutory liens, mortgages, deeds of trust, and other security interests. List creditors in alphabetical order to the extent practicable. If all secured creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column marked "Codebtor," include the entity on the appropriate schedule of creditors and complete Schedule H - Codebtors. If a joint petition is filed, state whether husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community.".

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Report the total of all claims listed on this schedule in the box labeled "Total" on the last sheet of the completed schedules. Report this total also on the Summary of Schedules.

☐ Check this box if debtor has no creditors holding secured claims to report on this Schedule D.

| Creditor's Name and Mailing Address Including Zip Code | Codebtor | Date Claim was Incurred, Nature of Lien, and Description and Market Value of Property Subject to Lien H—Husband W—Wife J—Joint C—Community | Contingent | Unliquidated | Disputed | Amount of Claim Without Deducting Value of Collateral | Unsecured Portion, if any |
|---|---|---|---|---|---|---|---|
| | | *Car Lease* *2002 Jaguar X-Type* | | | | $ 20,350.37 | $ 0.00 |
| | | Value: $ 23,635.00 | | | | | |
| Account No: | | | | | | | |
| | | Value: | | | | | |
| Account No: | | | | | | | |
| | | Value: | | | | | |
| Account No: | | | | | | | |
| | | Value: | | | | | |

| | | |
|---|---|---|
| No continuation sheets attached | Subtotal $ (Total of this page) | 20,350.37 |
| | Total $ (Use only on last page. Report total also on Summary of Schedules) | 20,350.37 |

Exhibit 3
Page 28

FORM B6E (4/04) West Group, Rochester, NY

In re __ROY KEITH BLACK__ _____ / Debtor    Case No. _____
                                                                          (if known)

# SCHEDULE E-CREDITORS HOLDING UNSECURED PRIORITY CLAIMS

A complete list of claims entitled to priority, listed separately by type of priority, is to be set forth on the sheets provided. Only holders of unsecured claims entitled to priority should be listed in this schedule. In the boxes provided on the attached sheets, state the name and mailing address, including zip code, and last four digits of the account number, if any, of all entities holding priority claims against the debtor or the property of the debtor, as of the date of the filing of the petition.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors and complete Schedule H - Codebtors. If a joint petition is filed, state whether husband, wife, both of them or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Report the total of claims listed on each sheet in the box labeled "Subtotal" on each sheet. Report the total of all claims listed on this Schedule E in the box labeled "Total" on the last sheet of the completed schedule. Repeat this total also on the Summary of Schedules.

☒  Check this box if debtor has no creditors holding unsecured priority claims to report on this Schedule E.

TYPES OF PRIORITY CLAIMS    (Check the appropriate box(es) below if claims in that category are listed on the attached sheets)

☐  **Extensions of credit in an involuntary case**
Claims arising in the ordinary course of the debtor's business or financial affairs after the commencement of the case but before the earlier of the appointment of a trustee or the order for relief. 11 U.S.C. § 507(a)(2).

☐  **Wages, salaries, and commissions**
Wages, salaries, and commissions, including vacation, severance, and sick leave pay owing to employees and commissions owing to qualifying independent sales representatives up to $4,925* per person earned within 90 days immediately preceding the filing of the original petition, or the cessation of business, whichever occurred first, to the extent provided in 11 U.S.C. § 507(a)(3).

☐  **Contributions to employee benefit plans**
Money owed to employee benefit plans for services rendered within 180 days immediately preceding the filing of the original petition, or the cessation of business, whichever occurred first, to the extent provided in 11 U.S.C. § 507(a)(4).

☐  **Certain farmers and fishermen**
Claims of certain farmers and fishermen, up to $4,925* per farmer or fisherman, against the debtor, as provided in 11 U.S.C. § 507(a)(5).

☐  **Deposits by individuals**
Claims of individuals up to $2,225* for deposits for the purchase, lease, or rental of property or services for personal, family, or household use, that were not delivered or provided. 11 U.S.C. § 507(a)(6).

☐  **Alimony, Maintenance or Support**
Claims of a spouse, former spouse, or child of the debtor, for alimony, maintenance, or support, to the extent provided in 11 U.S.C. § 507(a)(7).

☐  **Taxes and Certain Other Debts Owed to Governmental Units**
Taxes, custom duties, and penalties owing to federal, state, and local governmental units as set forth in 11 U.S.C. § 507(a)(8).

☐  **Commitments to Maintain the Capital of an Insured Depository Institution**
Claims based on commitments to FDIC, RTC, Director of the Office of Thrift Supervision, Comptroller of the Currency, or Board of Governors of the Federal Reserve System, or their predecessors or successors, to maintain the capital of an insured depository institution. 11 U.S.C. § 507(a)(9).

*Amounts are subject to adjustment on April 1, 2007, and every three years thereafter with respect to cases commenced on or after the date of adjustment.

No continuation sheets attached

Exhibit 3
Page 29

FORM B6F (12/03) West Group, Rochester, NY

In re ROY KEITH BLACK _____ / Debtor    Case No. _____
                                                                    (If known)

# SCHEDULE F-CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

State the name, mailing address, including zip code, and last four digits of any account number, if any, of all entities holding unsecured claims without priority against the debtor or the property of the debtor, as of the date of filing of the petition. Do not include claims listed in Schedules D and E. If all creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Report total of all claims listed on this schedule in the box labeled "Total" on the last sheet of the completed schedules. Report this total also on the Summary of Schedules.

☐ Check this box if debtor has no creditors holding unsecured nonpriority claims to report on this Schedule F.

| Creditor's Name and Mailing Address Including Zip Code | Codebtor | Date Claim was incurred, and Consideration for Claim. If Claim is Subject to Setoff, so State. H--Husband W--Wife J--Joint C--Community | Contingent | Unliquidated | Disputed | Amount of Claim |
|---|---|---|---|---|---|---|
| | | Various Credit Card Purchases | | | | $ 35,246.66 |
| | | Various Credit Card Purchases | | | | $ 13,448.97 |
| | | 12/28/04 Judgment | | | | $ 3,953.05 |
| | | Various Credit Card Purchases | | | | $ 31,515.92 |
| _ continuation sheets attached | | | Subtotal $ (Total of this page) | | | 84,164.60 |
| | | | Total $ (Report total also on Summary of Schedules) | | | |

Exhibit 3

FORM B6F (12/03) West Group, Rochester, NY

In re _ROY KEITH BLACK_____ / Debtor      Case No._____

(if known)

# SCHEDULE F-CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

(Continuation Sheet)

| Creditor's Name and Mailing Address Including Zip Code | Codebtor H–Husband W–Wife J–Joint C–Community | Date Claim was Incurred, and Consideration for Claim. If Claim is Subject to Setoff, so State. | Contingent | Unliquidated | Disputed | Amount of Claim |
|---|---|---|---|---|---|---|
| | X | Creditor of Telejoy, LLC; Debtor is Guarantor | | | | Unknown |
| | | Consumer Unsecured Loan | | | | $ 5,306.48 |
| | X | Unknown<br><br>Creditor of Telejoy, LLC; Debtor is Guarantor | | | | Unknown |
| | | 11/17/04<br>Judgment | | | | $ 37,615.00 |
| | X | Unkown<br><br>Debtor guarantor on Lease for Telejoy, LLC; Debtor is sole member | | | | Unknown |

Sheet No. _1_ of _1_ continuation sheets attached to Schedule of
Creditors Holding Unsecured Nonpriority Claims

| | |
|---|---|
| Subtotal $ (Total of this page) | 42,921.48 |
| Total $ (Report total also on Summary of Schedules) | 127,086.08 |

Exhibit 3
Page 31

FORM B6G (10/89) West Group, Rochester, NY

In re ROY KEITH BLACK _____ / Debtor    Case No. _____
                                                                          (if known)

# SCHEDULE G-EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Describe all executory contracts of any nature and all unexpired leases of real or personal property. Include any timeshare interests.
State nature of debtor's interests in contract, i.e., "Purchaser," "Agent," etc. State whether debtor is the lessor or lessee of a lease.
Provide the names and complete mailing addresses of all other parties to each lease or contract described.

NOTE: A party listed on this schedule will not receive notice of the filing of this case unless the party is also scheduled in the appropriate schedule of
creditors.

☐ Check this box if the debtor has no executory contracts or unexpired leases.

| Name and Mailing Address, including Zip Code, of other Parties to Lease or Contract | Description of Contract or Lease and Nature of Debtor's Interest. State whether Lease is for Nonresidential Real Property. State Contract Number of any Government Contract. |
|---|---|
| Westfield Corporation, Inc. 1640 Camino del Rio N Suite 351 San Diego CA  92109 | Contract Type:Non-residential lease * * Terms: Beginning date: Debtor's Interest: Description:Debtor was a guantor on Lease; Lease was for Telejoy, LLC Buyout Option: |

FORM B6H (6/90) West Group, Rochester, NY

In re ROY KEITH BLACK _____ / Debtor    Case No. _____
                                                                        (If known)

## SCHEDULE H-CODEBTORS

Provide the information requested concerning any person or entity, other than a spouse in a joint case, that is also liable on any debts listed by debtor in the schedules of creditors. Include all guarantors and co-signers. In community property states, a married debtor not filing a joint case should report the name and address of the nondebtor spouse on this schedule. Include all names used by the nondebtor spouse during the six years immediately preceding the commencement of this case.

☐ Check this box if the debtor has no codebtors.

| Name and Address of Codebtor | Name and Address of Creditor |
|---|---|
| Telejoy, LLC<br>4313 La Jolla Village Drive<br>Suite K2<br>La Jolla CA  92122 | Electrolux Financial Corp<br>Dept D754<br>Columbus OH  43271<br><br><br>Fujitsu General America<br>353 Rte 46W<br>Fairfield NJ  07004<br><br>Westfield Corporation, Inc.<br>1640 Camino del Rio N<br>Suite 351<br>San Diego CA  92108 |

Page __1__ of __1__

Exhibit 3
Page 33

FORM B6I (12/03) West Group, Rochester, NY

In re **ROY KEITH BLACK** _____ / Debtor     Case No. _____
(if known)

## SCHEDULE I-CURRENT INCOME OF INDIVIDUAL DEBTOR(S)

The column labeled "Spouse" must be completed in all cases filed by joint debtors and by a married debtor in a chapter 12 or 13 case whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.

| Debtor's Marital Status: **Married** | DEPENDENTS OF DEBTOR AND SPOUSE | |
|---|---|---|
| | RELATIONSHIP | AGE |
| | | |

| EMPLOYMENT: | DEBTOR | SPOUSE |
|---|---|---|
| Occupation | | |
| Name of Employer | | |
| How Long Employed | | |
| Address of Employer | | |

| Income: (Estimate of average monthly income) | DEBTOR | SPOUSE |
|---|---|---|
| Current Monthly gross wages, salary, and commissions (pro rate if not paid monthly) | $ 0.00 | $ 0.00 |
| Estimated Monthly Overtime | $ 0.00 | $ 0.00 |
| SUBTOTAL | $ 0.00 | $ 0.00 |
| LESS PAYROLL DEDUCTIONS | | |
| a. Payroll Taxes and Social Security | $ 0.00 | $ 0.00 |
| b. Insurance | $ 0.00 | $ 0.00 |
| c. Union Dues | $ 0.00 | $ 0.00 |
| d. Other (Specify): | $ 0.00 | $ 0.00 |
| SUBTOTAL OF PAYROLL DEDUCTIONS | $ 0.00 | $ 0.00 |
| TOTAL NET MONTHLY TAKE HOME PAY | $ 0.00 | $ 0.00 |
| Regular income from operation of business or profession or farm (attach detailed statement) | $ 0.00 | $ 0.00 |
| Income from Real Property | $ 0.00 | $ 0.00 |
| Interest and dividends | $ 0.00 | $ 0.00 |
| Alimony, maintenance or support payments payable to the debtor for the debtor's use or that of dependents listed above. | $ 0.00 | $ 0.00 |
| Social Security or other government assistance Specify: **Social Security** | $ 743.00 | $ 500.00 |
| Pension or retirement income | $ 0.00 | $ 0.00 |
| Other monthly income Specify: | $ 0.00 | $ 0.00 |
| TOTAL MONTHLY INCOME | $ 743.00 | $ 500.00 |

TOTAL COMBINED MONTHLY INCOME    $ _____ 1,243.00
(Report also on Summary of Schedules)

Describe any increase or decrease of more than 10% in any of the above categories anticipated to occur within the year following the filing of this document:

Page No. ___1___ of ___1___

Exhibit 3
Page 34

FORM 86J (6/90) West Group, Rochester, NY

In re ROY KEITH BLACK _____ / Debtor     Case No. _____
                                                                              (If known)

## SCHEDULE J-CURRENT EXPENDITURES OF INDIVIDUAL DEBTOR

Complete this schedule by estimating the average expenses of the debtor and the debtor's family. Pro rate any payments made bi-weekly, quarterly, semi-annually, or annually to show monthly rate.

☐ Check this box if a joint petition is filed and debtor's spouse maintains a separate household. Complete a separate schedule of expenditures labeled "Spouse."

| | |
|---|---:|
| Rent or home mortgage payment (include lot rented for mobile home) | $ 5,500.00 |
| Are real estate taxes included?    Yes ☒  No ☐ | |
| Is property insurance included?    Yes ☒  No ☐ | |
| Utilities: Electricity and heating fuel | $ 250.00 |
| Water and sewer | $ 40.00 |
| Telephone | $ 75.00 |
| Other | $ 0.00 |
| Other | $ 0.00 |
| Home maintenance (Repairs and upkeep) | $ 50.00 |
| Food | $ 400.00 |
| Clothing | $ 100.00 |
| Laundry and dry cleaning | $ 20.00 |
| Medical and dental expenses | $ 100.00 |
| Transportation (not including car payments) | $ 200.00 |
| Recreation, clubs and entertainment, newspapers, magazines, etc. | $ 100.00 |
| Charitable contributions | $ 0.00 |
| Insurance (not deducted from wages or included in home mortgage payments) | |
| Homeowner's or renter's | $ 75.00 |
| Life | $ 150.00 |
| Health | $ 150.00 |
| Auto | $ 150.00 |
| Other | $ 0.00 |
| Other | $ 0.00 |
| Other | $ 0.00 |
| Taxes (not deducted from wages or included in home mortgage) | |
| Specify: | $ 0.00 |
| Installment payments: (In chapter 12 and 13 cases, do not list payments to be included in the plan) | |
| Auto | $ 1,000.00 |
| Other:   U.S. Bank (Wife | $ 1,000.00 |
| Other: | $ 0.00 |
| Other: | $ 0.00 |
| Alimony, maintenance, and support paid to others | $ 0.00 |
| Payments for support of additional dependents not living at your home | $ 0.00 |
| Regular expenses from operation of business, profession, or farm (attach detailed statement) | $ 0.00 |
| Other: | $ 0.00 |
| Other: | $ 0.00 |
| Other: | $ 0.00 |
| TOTAL MONTHLY EXPENSES     (Report also on Summary of Schedules) | $ 9,360.00 |

Exhibit 3
Page 35

Form 7 (12/03) West Group, Rochester, NY

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF CALIFORNIA

In re *ROY KEITH BLACK*

Case No.
Chapter  7

_____ / Debtor

### STATEMENT OF FINANCIAL AFFAIRS

This statement is to be completed by every debtor. Spouses filing a joint petition may file a single statement on which the information for both spouses is combined. If the case is filed under chapter 12 or chapter 13, a married debtor must furnish information for both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed. An individual debtor engaged in business as a sole proprietor, partner, family farmer, or self-employed professional, should provide the information requested on this statement concerning all such activities as well as the individual's personal affairs.

Questions 1-18 are to be completed by all debtors. Debtors that are or have been in business, as defined below, also must complete Questions 19-25. If the answer to any question is "None," or the question is not applicable, mark the box labeled "None." If additional space is needed for the answer to any question, use and attach a separate sheet properly identified with the case name, case number (if known), and the number of the question.

### DEFINITIONS

"In business." A debtor is "in business" for the purpose of this form if the debtor is a corporation or partnership. An individual debtor is "in business" for the purpose of this form if the debtor is or has been, within the six years immediately preceding the filing of this bankruptcy case, any of the following: an officer, director, managing executive, or owner of 5 percent or more of the voting or equity securities of a corporation; a partner, other than a limited partner, of a partnership; a sole proprietor or self-employed.

"Insider." The term "insider" includes but is not limited to: relatives of the debtor; general partners of the debtor and their relatives; corporations of which the debtor is an officer, director, or person in control; officers, directors, and any owner of 5 percent or more of the voting or equity securities of a corporation debtor and their relatives; affiliates of the debtor and insiders of such affiliates; any managing agent of the debtor. 11 U.S.C. §101.

**1. Income from employment or operation of business.**

State the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business from the beginning of this calendar year to the date this case was commenced. State also the gross amounts received during the two years immediately preceding this calendar year. (A debtor that maintains, or has maintained, financial records on the basis of a fiscal rather than a calendar year may report fiscal year income. Identify the beginning and ending dates of the debtor's fiscal year.) If a joint petition is filed, state income for each spouse separately. (Married debtors filing under chapter 12 or chapter 13 must state income of both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

**2. Income other than from employment or operation of business.**

State the amount of income received by the debtor other than from employment, trade, profession, or operation of the debtor's business during the two years immediately preceding the commencement of this case. Give particulars. If a joint petition is filed, state income for each spouse separately. (Married debtors filing under chapter 12 or chapter 13 must state income for each spouse whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

Exhibit 3
Page 36

Form 7 (12/03) West Group, Rochester, NY

**3. Payments to creditors.**

a. List all payments on loans, installment purchases of goods or services, and other debts, aggregating more than $600 to any creditor, made within 90 days immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is filed.)

| NAME AND ADDRESS OF CREDITOR | DATES OF PAYMENTS | AMOUNT PAID | AMOUNT STILL OWING |
|---|---|---|---|
| Creditor:Seltzer, Caplan, McMahan Address:c/o Miles Grant 1331 India Street San Diego, CA  92101 | | 8,000.00 | 30,615.00 |

b. List all payments made within one year immediately preceding the commencement of this case to or for the benefit of creditors who are or were insiders. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

---

**4. Suits and administrative proceedings, executions, garnishments and attachments.**

a. List all suits and administrative proceedings to which the debtor is or was a party within one year immediately preceding the filing of this bankruptcy case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| CAPTION OF SUIT AND CASE NUMBER | NATURE OF PROCEEDING | COURT OR AGENCY AND LOCATION | STATUS OR DISPOSITION |
|---|---|---|---|
| California Bank & Trust v. Roy K. Black | Collection | S.D. Superior Court, San Diego, CA | Judgment |
| Seltzer Caplin, etc. v. Anthony Black, et al; SDSC Case No. GIC82045 | Collection | Superior Court, San Diego, CA | Judgment |

b. Describe all property that has been attached, garnished or seized under any legal or equitable process within one year immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

---

**5. Repossessions, foreclosures and returns.**

List all property that has been repossessed by a creditor, sold at a foreclosure sale, transferred through a deed in lieu of foreclosure or returned to the seller, within one year immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

---

**6. Assignments and receiverships.**

a. Describe any assignment of property for the benefit of creditors made within 120 days immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include any assignment by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

b. List all property which has been in the hands of a custodian, receiver, or court-appointed official within one year immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

Form 7 (12/03)  West Group, Rochester, NY

**7. Gifts.**

List all gifts or charitable contributions made within one year immediately preceding the commencement of this case except ordinary and usual gifts to family members aggregating less than $200 in value per individual family member and charitable contributions aggregating less than $100 per recipient.(Married debtors filing under chapter 12 or chapter 13 must include gifts or contributions by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

**8. Losses.**

List all losses from fire, theft, other casualty or gambling within one year immediately preceding the commencement of this case or since the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include losses by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

**9. Payments related to debt counseling or bankruptcy.**

List all payments made or property transferred by or on behalf of the debtor to any persons, including attorneys, for consultation concerning debt consolidation, relief under the bankruptcy law or preparation of a petition in bankruptcy within one year immediately preceding the commencement of this case.

☒ NONE

**10. Other transfers.**

List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within one year immediately preceding the commencement of this case.(Married debtors filing under chapter 12 or chapter 13 must include transfers by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

**11. Closed financial accounts.**

List all financial accounts and instruments held in the name of the debtor or for the benefit of the debtor which were closed, sold, or otherwise transferred within one year immediately preceding the commencement of this case. Include checking, savings, or other financial accounts, certificates of deposit, or other instruments; shares and share accounts held in banks, credit unions, pension funds, cooperatives, associations, brokerage houses and other financial institutions. (Married debtors filing under chapter 12 or chapter 13 must include information concerning accounts or instruments held by or for either or both spouses whether or not a joint petition is filed, unless spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF INSTITUTION | TYPE OF ACCOUNT, LAST FOUR DIGITS OF ACCOUNT NUMBER AND AMOUNT OF FINAL BALANCE | AMOUNT AND DATE OF SALE OR CLOSING |
|---|---|---|

**12. Safe deposit boxes.**

List each safe deposit or other box or depository in which the debtor has or had securities, cash, or other valuables within one year immediately preceding the commencement of this case.(Married debtors filing under chapter 12 or chapter 13 must include boxes or depositories of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

**13. Setoffs.**

List all setoffs made by any creditor, including a bank, against a debt or deposit of the debtor within 90 days preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

Statement of Affairs - Page 3

Exhibit 3
Page 38

Form 7 (12/03)  West Group, Rochester, NY

**14. Property held for another person.**

List all property owned by another person that the debtor holds or controls.

☒ NONE

**15. Prior address of debtor.**

If the debtor has moved within the two years immediately preceding the commencement of this case, list all premises which the debtor occupied during that period and vacated prior to the commencement of this case. If a joint petition is filed, report also any separate address of either spouse.

☒ NONE

**16. Spouses and Former Spouses**

If the debtor resides or resided in a community property state, commonwealth or territory (including Alaska, Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington, or Wisconsin) within the six-year period immediately preceding the commencement of the case, identify the name of the debtor's spouse and of any former spouse who resides or resided with the debtor in the community property state.

NAME

Name:  Maureen Black

**17. Environmental Information**

For the purpose of this question, the following definitions apply:

"Environmental Law" means any federal, state, or local statute or regulation regulating pollution, contamination, release of hazardous or toxic substances, wastes or materials into the air, land, soil, surface water, groundwater, or other medium, including, but not limited to, statutes or regulations regulating the cleanup of these substances, wastes, or material.

"Site" means any location, facility, or property as defined under any Environmental Law, whether or not presently or formerly owned or operated by the debtor, including, but not limited to disposal sites.

"Hazardous Material" means anything defined as hazardous waste, hazardous substance, toxic substance, hazardous material, pollutant, or contaminant or similar term under and Environmental Law.

a. List the name and address of every site for which the debtor has received notice in writing by a governmental unit that it may be liable or potentially liable under or in violation of an Environmental Law. Indicate the governmental unit, the date of the notice, and, if known, the Environmental Law.

☒ NONE

b. List the name and address of every site for which the debtor provided notice to a governmental unit of a release of Hazardous Material. Indicate the governmental unit to which the notice was sent and the date of the notice.

☒ NONE

c. List all judicial or administrative proceedings, including settlements or orders, under any Environmental Law, with respect to which the debtor is or was a party. Indicate the name and address of the governmental unit that is or was a party to the proceeding, and the docket number.

☒ NONE

Statement of Affairs - Page 4

Exhibit 3
Page 39

Form 7 (12/03) West Group, Rochester, NY

**18. Nature, location and name of business**

a. If the debtor is an individual, list the names, addresses, taxpayer identification numbers, nature of the businesses and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partnership, sole proprietorship, or was a self-employed professional within the six years immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within the six years immediately preceding the commencement of this case.

If the debtor is a partnership, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was a partner or owned 5 percent or more of the voting or equity securities within the six years immediately preceding the commencement of this case.

If the debtor is a corporation, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was a partner or owned 5 percent or more of the voting or equity securities, within the six years immediately preceding the commencement of this case.

| NAME AND ADDRESS | TAXPAYER I.D. NUMBER | NATURE OF BUSINESS | BEGINNING AND ENDING DATES |
|---|---|---|---|
| | | *Retail Electronics* | 10/02 to 12/04 |
| | *TaxPayer ID:* | *Stock Broker* | 03/99 - 02/02 |

"Single asset real estate" as defined in 11 U.S.C. § 101.

☒ NONE

Form 7 (12/03) West Group, Rochester, NY

### DECLARATION UNDER PENALTY OF PERJURY BY INDIVIDUAL DEBTOR

I declare under penalty of perjury that I have read the answers contained in the foregoing statement of financial affairs and any attachments thereto and that they are true and correct to the best of my knowledge, information, and belief.

Date __2 - 1C - 0 5__   Signature _____

ROY KEITH BLACK

Date _____   Signature _____

Penalty for making a false statement: Fine of up to $500,000 or imprisonment for up to 5 years or both, 18 U.S.C. § 152 and § 3571.

Rule 2015(b) (8/91) West Group, Rochester, NY

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF CALIFORNIA

In re    **ROY KEITH BLACK**

Case No.
Chapter 7

/ Debtor

Attorney for Debtor: **Jack I. Mann, Esq.**

## STATEMENT PURSUANT TO RULE 2016(B)

The undersigned, pursuant to Rule 2016(b), Bankruptcy Rules, states that:

1.  The undersigned is the attorney for the debtor(s) in this case.

2.  The compensation paid or agreed to be paid by the debtor(s), to the undersigned is:
    a)  For legal services rendered or to be rendered in contemplation of and in
        connection with this case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $_____1,000.00_____
    b)  Prior to the filing of this statement, debtor(s) have paid . . . . . . . . . . . . . . $_____1,000.00_____
    c)  The unpaid balance due and payable is . . . . . . . . . . . . . . . . . . . . . . . . $_____0.00_____

3.  $_____209.00_____ of the filing fee in this case has been paid.

4.  The Services rendered or to be rendered include the following:
    a)  Analysis of the financial situation, and rendering advice and assistance to the debtor(s) in determining whether to
        file a petition under title 11 of the United States Code.
    b)  Preparation and filing of the petition, schedules, statement of financial affairs and other documents required by the
        court.
    c)  Representation of the debtor(s) at the meeting of creditors.

5.  The source of payments made by the debtor(s) to the undersigned was from earnings, wages and compensation for
    services performed, and
    **Paid by Daughter**

6.  The source of payments to be made by the debtor(s) to the undersigned for the unpaid balance remaining, if any, will
    be from earnings, wages and compensation for services performed, and
    **None other**

7.  The undersigned has received no transfer, assignment or pledge of property from debtor(s) except the following for
    the value stated:
    **None**

8.  The undersigned has not shared or agreed to share with any other entity, other than with members of undersigned's
    law firm, any compensation paid or to be paid except as follows:
    **None**

Dated:                                Respectfully submitted,

                                      X _____
Attorney for Petitioner: **Jack I. Mann, Esq.**
                         **Law Offices of Jack I. Mann**
                         **1901 First Avenue, Suite 405**
                         **San Diego CA   92101**

Exhibit 3
Page 42

FORM B8 (12/03) West Group, Rochester, NY

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF CALIFORNIA

In re *ROY KEITH BLACK*

Case No. _____
Chapter  7

_____ / Debtor

## CHAPTER 7 INDIVIDUAL DEBTOR'S STATEMENT OF INTENTION

1. I have filed a schedule of assets and liabilities which includes consumer debts secured by property of the estate.

2. I intend to do the following with respect to the property of the estate which secures those consumer debts:

a. **Property to Be Surrendered.**

| Description of Property | Creditor's Name |
|---|---|
| *None* | |

b. **Property to Be Retained.** [Check any applicable statement.]

| Description of Property | Creditor's Name | Property is claimed as exempt | Property will be redeemed pursuant to 11 U.S.C. § 722 | Debt will be reaffirmed pursuant to 11 U.S.C. § 524(d) |
|---|---|---|---|---|
| *2002 Jaguar X-Type* | *Jaguar Credit* | X | | X |

**Signature of Debtor(s)**

Date: 3 - 16 - 05          Debtor: _____

Date: _____          Joint Debtor: _____

Page __1__ of __1__

Exhibit 3
Page 43

Jack I. Mann, Esq.
Law Offices of Jack I. Mann
1301 First Avenue, Suite 405
San Diego, CA  92101
619-238-5500
062001

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF CALIFORNIA

In re *ROY KEITH BLACK*

Case No.
Chapter  7

_____ / Debtor

Attorney for Debtor: *Jack I. Mann, Esq.*

## VERIFICATION OF CREDITOR MATRIX

**Part I**  (check and complete one):

☒  New petition filed. Creditor diskette required.

☐  Conversion filed on: _____

    ☐  Former Chapter 13 converting.  Creditor diskette required

    ☐  Post-petition creditors added.  Scannable matrix required.

    ☐  There are no post-petition creditors.  No matrix required.

☐  Amendment or Balance of Schedules filed concurrently with this original scanable matrix affecting Schedule of Debts and/or Schedule of Equity Security Holders.

    ☐  Names and addresses are being ADDED.

    ☐  Names and addresses are being DELETED.

    ☐  Names and addresses are being CORRECTED.

TOTAL NO. OF CREDITORS _9_

TOTAL NO. OF CREDITORS _____

**Part II**  (check one):

☒  The above-named Debtor(s) hereby verifies that the attached list of creditors is true and correct to the best of my (our) knowledge.

☐  The above-named Debtor(s) hereby verifies that there are no post-petition creditors affected by the filing of the conversion of this case and that the filing of a matrix is not required.

Date:  _2-16-05_

Debtor: _____

Exhibit 3
Page 44

American Express
P.O. Box 360002
Ft Lauderdale, FL  33336


California Bank & Trust
c/o Martin D. Goodman
456 Montgomery Street, Suite 1
San Francisco, CA  94104


Chase Manhattan Bank USA, N.A.
P.O. Box 52195
Phoenix, AZ  85072


Electrolux Financial Corp
Dept D754
Columbus, OH  43271


First National Bank
5900 La Place court, Suite 200
Carlsbad, CA  92008


Fujitsu General America
353 Rte 46W
Fairfield, NJ  07004


Jaguar Credit
P,O. Box 55000
Detroit, MI  48255


Seltzer, Caplan, McMahan, etc.
c/o Miles Grant, Esq.
1331 India Street
San Diego, CA  92101

Exhibit 3
Page 45

# EXHIBIT 4



**Financial Group®**

Please check appropriate underwriting company:
☒ Jefferson-Pilot Life Insurance Company, PO Box 21008, Greensboro, NC 27420-1008
☐ Jefferson Pilot Financial Insurance Company, PO Box 515, Concord, NH 03302-0515

## AMENDMENT TO APPLICATION FOR INSURANCE

Policy No. JF5567566

The undersigned hereby amends his or her application for insurance dated 12/21/2006 on the life of
Roy Keith Black.

We are authorized to make the following alterations in or additions to the application and to issue a policy as may be necessary to conform to said application as modified herein. I hereby accept the policy as issued.

Question 38: The primary beneficiary is the Black Irrevocable Trust;
Question 54: My Annual Unearned Income is $4,700.00;
Question 60: No, I do not have any applications pending with any other life insurance company;

Question 63c: No, I have not been involved in any discussion about the possible sale or assignment of this policy to a life settlement, viatical or other secondary market provider;
Question 64c: No, in the past two years, I have not sold a policy to a life settlement, viatical or other secondary market provider;

This policy is issued in a Rated class with the cost of insurance rates increased accordingly;

The undersigned hereby makes the same representations, statements, answers and agreements to Jefferson-Pilot Life Insurance Company as were made to AXA Equitable Life Insurance Company on the Application Part 2 dated November 17, 2006, a copy of which is attached to and made part of this policy;

Neither I nor any person or entity on my behalf are receiving any compensation for the issuance of this contract, whether payable currently or in the future. The prohibited compensation may be in the form of cash, property, or a percentage of the death benefit;
In the event of my death, my designated beneficiary receives the net amount payable under the policy;
I am purchasing insurance for my benefit and the benefit of my personal beneficiaries;
The premiums illustrated to be paid in the first two years are not being advanced, loaned or financed by a third party;
I have not been involved in any discussion about the possible sale or assignment of this policy as an inducement to purchase the life insurance policy for sale at a later date;
I have not been involved in any discussion about the possible sale of a beneficial interest in a trust, LLC, or other entity created, or to be created, on my behalf.

Dated in _____California_____ , this __2__ day of ___February___ ___2007___
　　　　　　　　(state)　　　　　　　　　　　　　　　(month)　　　　　　(year)

_____
**Signature of Proposed Insured**
(Parent or Guardian if under 14 years of age)

_____
**Signature of Proposed Insured**
(Parent or Guardian if under 14 years of age)

_____
**Signature of Owner (If other than Proposed Insured)**

_____
**Signature of Owner (If other than Proposed Insured)**

_____
**Signature of Witness**

_____
**Signature of Spouse (If coverage applied for)**

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
BJF-01003

Page 1 of 1
1/07

Exhibit 4
Page 46

# EXHIBIT 5

## Jefferson-Pilot
## Life Insurance Company

(the "Company")

Service Office: 100 North Greene Street
P.O. Box 21008
Greensboro, North Carolina 27420

A Stock Company

This policy is a legal contract between You and Us. It is important that You read Your contract carefully.

We will pay the proceeds of this policy to the beneficiary upon receipt of due proof that the death of the Insured occurred while this policy was in force. This payment and all other rights, options and benefits will be subject to the terms of this policy.

**Right to Cancel Policy** . Within 20 days after You receive this policy, You may have it cancelled by returning it to Us, to the agent from whom You bought it, or to any of Our agents. The return of this policy will void it from the beginning and We will refund any premiums paid.

*Dennis R Glass    Robert A Reed*

Chief Executive Officer              Secretary

| Table of Contents | Page No. |
|---|---|
| Benefits and Premiums | 3 |
| Coverage Protection Guarantee Provisions | 11 |
| Definitions | 5 |
| General Provisions | 6 |
| Insurance Coverage Provisions | 8 |
|   Death Benefit | |
|   Death Benefit Qualification Test | |
|   Death Benefit Options | |
|   Continuation of Policy After Age 100 | |
| Nonforfeiture Provisions | 9 |
|   Surrender and Surrender Value | |
|   Partial Surrender | |
| Owner and Beneficiary | 5 |
| Policy Loans | 12 |
| Policy Specifications | 3 |
| Premium Provisions | 7 |
|   Grace Period | |
|   Reinstatement | |
| Settlement Options | 12 |
| Summary of Policy Features | 2 |
| Table of Maximum Insurance Rates | 13 |

Riders providing supplemental benefits or policy changes, if any, and a copy of the application follow Page 14.

Insured:    ROY KEITH BLACK

Policy Number:    JF5567566

**FLEXIBLE PREMIUM ADJUSTABLE LIFE INSURANCE POLICY**
**Proceeds payable at death. Adjustable Death Benefit. Flexible premiums payable to Insured's Attained Age 100. Policy values may increase or decrease as determined by declared interest and risk rates. Non-participating – No Dividends.**

Form UL 5023

Exhibit 5
Page 47

(This Page Left Blank Intentionally)

Exhibit 5
Page 48

## Summary of Policy Features

This Summary is an overview of the important features and operations of Your policy. It is meant to give You a basic understanding of Your policy. Specific details regarding these features are only provided in the policy provisions and cannot be fully described in a summary. **This summary is not a substitute for reading the entire policy carefully.**

**Flexible Premium Adjustable Life Insurance** – This title is Our generic name for universal life insurance. "Flexible premium" means that You may pay premiums by any method agreeable with Us, at any time prior to the Insured's Attained Age 100 and in any amount subject to certain limitations. "Adjustable life insurance" means that You, with Our agreement, can change the death benefit to meet Your changing needs.

**Policy Value** – The Policy Value is a key component of Your policy. It's where Your premiums go and where We assess Our charges for providing coverage. We apply a charge to each premium You pay, then add the balance to the Policy Value. We deduct the cost of providing the coverage (the cost of insurance) plus the cost of any additional benefits and/or riders and administrative expense charges from this value each month as a "monthly deduction". We then credit interest to the difference.

Simply put - premium and interest additions increase the Policy Value, Our charges decrease the Policy Value. If additions exceed deductions, Your Policy Value increases; if deductions exceed additions, Your Policy Value decreases. If the Policy Value, less surrender charge, less Debt (Cash Surrender Value) becomes so small that We cannot take an entire monthly deduction, Your policy may terminate; see, however, the Coverage Protection Guarantee and the Coverage Protection Guarantee Period policy provisions and the provisions describing the Grace Period.

**Coverage Protection Guarantee** – Your policy provides an important Coverage Protection Guarantee which can ensure that Your coverage will continue during the Coverage Protection Guarantee Period even if Your Cash Surrender Values are insufficient to cover the monthly deductions.

How does the Coverage Protection Guarantee work? The guarantee references an "alternate" policy value calculated in a similar manner as the actual Policy Value but utilizing different charges (cost of insurance, cost of additional benefits and/or riders, administrative expense charges) and interest rates. All charges used in this alternate policy value calculation are guaranteed not to increase and all interest rates used in this alternate policy value calculation are guaranteed not to decrease. The alternate policy value is not used in determining the actual Policy Value, it is simply a reference value used to determine whether the Coverage Protection Guarantee is in effect.

Note that the length of time the Coverage Protection Guarantee can continue Your policy in force during the Coverage Protection Guarantee Period may vary based upon the following factors:

- changes in premium frequency, timing or amount;

- policy changes such as loans, partial surrenders, changes in the death benefit and addition of riders.

In addition, if You have allowed the policy to lapse longer than 90 days, the guarantee is permanently lost. In no event will the Coverage Protection Guarantee extend beyond the Coverage Protection Guarantee Period. We will provide You with an annual notification of the status of Your Coverage Protection Guarantee during the Coverage Protection Guarantee Period, which You should review carefully.

**Variables** - Many variables affect Your policy's performance. The better You understand these variables, the better You will be able to monitor Your policy's performance and take advantage of its flexibility:

- **Credited Interest Rates.** Interest is the most volatile component of Your policy. Do not assume that interest rates will remain constant for any extended period of time. We can change interest rates at any time based on certain contractually identified factors subject to a minimum rate.

- **Monthly Cost of Insurance Charges** These charges are assessed against Your Policy Value to cover the company's cost of insurance and other expenses. These charges will be detailed in Your annual statement of account. We can change these charges based on certain contractually identified factors subject to the maximum guaranteed factors shown in Your policy.

**Premium Payments.** Payment of premiums, even planned premiums, may not result in Policy Value performance as originally expected. Premium payments are only one variable affecting the performance of Your Policy Value. Your policy could perform better or worse than expected due to the effect of changes in interest rates, monthly cost of insurance charges, as well as the timing, amount and frequency of Your premium payments. Obviously, if You choose to pay lower premiums or skip premium payments, such actions will have the impact of slowing Your Policy Value growth and increasing the potential that Your policy will lapse.

**Monitoring Your Policy's Performance** - We will send You an annual Statement of Account to help You monitor Your policy's performance and compare it to Your objectives when You purchased Your policy. Begin by verifying that Your planned premiums will accomplish

Exhibit 5
Page 49
Policy Number   JF05075033

## Summary of Policy Features (Cont'd)

Your insurance objective. Ask Your life insurance agent to explain anything You do not understand. You may need to adjust Your premiums to achieve Your insurance objectives. You may request a projection of future death benefits and Policy Values from Us at any time. We are also available to answer Your questions and assist You in making changes to Your policy.

Exhibit 5
Page 50

SCHEDULE OF BENEFITS AND PREMIUMS - POLICY NUMBER    JF-5567566

| FORM NUMBER | BENEFIT | | ISSUE DATE | MONTHLY DEDUCTION | RATE CLASS | YEARS PAYABLE |
|---|---|---|---|---|---|---|
| UL5023 | INITIAL SPECIFIED AMOUNT | 3,000,000 | JAN 28, 2007 | SEE PAGE 9 | RATED* NON- TOBACCO USER | 1 |

```
*  THE GUARANTEED MAXIMUM COST OF INSURANCE RATES SHOWN ON PAGE 13 SHOULD BE
   MULTIPLIED BY 3.50 FOR 20 YEARS.  THEREAFTER STANDARD RATES WILL BE USED.
```

POLICY SPECIFICATIONS
---------------------

NOTE:    THIS POLICY PROVIDES LIFE INSURANCE COVERAGE TO THE DEATH OF THE
         INSURED IF SUFFICIENT PREMIUMS ARE PAID. THE DURATION OF COVERAGE WILL
         DEPEND ON THE AMOUNT, TIMING AND FREQUENCY OF PREMIUM PAYMENTS,
         INTEREST CREDITED. COST OF INSURANCE, ANY LOANS OR WITHDRAWALS AND
         THE COST OF ADDITIONAL BENEFITS. THE PLANNED PREMIUM MAY NEED TO BE
         INCREASED TO KEEP THIS POLICY AND THE COVERAGE IN FORCE.

OWNER                    BLACK IRREVOCABLE TRUST

BENEFICIARY              AS STATED IN THE APPLICATION UNLESS LATER CHANGED

INSURED    ROY KEITH BLACK

POLICY NUMBER    JF-5567566                  POLICY DATE    JAN 28, 2007

AGE AND SEX    79 MALE

SPECIFIED AMOUNT        $3,000,000

DEATH BENEFIT OPTION I

PLAN OF INSURANCE    FLEXIBLE PREMIUM
                     ADJUSTABLE LIFE

F5123-A.1                        PAGE 3

Exhibit 5
Page 51

INSURED    ROY KEITH BLACK

POLICY NUMBER    JF-5567566

FORM NUMBER    UL5023

PLANNED PREMIUM        $497,100.00    ANNUAL

MINIMUM SPECIFIED AMOUNT        $100,000.00

FACTORS USED IN THE CALCULATION OF POLICY VALUES:

LOAD BASIS AMOUNT        $263,220.00

MONTHLY ADMINISTRATIVE CHARGES:

1.    $14.00 FOR POLICY MONTHS 1-12
      $4.00 FOR POLICY MONTHS 13 AND LATER.

2.    2.0% OF THE LOAD BASIS AMOUNT FOR POLICY MONTHS 1-24 AND IN MONTHS 1-24
      FOLLOWING THE EFFECTIVE DATE OF AN INCREASE IN SPECIFIED AMOUNT: AND
      1.0% OF THE LOAD BASIS AMOUNT FOR POLICY MONTHS 25-60 AND IN MONTHS
      25-60 FOLLOWING THE EFFECTIVE DATE OF AN INCREASE IN SPECIFIED AMOUNT.

      THE LOAD BASIS AMOUNT SHOWN ABOVE IS BASED ON THE INITIAL SPECIFIED
      AMOUNT. THE REVISED LOAD BASIS AMOUNT APPLICABLE TO AN INCREASE WILL BE
      SHOWN ON A SUPPLEMENTAL POLICY SPECIFICATIONS PAGE. A DECREASE IN
      SPECIFIED AMOUNT WILL HAVE NO EFFECT ON THIS ADMINISTRATIVE CHARGE.

3.    ADMINISTRATIVE CHARGE PER $1,000 OF SPECIFIED AMOUNT
      $0.06 FOR POLICY MONTHS 1-12.

GUARANTEED NET PREMIUM FACTOR:
      92% OF GROSS PREMIUM PAID IN ALL POLICY YEARS.

BASIS OF CALCULATION OF POLICY VALUES:
THE INTEREST RATE USED TO CALCULATE MINIMUM CASH SURRENDER VALUES IS 3.00%.
THE GUARANTEED MAXIMUM COST OF INSURANCE RATES ARE AS SHOWN ON PAGE 13.
FACTORS USED IN THE CALCULATION OF THE MINIMUM GUARANTEED CASH SURRENDER
VALUES MEET THE STATUTORY REQUIREMENTS OF THE 2001 CSO MALE OR FEMALE
NONSMOKER OR SMOKER MORTALITY TABLE.

PLAN OF INSURANCE    FLEXIBLE PREMIUM
                     ADJUSTABLE LIFE

**INSURED    ROY KEITH BLACK**

**POLICY NUMBER    JF-5567566**

**FORM NUMBER        UL5023**

**TABLE OF SURRENDER CHARGES PER $1,000 OF INITIAL SPECIFIED AMOUNT**

| POLICY MONTH | SURRENDER CHARGE |
|---|---|
| 1- 12 | 25.04 |
| 13- 24 | 23.71 |
| 25- 36 | 22.43 |
| 37- 48 | 21.20 |
| 49- 60 | 20.01 |
| 61- 72 | 18.86 |
| 73- 84 | 17.76 |
| 85- 96 | 16.71 |
| 97-108 | 15.71 |
| 109-120 | 14.77 |
| 121-132 | 13.87 |
| 133-144 | 13.00 |
| 145-156 | 12.12 |
| 157-168 | 11.21 |
| 169-180 | 10.23 |
| 181-192 | 9.11 |
| 193-204 | 7.77 |
| 205-216 | 6.01 |
| 217-228 | 3.58 |
| 229 & OVER | 0.00 |

THE SURRENDER CHARGES ABOVE ARE BASED ON THE INITIAL SPECIFIED AMOUNT.
ADDITIONAL SURRENDER CHARGES RELATED TO ANY INCREASE IN SPECIFIED AMOUNT
WILL BEGIN FROM THE EFFECTIVE DATE OF THE INCREASE IN COVERAGE.
THESE ADDITIONAL SURRENDER CHARGES WILL BE SHOWN ON A SUPPLEMENTAL
POLICY SPECIFICATIONS PAGE.

POLICY LOAN INTEREST RATE CHARGED IN ARREARS: 5.00% PER YEAR UP TO
ATTAINED AGE 100; 3.00% AFTER ATTAINED AGE 100.

INTEREST RATE CREDITED DAILY TO POLICY VALUE HELD FOR POLICY LOAN
COLLATERAL WILL NEVER BE LESS THAN THE GUARANTEED MINIMUM EFFECTIVE
ANNUAL RATE OF 3.00% IN ALL POLICY YEARS.

PARTIAL SURRENDER MINIMUM AMOUNT: $500.00

PARTIAL SURRENDER FEE: $25.00

MAXIMUM ATTAINED AGE FOR AN INCREASE: 85

**PLAN OF INSURANCE        FLEXIBLE PREMIUM**
**ADJUSTABLE LIFE**

**F5123-A.1**                    **PAGE 4B**

Exhibit 5
Page 53

INSURED     ROY KEITH BLACK
POLICY NUMBER    JF-5567566
FORM NUMBER     UL5023

DEATH BENEFIT QUALIFICATION TEST - GUIDELINE PREMIUM TEST

## TABLE OF CORRIDOR FACTORS

| ATTAINED AGE | CORRIDOR FACTOR | ATTAINED AGE | CORRIDOR FACTOR |
|---|---|---|---|
| 15-40 | 2.50 | 60 | 1.30 |
| 41 | 2.43 | 61 | 1.28 |
| 42 | 2.36 | 62 | 1.26 |
| 43 | 2.29 | 63 | 1.24 |
| 44 | 2.22 | 64 | 1.22 |
| 45 | 2.15 | 65 | 1.20 |
| 46 | 2.09 | 66 | 1.19 |
| 47 | 2.03 | 67 | 1.18 |
| 48 | 1.97 | 68 | 1.17 |
| 49 | 1.91 | 69 | 1.16 |
| 50 | 1.85 | 70 | 1.15 |
| 51 | 1.78 | 71 | 1.13 |
| 52 | 1.71 | 72 | 1.11 |
| 53 | 1.64 | 73 | 1.09 |
| 54 | 1.57 | 74 | 1.07 |
| 55 | 1.50 | 75-90 | 1.05 |
| 56 | 1.46 | 91 | 1.04 |
| 57 | 1.42 | 92 | 1.03 |
| 58 | 1.38 | 93 | 1.02 |
| 59 | 1.34 | 94 | 1.01 |
| | | 95 AND OVER | 1.00 |

PLAN OF INSURANCE    FLEXIBLE PREMIUM
ADJUSTABLE LIFE

F5123-A.1                          PAGE 4C                          Exhibit 5
                                                                    Page 54

INSURED     ROY KEITH BLACK
POLICY NUMBER     JF-5567566
FORM NUMBER     UL5023

COVERAGE PROTECTION GUARANTEE PERIOD:     JAN 28, 2007   -   JAN 28, 2018
FACTORS USED IN THE CALCULATION OF COVERAGE PROTECTION GUARANTEE DURING
THE COVERAGE PROTECTION GUARANTEE PERIOD:

CPA I INTEREST RATE: 5.00%

CPA II INTEREST RATE: 5.00%

CPA III INTEREST RATE: 5.00%

COVERAGE PROTECTION GUARANTEE REINSTATEMENT PROVISIONS PERIOD:
WITHIN 90 DAYS AFTER THE DATE OF TERMINATION PROVIDED SUCH
REINSTATEMENT OCCURS WITHIN THE COVERAGE PROTECTION GUARANTEE PERIOD.

PLAN OF INSURANCE     FLEXIBLE PREMIUM
                      ADJUSTABLE LIFE

F5123-A.1                      PAGE 4D                      Exhibit 5
                                                           Page 55

INSURED     ROY KEITH BLACK

POLICY NUMBER     JF-5567566

FORM NUMBER     UL5023

### COVERAGE PROTECTION GUARANTEE
### COST OF INSURANCE RATES PER 1,000 OF SPECIFIED AMOUNT

| POLICY YEAR | TABLE A MONTHLY RATE | TABLE B MONTHLY RATE |
|---|---|---|
| 1 | 4.44029 | 4.44029 |
| 2 | 5.25644 | 5.25644 |
| 3 | 6.08498 | 6.08498 |
| 4 | 7.28567 | 7.28567 |
| 5 | 8.01540 | 8.01540 |
| 6 | 9.54755 | 9.54755 |
| 7 | 13.86750 | 13.86750 |
| 8 | 13.86750 | 13.86750 |
| 9 | 13.86750 | 13.86750 |
| 10 | 13.86750 | 13.86750 |
| 11 | 13.86750 | 13.86750 |

PLAN OF INSURANCE     FLEXIBLE PREMIUM ADJUSTABLE LIFE

F5123-A.1                          PAGE 4E

Exhibit 5
Page 56

INSURED    ROY KEITH BLACK

POLICY NUMBER    JF-5567566

FORM NUMBER    UL5023

COVERAGE PROTECTION GUARANTEE
TABLE OF ADMINISTRATIVE CHARGES

| POLICY YEAR | MONTHLY RATE |
|---|---|
| 1 | 28281.62 |
| 2 | 25833.16 |
| 3 | 23347.54 |
| 4 | 19746.49 |
| 5 | 17655.30 |
| 6 | 12959.85 |
| 7 | .00 |
| 8 | .00 |
| 9 | .00 |
| 10 | .00 |
| 11 | .00 |

PLAN OF INSURANCE    FLEXIBLE PREMIUM
ADJUSTABLE LIFE

F5123-A.1                    PAGE 4F                    Exhibit 5
                                                        Page 57

**(This Page Left Blank Intentionally)**

Exhibit 5
Page 58

# Definitions

Where the terms below appear in this policy, We define them as follows:

**Age**    The Insured's age, nearest birthday, on the Policy Date.

**Attained Age**    The Insured's age as measured from the Policy Date plus the number of completed policy years.

**Cash Surrender Value**    The Policy Value as of the date of surrender less the charge, if any, for full surrender, and less any Debt.

**Cash Value**    Policy Value less any surrender charge.

**Coverage Protection Guarantee**    A policy feature that provides that the policy will remain in effect during the Coverage Protection Guarantee Period subject to the requirements as stipulated in the Coverage Protection Guarantee Provisions on Page 11.

**Debt**    The principal of a policy loan together with interest due.

**Insured**    The person whose life is insured under this policy.

**Irrevocable Beneficiary**    A beneficiary, named by You as irrevocable, whose written consent is necessary for You to exercise any right specified in this policy.

**Issue Date**    The date the policy is issued at Our Service Office as stated on Page 3.

**Monthly Anniversary Day**    The same day in each month as the Policy Date.

**Nonparticipating**    No dividends will be paid on this policy.

**Notice, Election, Request**    Writings satisfactory to Us that have been received at Our Service Office. We will not be held responsible for any payment or other action We have taken before Your writings are recorded at Our Service Office.

**Policy Date**    The date We use to determine policy anniversaries and monetary values. If a requested Policy Date should fall on the 29th, 30th or 31st of a month, the Policy Date will be the 28th of such month.

**Policy Value**    As defined in the Nonforfeiture Provisions on Page 9.

**Proceeds**    The money We will pay as a death benefit or if the policy is surrendered for its Cash Surrender Value.

1.  As a Death Claim    The proceeds will be the amount of Insurance as described on page 8.

2.  Upon Surrender    The proceeds will be the Cash Surrender Value.

**Service Office**    Our principal place of business as shown on Page 1.

**"We", "Our", "Us"**    The Company.

**"You", "Your"**    The Owner of this policy.

# Owner and Beneficiary

**Owner**    The Owner is shown on page 3 or in a rider attached to this policy. While the Insured is alive, the Owner may exercise every right and option and receive every benefit provided by this policy. These rights, however, are subject to the written consent of any Irrevocable Beneficiary.

**Beneficiary**    The beneficiary is as stated in the application unless later changed.

**Change of Owner or Beneficiary**    While the Insured is alive, the Owner or beneficiary may be changed. Any change will take effect as of the date the request is signed. The Insured need not be living when the requested change is recorded at Our Service Office, however the requested change must be delivered to Us prior to the death of the Insured.

**Death of the Owner or Beneficiary**    If an Owner other than the Insured dies while the Insured is living, all rights and options of the Owner will belong to the Owner's executors or administrators or to the Owner's successor in interest (if the Owner is a non-natural person) unless otherwise provided. The interest of any beneficiary, including any Irrevocable Beneficiary, who dies before the Insured, will belong to the Owner unless otherwise provided.

Exhibit 5
Page 59

Policy Number    JF5555558    55223

## General Provisions

**The Contract** This policy is issued in consideration of the application and payment of the initial premium. This policy, the attached copy of the application and/or endorsements, and any attached supplemental applications and riders form the entire contract. All statements made by or for the Insured are, in the absence of fraud, considered to be representations and not warranties. We will not use any statement by or for the Insured to void this policy or to deny a claim unless it is contained in an application.

**Policy Changes** Only an authorized officer of the Company can change the terms or waive provisions of this policy. A change must be in writing.

**Incontestability** We will not contest this policy after it has been in force during the Insured's lifetime for 2 years from the Issue Date. An increase in the Specified Amount will not be contested after it has been in force during the Insured's lifetime for 2 years from its effective date.

**Suicide** If the Insured, while sane or insane, commits suicide within 2 years from the Issue Date, the amount payable will be no more than the sum of the premiums paid less any Debt and any partial surrenders. If the Insured, while sane or insane, commits suicide within 2 years from the effective date of an increase in the Specified Amount, the amount payable under such increase will be the sum of the monthly deductions for such increase. The amount payable under this provision will be paid to the Beneficiary. Any amount payable will first be used to pay the interest of anyone to whom the policy has been assigned.

**Assignment** Only You have the right to assign this policy. We are not bound by an assignment unless it has been recorded at Our Service Office. We are not responsible for the validity or effect of any assignment.

**Misstatement of Age or Sex** If the age or sex of the Insured has been misstated, the amount of death benefit will be adjusted to the amount which would have been provided by the most recent cost of insurance deduction at the true age and sex. The Policy Value will not be affected.

**Compliance with the Internal Revenue Code** This policy is intended to qualify as life insurance under the Internal Revenue Code. The death benefit provided by this policy is intended to qualify for the Federal income tax exclusion. If at any time the premium paid under this policy exceeds the amount allowable for such qualification, We will refund the premium to You with interest within sixty days after the end of the policy year in which the premium was received. If, for any reason, We do not refund the excess premium within sixty days after the end of such policy year, the excess premium will be held in a separate deposit fund and credited with interest until refunded to You. The interest rate used on any refund or credited to the separate deposit fund created by this provision will be the current rate of interest We are paying on this policy. We also reserve the right to refuse to make any change in the Specified Amount or the Death Benefit Option or any other change if such change would cause this policy to fail to qualify as life insurance under the Internal Revenue Code.

**Modified Endowment** This policy will be allowed to become a modified endowment contract under the Internal Revenue Code only with Your consent. Otherwise, if at any time the premiums paid under the policy exceed the limit for avoiding modified endowment contract status, the excess premium will be refunded to You with interest within sixty days after the end of the policy year in which the premium was received. If, for any reason, We do not refund the excess premium within sixty days after the end of such policy year, the excess premium will be held in a separate deposit fund and credited with interest until refunded to You. The interest rate used on any refund or credited to the separate deposit fund created by this provision will be the current rate of interest We are paying on this policy.

**Annual Report** We will provide an Annual Report to You. This report will show the activity of the policy for the past policy year. It will list premiums paid, expenses charged, monthly deductions, interest credited, and partial surrenders. It will show the then current death benefit, Policy Values and Debt, as well as any other information required by state law and regulation. By comparing the actual policy values to the projection of values received when this policy was purchased You can determine whether this policy is performing as planned.

Upon request, We will provide a projection of illustrative future death benefits and Policy Values. The first illustration in any policy year will be furnished free of charge. If You request more than one illustration in a policy year We reserve the right to apply a charge for this service.

**Settlement** Payment or settlement under this policy will be made at Our Service Office in a lump sum payment unless You elect to receive proceeds under a Settlement Option as stated in the Settlement Options provision. At the time of settlement, any Debt will be deducted. At the time of settlement, We reserve the right to require surrender of this policy.

**Deferment** We may defer making a partial surrender or policy loan up to 6 months after We receive Your request, however a partial surrender or loan for payment of premiums to Us will not be deferred.

Exhibit 5
Page 60

## Premium Provisions

**Premium Payment**  The initial premium is due on the Policy Date and is payable on or before delivery of this policy. Thereafter, premiums may be paid at any time and in any amount, subject to the following conditions, unless otherwise agreed to in writing by Us, however sufficient premium must be paid to keep this policy in force.

The amount of each premium must be at least $25.

We reserve the right to limit the amount of premiums paid in accordance with the Compliance with the Internal Revenue Code and Modified Endowment provisions. We also reserve the right to require evidence of insurability satisfactory to Us for any premium payment that would result in an immediate increase in the difference between the Death Benefit and the Policy Value. If satisfactory evidence of insurability is not received, the premium or portion thereof may be returned.

Your premiums are payable in United States currency. Premium payments, after the first, can be made as follows:

1. through prearranged withdrawals by contacting the Service Office;

2. sent to any premium address designated by Us;

3. made to Our authorized agent. A receipt signed by one of Our Officers will be provided upon request.

**Grace Period**  If on a Monthly Anniversary Day the Cash Surrender Value is less than the monthly deduction due, Your policy will enter the grace period unless the Coverage Protection Guarantee is in effect during the Coverage Protection Guarantee Period. A grace period of 60 days from the date that the policy enters the grace period will be allowed for the payment of the minimum amount needed to continue the policy. If the Coverage Protection Guarantee is in effect, the grace period will not begin and this policy will not be subject to termination under this provision.

We will notify You and any assignee of the minimum amount due at least 30 days before the end of the grace period. If the amount specified is not paid within the grace period, this policy will terminate without value at the end of such period. If the Insured dies within the grace period, the amount needed to continue this policy to the end of the policy month of death will be deducted from the amount otherwise payable.

**Reinstatement**  Application to reinstate this policy may be made within 5 years after the date of termination and prior to the Insured's Attained Age 100 provided this policy has not been surrendered for its Cash Surrender Value. Limitations exist for reinstatement of the Coverage Protection Guarantee Provisions during the Coverage Protection Guarantee Period as stated in this provision. You may apply to reinstate this policy even if the Coverage Protection Guarantee Provisions can no longer be reinstated.

In addition to the application, reinstatement will require all of the following:

1. You must furnish evidence of insurability satisfactory to Us;

2. You must pay an amount that results in a Cash Surrender Value on the date of reinstatement that is sufficient to keep this policy in force for at least 2 months;

3. You must pay or reinstate any Debt.

The Cash Surrender Value on the date of reinstatement will equal:

(a) The Policy Value at the time of policy termination; plus

(b) Net Premiums credited at the time of reinstatement; less

(c) The surrender charge at the time of reinstatement; less

(d) Any Debt at the time of reinstatement.

The surrender charge will be based on the duration from the original Policy Date as though the policy had never lapsed.

Reinstatement will be effective on the date We approve the application unless another date acceptable to Us is requested. In addition to the required payment to keep the policy in force as stated in 2. above, We recommend that You resume Your modal premium payments in order to provide coverage beyond the initial period following the date of reinstatement.

We will not contest this policy for misrepresentations made in the application for reinstatement after this policy has been in force during the lifetime of the Insured for 2 years from the date of the last reinstatement.

The Coverage Protection Guarantee Provisions may be reinstated at the time of policy reinstatement if application for reinstatement is received during the Coverage Protection Guarantee Provisions Reinstatement Period as shown on page 4 and the Coverage Protection Guarantee Period is in effect. In order to reinstate the Coverage Protection Guarantee Provisions We will require payment at the time of policy reinstatement of the lesser of:

(i) the amount stipulated in 2. above; and

(ii) the amount required to reinstate the Coverage Protection Guarantee Provisions.

You will be advised at the time of reinstatement of the amount required. In order for the guarantee described in the Coverage Protection Guarantee Provisions to become effective, additional payment may be required. Your request for reinstatement of the Coverage Protection Guarantee Provisions must be received during the specified time period and while the Coverage Protection Guarantee Period is in effect.

**Premium Refund at Death**  Any premium paid after the beginning of the policy month of death will be refunded as part of the proceeds, unless You request otherwise prior to such payment.

Exhibit 5
Page 65323
Policy Number   JP68268B1

## Insurance Coverage Provisions

**Death Benefit**    The death benefit of this policy is the larger of:

(a) The death benefit under the Death Benefit Option in effect; or

(b) The Policy Value at the beginning of the policy month of death times the Corridor Factor shown in the table on page 4.

The death benefit will be reduced by any Debt on the date of death. The Policy Value at the beginning of the policy month of death used in calculating the death benefit is after subtracting all parts of the monthly deduction for the policy month except for the cost of insurance.

**Death Benefit Qualification Test**    This policy is intended to qualify as life insurance under the Internal Revenue Code. The death benefit provided by this policy is intended to qualify for the Federal income tax exclusion. Two methods of qualifying as life insurance are the Cash Value Accumulation Test and the Guideline Premium Test, as defined in Internal Revenue Code Section 7702. The Death Benefit Qualification Test for this policy is shown on page 4 and cannot be changed. Unless You elected otherwise, the Death Benefit Qualification Test is the Guideline Premium Test.

**Death Benefit Options**    There are three death benefit options as described in this provision. The death benefit option for this policy is shown on page 3.

*   **Option I**    The death benefit is the Specified Amount on the date of death.

*   **Option II**    The death benefit is the Specified Amount on the date of death plus the Policy Value at the beginning of the policy month of death.

*   **Option III**    The death benefit is the Specified Amount on the date of death plus the total of the premiums paid less the total of any partial surrenders taken to the date of death. If the total of the partial surrenders is greater than the total of premiums paid, then the death benefit will be less than the Specified Amount.

**Continuation of Policy After Age 100**    If this policy is in force at the Attained Age 100 of the Insured (but not in the grace period) the following will occur:

(a) Your policy will continue in force for the lifetime of the Insured unless You surrender this policy;

(b) the Death Benefit Option in effect may not be changed;

(c) no further premium payments may be made;

(d) no further monthly deductions will be taken;

(e) Policy loans and partial surrenders can continue to be taken. Loan rates will apply as stated on Page 4;

(f) All supplemental riders and benefits will terminate.

If this policy is in the grace period at Attained Age 100 You will need to pay the minimum amount required to remove this policy from the grace period in order to guarantee continuation of this policy beyond Attained Age 100.

**Changes in Insurance Coverage**    Upon request, the insurance coverage may be changed at any time after the first policy year as described in this provision.

*   **Increases in Specified Amount**    The Maximum Attained Age for an increase in Specified Amount is as shown on Page 4. If a change would result in an increase in the amount payable at death, such change will be subject to satisfactory evidence of insurability. The minimum amount for an increase is $1,000.

*   **Decreases in Specified Amount**    A decrease in Specified Amount may be made prior to the Attained Age 100 of the Insured. The Specified Amount may not be decreased below the minimum shown on page 4. A decrease in the Specified Amount will apply first against insurance with the most recent effective date, with the Initial Specified Amount being last to be decreased. A surrender charge will be applied as specified in the Surrender Charges provision.

*   **Changes in Death Benefit Option**    Prior to Attained Age 100 You may request a change in death benefit option to Option I or Option II. Changes to Option III are not permitted. If a change would result in an increase in the amount payable at death, such change will be subject to satisfactory evidence of insurability.

Rating class changes may occur at any time after the first policy year and prior to Attained Age 100. Changes in insurance coverage will be effective on the Monthly Anniversary Day on or next following the date of approval by Us of the request for the change, unless another date acceptable to Us is requested.

**Policy Changes and the Coverage Protection Guarantee**    Rating class changes that result in a more favorable mortality rating will require a change to Table A, B and the Table of Coverage Protection Guarantee Administrative Charges used in determining the Coverage Protection Guarantee. A new specifications page will be sent to You after such change. Decreases in Specified Amount for the policy or any attached rider and death benefit option changes will not require a change to Table A, B or the Table of Coverage Protection Guarantee Administrative Charges. A charge will be applied in determining the Coverage Protection Guarantee following an increase in Specified Amount as stipulated in the Coverage Protection Guarantee Provisions.

Exhibit 5
Page 62

## Nonforfeiture Provisions

**Policy Value**   The Policy Value on the Policy Date will be equal to all net premiums paid for this policy. The Policy Value of this policy is then determined on each Monthly Anniversary Day by accumulating with interest the Policy Value for the prior month increased by net premiums credited and decreased by monthly deductions and by the reduction in Policy Value caused by any partial surrender since the preceding Monthly Anniversary Day.

On any day other than a Monthly Anniversary Day, the Policy Value will be the Policy Value as of the preceding Monthly Anniversary Day minus both the monthly deduction for the current policy month and the reduction in Policy Value caused by any partial surrender since the preceding Monthly Anniversary Day.

In addition, if the surrender is processed as of the preceding Monthly Anniversary Day We will refund any premium received since the preceding Monthly Anniversary Day.

**Net Premium**   Each net premium will be computed by multiplying each gross premium by the guaranteed net premium factor shown on page 4.  A higher net premium factor may be applied as determined by Us.

**Interest Rate**   The interest rate used in the calculation of the Policy Value will never be less than the Interest Rate Used to Calculate Minimum Cash Surrender Values as shown on page 4. Interest in excess of the guaranteed rate may be applied as determined by Us. Such interest is referred to in this policy as excess interest. Excess interest is not guaranteed and may not be credited on any Policy Value held as security for a policy loan. Interest will begin to accumulate as of the date the Net Premium is credited.

**Monthly Deduction**   The monthly deduction for a policy month will be computed as (1) plus (2) where

(1)  is the cost of insurance and the cost of any additional   benefits provided by rider for the policy month.

(2)  is the sum of all administrative charges for the policy and any attached riders shown on page 4 as being due for the policy month.

If there is an increase in the Specified Amount, additional charges will be in effect for the increase as shown on page 4. A new specifications page will be sent to You following an increase in Specified Amount.

**Cost of Insurance**   The cost of insurance is determined on a monthly basis as the cost of insurance rate for the month multiplied by the net amount at risk for the month. The net amount at risk for the Policy Value calculation is computed as (1) minus (2) where

(1)  is the death benefit for the month before reduction for any Debt, discounted to the beginning of the month at the guaranteed interest rate.

(2)  is the Policy Value at the beginning of the month.

For months in which Death Benefit Option I is in effect, for the purpose of allocating the cost of insurance between different parts of the Specified Amount, the Policy Value will be considered as part of the initial Specified Amount. If such value exceeds the initial Specified Amount, any excess will be considered part of the earliest addition to the Specified Amount. This allocation will continue in order of all additions to the Specified Amount until all value is allocated.

**Cost of Insurance Rates**   The monthly cost of insurance rates are determined by Us. The table of guaranteed maximum rates is shown on page 13. We may use rates lower than these guaranteed maximum rates. We will never use higher rates. See the Basis of Calculation of Policy Values on Page 4.

**Continuation of Insurance**   During the Coverage Protection Guarantee Period this policy and all riders will continue in force according to the terms as long as either the Cash Surrender Value is sufficient to cover the cost of the monthly deduction or the total of the Coverage Protection Accounts equals or exceeds Debt. If neither amount is sufficient, the policy will enter the grace period. After the Coverage Protection Guarantee Period, if the Cash Surrender Value is insufficient to cover the cost of the monthly deduction the policy will enter the grace period. If premiums are discontinued on any date, the Cash Surrender Value on that date will be used to provide insurance under this provision.

**Basis of Calculation of Policy Values**   Minimum Policy Values are based on the mortality assumptions and interest rates shown on page 4. The values for this policy are at least equal to the minimum required by law. If required, a detailed statement of the method used to determine policy values and reserves has been filed with the states in which this policy is delivered.

**Changes in Rates**   At Our sole discretion, We may change the monthly cost of insurance rates or excess interest rate at any time.  We will base any change on Our future expectations as to investment earnings, mortality, persistency, expenses and taxes. We will not make any change in order to distribute past gains or recoup prior losses. Any change in the monthly cost of insurance rates will apply to all insureds with the same combination of the following: Attained Age, sex, length of time the policy has been in force and rate class. Changes in rates will affect the Policy Value. Changes in rates may also affect length of insurance coverage.

Exhibit 5
Page 63

Policy Number   JF5423

# Nonforfeiture Provisions (Continued)

**Surrender and Surrender Value**   Upon request, You may surrender this policy for its Cash Surrender Value. Surrender within 31 days after a policy anniversary date will be treated as a surrender on that date, otherwise the surrender request will be effective on the Monthly Anniversary Day nearest the date We receive Your request.

**Partial Surrender**   Upon request, You may make a partial surrender of this policy. The partial surrender may be for any amount equal to, or greater than the Partial Surrender Minimum Amount shown on page 4, not to exceed the Cash Surrender Value less $500.

When a partial surrender is made:

1. the Policy Value will be reduced by the amount of the partial surrender, plus the partial surrender fee shown on page 4;

2. the death benefit will be reduced by the amount at least equal to the reduction in Policy Value. Such a reduction may be produced without changing the Specified Amount. If not, We will reduce the Specified Amount so that the reduction in death benefit is equal to the reduction in value. If Death Benefit Option III is in effect and the total of the partial surrenders is greater than the premiums paid, then the Death Benefit will be less than the Specified Amount. A partial surrender cannot be allowed if it would reduce the Specified Amount below the minimum shown on page 4.

**Surrender Charges**   The charge for full surrender will be the amount shown on Page 4 for the number of completed policy months preceding surrender. There will be a partial charge if there is a decrease in the Specified Amount while there is a surrender charge in effect. If there is an increase in the Specified Amount, an additional surrender charge may be in effect for the increase. If there is an additional surrender charge in effect for an increase in Specified Amount, a new schedule of surrender charges will be provided after such increase.

Surrender charges are computed based on the number of thousands of Specified Amount. The partial charge for a decrease in Specified Amount will be based on the per thousand charge for the number of thousands of the decrease. A decrease in Specified Amount will apply first against insurance with the most recent effective date.

A new schedule of surrender charges will be provided after a change in such charges.

Exhibit 5
Page 64

## Coverage Protection Guarantee Provisions

**Coverage Protection Guarantee**   While the Coverage Protection Guarantee is in effect during the Coverage Protection Period, this guarantee will provide that this policy will not enter the grace period because the policy's Cash Surrender Value is insufficient to cover the current monthly deductions as defined in the policy. The Coverage Protection Guarantee is in effect if the total of the Coverage Protection Accounts (herein referred to as "CPA I", "CPA II" and "CPA III" or the "account(s)") equals or exceeds Debt during the Coverage Protection Guarantee Period as shown on Page 4. The total of the Coverage Protection Accounts is a value equal to what the Policy Value would have been if calculated using the provisions described below. The Coverage Protection Accounts are used only for determining if the Coverage Protection Guarantee is in effect and are not used in calculating the actual Policy Value provided under this policy.

**Coverage Protection Value**   On the Policy Date, the value of each of the accounts, CPA I, CPA II and CPA III, equals the premiums applied to each account. The value of each account is then determined on each Monthly Anniversary Day by accumulating with interest the value for the prior month increased by premiums credited to that account and decreased by monthly deductions charged to that account and by the reduction in value caused by any partial surrender charged to that account since the preceding Monthly Anniversary Day. The total of the Coverage Protection Accounts may become less than zero.

On any day other than a Monthly Anniversary Day, the value of the account will be the value as of the preceding Monthly Anniversary Day minus both the monthly deduction for the current policy month charged to that account and the reduction in value caused by any partial surrender charged to that account since the preceding Monthly Anniversary Day.

**Interest Rate**   The interest rates are shown for each account on Page 4.

Interest will begin to accumulate as of the date the premium is credited. We will never credit a negative amount of interest.

**Monthly Deduction**   The monthly deduction for a policy month will be computed as (1) plus (2) where

(1)   is the cost of insurance and the guaranteed maximum cost of any additional benefits provided by rider for the policy month.

(2)   is the administrative charges. The Coverage Protection Guarantee Administrative Charges on Page 4 will be used, plus the maximum guaranteed administrative charges for any attached riders shown on page 4 as being due for the policy month.

This amount will include any Coverage Protection Guarantee charge in effect for an increase. Such charge will be based upon the Attained Age, sex, class of the insured and the amount of the increase and will be shown on a supplemental specifications page that We will send to You.

**Cost of Insurance**   The cost of insurance is determined on a monthly basis as the cost of insurance rate for the month multiplied by the net amount at risk for the month.

The net amount at risk for the month is computed as (1) minus (2) where

(1)   is the death benefit for the month before reduction for any Debt, discounted to the beginning of the month at the CPA III guaranteed interest rate.

(2)   is the total of all Coverage Protection Accounts at the beginning of the month.

**Cost of Insurance Rates**   The monthly cost of insurance rates for use in the account calculations are shown in the Coverage Protection Guarantee Cost of Insurance Table A and B on Page 4. Table B will be applied if CPA III is not equal to zero otherwise Table A will be applied. The rate in the designated Table will apply to all accounts.

**Changes in Rates**   The cost of insurance rates and the interest rates described in the Coverage Protection Guarantee provisions are fixed and guaranteed and not subject to change.

**Allocation Among Accounts**   Premiums, partial surrenders and monthly deductions will be allocated among the accounts by the following rules:

• **Premiums**

a)   The initial premium is applied to CPA I.

b)   Any premiums paid in the first policy year, while the total of all accounts exceeds zero, are applied to CPA I.

c)   Any premiums paid, while the total of the accounts is equal to or less than zero, are applied to CPA III.

d)   All other premiums are applied to CPA II.

• **Partial Surrenders**

a)   Partial surrenders are first deducted from CPA I until the value of CPA I reduces to zero.

b)   The remaining partial surrenders are then deducted from CPA II until the value of CPA II reduces to zero.

c)   Any remaining partial surrenders are then deducted from CPA III.

• **Monthly Deductions**

a)   Monthly deductions are first deducted from CPA III until the value of CPA III reduces to zero.

b)   The remaining monthly deductions are then deducted from CPA II until the value of CPA II reduces to zero.

c)   The remaining monthly deductions are then deducted from CPA I until the value of CPA I reduces to zero.

d)   Any remaining Monthly Deductions are then deducted from CPA III (in addition to any deductions made to CPA III in a) above).

Exhibit 5
F5523

Policy Number   JF5565565

## Coverage Protection Guarantee Provisions (Continued)

**Disability Waiver Benefits**    If a Disability Waiver of Monthly Deduction Benefit is attached to this policy and if You qualify for a Disability Waiver Benefit, monthly deductions due for the purposes of determining if the Coverage Protection Guarantee is in effect will be waived.

If a Disability Waiver of Specified Premium Benefit is attached to this policy, any premium paid to this policy will be applied as premium for the purposes of determining if the Coverage Protection Guarantee is in effect.

## Policy Loans

**When Available**    A loan may be obtained by request when this policy has a loan value. This policy will be the sole security for the loan.

**Amount Available**    The loan value at any time is the then current Policy Value if this policy were surrendered on the date of determination.

The maximum loan at any time is the loan value at that time less:

1.    any existing loan;

2.    accrued interest on any existing loan; and

3.    interest on the total outstanding loan to the end of the policy year.

**Loan Interest**    Interest on a policy loan is due and payable on each policy anniversary. If You do not pay the interest when it is due, We will add the amount of interest to the loan. We will charge interest on this amount at the same interest being charged on the loan.

The effective annual policy loan interest rate charged is shown on Page 4. The interest rate credited daily to Policy Value held for policy loan will never be less than the guaranteed minimum effective annual rate as shown on Page 4.

You must assign this policy to Us to the extent of the outstanding loan. If the Insured dies, We will deduct the outstanding loan from the death benefit before We pay the death benefit to the beneficiary.

**Loan Repayments**    You may repay all or part of a loan at any time while this policy is in force. Each partial repayment must be at least $25.

Every payment to Us on this policy will be considered a premium payment unless clearly marked for loan repayment or for payment of loan interest.

**Maximum Loan Amount**    If the Debt at any time equals or exceeds the loan value, this policy will enter the grace period.

## Settlement Options

When the Insured dies while the policy is in force, policy proceeds may be paid in a lump sum or left with Us for payment under a settlement option that We make available.

The amount applied under an option for the benefit of any beneficiary must be at least $2,500. The amount of each payment under an option must be at least $50.

You may make, change or revoke an election at any time while the Insured is alive.    Following the death of the Insured, the beneficiary may elect an option if You have not elected one or if proceeds are payable in one sum. A beneficiary may make a change in payment under a settlement option You elect only if You provided for it in Your election.

A change of beneficiary automatically cancels a previous election of a settlement option.

If this policy is assigned, the assignee's portion of proceeds will be paid in one sum. Any balance of proceeds may be applied under a settlement option.

To the extent allowed by law, all payments under the policy will be free from creditor claims or legal process.

## Table of Guaranteed Maximum Cost of Insurance Rates - Male

See the Basis of Calculation of Policy Values on Page 4

| Attained Age | Monthly Rate Per $1,000 | |
|---|---|---|
| | *Non-Tobacco-User | Tobacco-User |
| 15 | 0.05085 | 0.05085 |
| 16 | 0.06169 | 0.06588 |
| 17 | 0.07086 | 0.08087 |
| 18 | 0.07670 | 0.09255 |
| 19 | 0.07837 | 0.10089 |
| 20 | 0.07920 | 0.10589 |
| 21 | 0.07920 | 0.11090 |
| 22 | 0.07920 | 0.11674 |
| 23 | 0.08004 | 0.12175 |
| 24 | 0.08087 | 0.12842 |
| 25 | 0.08170 | 0.13593 |
| 26 | 0.08504 | 0.14281 |
| 27 | 0.08921 | 0.15096 |
| 28 | 0.08754 | 0.15179 |
| 29 | 0.08587 | 0.15096 |
| 30 | 0.08504 | 0.15012 |
| 31 | 0.08421 | 0.15012 |
| 32 | 0.08421 | 0.15179 |
| 33 | 0.08671 | 0.15597 |
| 34 | 0.08838 | 0.16181 |
| 35 | 0.09088 | 0.16682 |
| 36 | 0.09588 | 0.17600 |
| 37 | 0.10006 | 0.18602 |
| 38 | 0.10756 | 0.20022 |
| 39 | 0.11424 | 0.21442 |
| 40 | 0.12175 | 0.23113 |
| 41 | 0.13176 | 0.25285 |
| 42 | 0.14428 | 0.27792 |
| 43 | 0.15847 | 0.30802 |
| 44 | 0.17517 | 0.34398 |
| 45 | 0.19437 | 0.38163 |
| 46 | 0.21275 | 0.41679 |
| 47 | 0.23280 | 0.45814 |
| 48 | 0.24450 | 0.47792 |
| 49 | 0.25787 | 0.50306 |
| 50 | 0.27709 | 0.53910 |
| 51 | 0.29966 | 0.58186 |
| 52 | 0.33060 | 0.64059 |
| 53 | 0.36406 | 0.70691 |
| 54 | 0.40674 | 0.79009 |
| 55 | 0.45949 | 0.88429 |
| 56 | 0.51311 | 0.98027 |
| 57 | 0.57096 | 1.08225 |
| 58 | 0.62045 | 1.16240 |
| 59 | 0.67752 | 1.25530 |
| 60 | 0.74639 | 1.36774 |
| 61 | 0.83045 | 1.50744 |
| 62 | 0.93311 | 1.67620 |
| 63 | 1.04853 | 1.86399 |
| 64 | 1.17000 | 2.05643 |
| 65 | 1.29840 | 2.24672 |
| 66 | 1.42867 | 2.43056 |
| 67 | 1.56083 | 2.60963 |
| 68 | 1.70337 | 2.79851 |
| 69 | 1.85123 | 2.98606 |
| 70 | 2.03086 | 3.21370 |
| 71 | 2.23220 | 3.46356 |
| 72 | 2.49735 | 3.80444 |
| 73 | 2.77788 | 4.14835 |
| 74 | 3.07394 | 4.49708 |
| 75 | 3.39865 | 4.90432 |
| 76 | 3.75405 | 5.33991 |
| 77 | 4.16842 | 5.84602 |
| 78 | 4.65484 | 6.43457 |
| 79 | 5.21978 | 7.10897 |
| 80 | 5.83980 | 7.83478 |
| 81 | 6.55095 | 8.65446 |
| 82 | 7.29756 | 9.48906 |
| 83 | 8.10961 | 10.37259 |
| 84 | 9.01738 | 11.34326 |
| 85 | 10.04235 | 12.49853 |
| 86 | 11.19223 | 13.78043 |
| 87 | 12.46504 | 15.17947 |
| 88 | 13.84938 | 16.67389 |
| 89 | 15.33342 | 18.24676 |
| 90 | 16.90861 | 19.88006 |
| 91 | 18.41631 | 21.37882 |
| 92 | 20.01527 | 22.93445 |
| 93 | 21.73361 | 24.57148 |
| 94 | 23.56543 | 26.30185 |
| 95 | 25.57306 | 28.25727 |
| 96 | 27.43168 | 30.02008 |
| 97 | 29.45788 | 31.91763 |
| 98 | 31.67269 | 33.96660 |
| 99 | 34.09954 | 36.18444 |

## Table of Guaranteed Maximum Cost of Insurance Rates - Female

See the Basis of Calculation of Policy Values on Page 4

| Attained Age | Monthly Rate Per $1,000 | |
|---|---|---|
| | *Non-Tobacco-User | Tobacco-User |
| 15 | 0.02917 | 0.02917 |
| 16 | 0.03251 | 0.03417 |
| 17 | 0.03417 | 0.03834 |
| 18 | 0.03501 | 0.04168 |
| 19 | 0.03751 | 0.04501 |
| 20 | 0.03751 | 0.04835 |
| 21 | 0.03834 | 0.05085 |
| 22 | 0.04001 | 0.05418 |
| 23 | 0.04001 | 0.05585 |
| 24 | 0.04168 | 0.06002 |
| 25 | 0.04168 | 0.06419 |
| 26 | 0.04418 | 0.06753 |
| 27 | 0.04751 | 0.07253 |
| 28 | 0.04835 | 0.07670 |
| 29 | 0.05168 | 0.08254 |
| 30 | 0.05335 | 0.08587 |
| 31 | 0.05668 | 0.09338 |
| 32 | 0.06002 | 0.09922 |
| 33 | 0.06336 | 0.10673 |
| 34 | 0.06836 | 0.11591 |
| 35 | 0.07420 | 0.12759 |
| 36 | 0.07920 | 0.13760 |
| 37 | 0.08587 | 0.14929 |
| 38 | 0.08921 | 0.15680 |
| 39 | 0.09422 | 0.16682 |
| 40 | 0.10006 | 0.17884 |
| 41 | 0.10589 | 0.18853 |
| 42 | 0.11257 | 0.20273 |
| 43 | 0.12091 | 0.21943 |
| 44 | 0.13093 | 0.23865 |
| 45 | 0.14281 | 0.26121 |
| 46 | 0.15597 | 0.28628 |
| 47 | 0.17266 | 0.31806 |
| 48 | 0.19103 | 0.35737 |
| 49 | 0.21108 | 0.40172 |
| 50 | 0.23447 | 0.45028 |
| 51 | 0.26037 | 0.50306 |
| 52 | 0.28963 | 0.56089 |
| 53 | 0.32140 | 0.62212 |
| 54 | 0.35486 | 0.68927 |
| 55 | 0.39084 | 0.75980 |
| 56 | 0.43265 | 0.83350 |
| 57 | 0.47625 | 0.91627 |
| 58 | 0.52317 | 0.99459 |
| 59 | 0.57012 | 1.08141 |
| 60 | 0.61877 | 1.17169 |
| 61 | 0.67164 | 1.26544 |
| 62 | 0.72859 | 1.37113 |
| 63 | 0.78925 | 1.47694 |
| 64 | 0.85400 | 1.58881 |
| 65 | 0.92553 | 1.71101 |
| 66 | 1.00470 | 1.84103 |
| 67 | 1.09153 | 1.98741 |
| 68 | 1.18857 | 2.14854 |
| 69 | 1.29502 | 2.32363 |
| 70 | 1.41259 | 2.51963 |
| 71 | 1.54811 | 2.74352 |
| 72 | 1.69997 | 2.99122 |
| 73 | 1.86484 | 3.25861 |
| 74 | 2.04621 | 3.55277 |
| 75 | 2.24758 | 3.84964 |
| 76 | 2.48909 | 4.17453 |
| 77 | 2.71347 | 4.52511 |
| 78 | 2.88433 | 4.90432 |
| 79 | 3.27761 | 5.31604 |
| 80 | 3.60652 | 5.76162 |
| 81 | 4.05506 | 6.39253 |
| 82 | 4.58366 | 7.08284 |
| 83 | 5.07336 | 7.76030 |
| 84 | 5.64004 | 8.49414 |
| 85 | 6.28261 | 9.23953 |
| 86 | 6.86953 | 9.86560 |
| 87 | 7.76030 | 10.86742 |
| 88 | 8.70032 | 11.87864 |
| 89 | 9.71331 | 12.90713 |
| 90 | 10.65716 | 13.74743 |
| 91 | 11.13848 | 13.93102 |
| 92 | 12.09273 | 14.86487 |
| 93 | 13.52742 | 15.91312 |
| 94 | 15.37195 | 17.50492 |
| 95 | 17.70248 | 19.96740 |
| 96 | 19.97365 | 22.27967 |
| 97 | 22.37368 | 24.66466 |
| 98 | 22.79151 | 24.78100 |
| 99 | 24.20411 | 25.97065 |

*Applies to Preferred Plus Rate Classes

Exhibit 5 F5633

Policy Number JF... 7

**(This Page Left Blank Intentionally)**

Exhibit 5
Page 68



**Financial Group**

Please check appropriate underwriting company:
☒ Jefferson-Pilot Life Insurance Company, PO Box 21008, Greensboro, NC 27420-1008
☐ Jefferson-Pilot Financial Insurance Company, PO Box 515, Concord, NH 03302-0515

## AMENDMENT TO APPLICATION FOR INSURANCE

Policy No. JF5567566

The undersigned hereby amends his or her application for insurance dated 12/21/2006 on the life of
Roy Keith Black.

We are authorized to make the following alterations in or additions to the application and to issue a policy as may be necessary to conform to said application as modified herein. I hereby accept the policy as issued.

Question 38: The primary beneficiary is the Black Irrevocable Trust;
Question 54: My Annual Unearned Income is $4,700.00;
Question 60: No, I do not have any applications pending with any other life insurance company;

Question 63c: No, I have not been involved in any discussion about the possible sale or assignment of this policy to a life settlement, viatical or other secondary market provider;
Question 64c: No, In the past two years, I have not sold a policy to a life settlement, viatical or other secondary market provider;

This policy is issued in a Rated class with the cost of insurance rates increased accordingly;

The undersigned hereby makes the same representations, statements, answers and agreements to Jefferson-Pilot Life Insurance Company as were made to AXA Equitable Life Insurance Company on the Application Part 2 dated November 17, 2006, a copy of which is attached to and made part of this policy;

Neither I nor any person or entity on my behalf are receiving any compensation for the issuance of this contract, whether payable currently or in the future. The prohibited compensation may be in the form of cash, property, or a percentage of the death benefit;
In the event of my death, my designated beneficiary receives the net amount payable under the policy;
I am purchasing insurance for my benefit and the benefit of my personal beneficiaries;
The premiums illustrated to be paid in the first two years are not being advanced, loaned or financed by a third party;
I have not been involved in any discussion about the possible sale or assignment of this policy as an inducement to purchase the life insurance policy for sale at a later date;
I have not been involved in any discussion about the possible sale of a beneficial interest in a trust, LLC, or other entity created, or to be created, on my behalf.

Dated in _____California_____ , this __2__ day of __February__ __2007__
                    (state)                                    (month)        (year)

_____                    _____
Signature of Proposed Insured                      Signature of Proposed Insured
(Parent or Guardian if under 14 years of age)      (Parent or Guardian if under 14 years of age)

_____                    _____
Signature of Owner (If other than Proposed Insured)  Signature of Owner (If other than Proposed Insured)

_____                    _____
Signature of Witness                               Signature of Spouse (If coverage applied for)

Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
BJF-01003

Page 1 of 1
1/07

Exhibit 5
Page 69

Supplemental Text to Section XI "Service Office Endorsements" on Page 5 of the Application for Life Insurance on Roy Keith Black dated 12/21/2006.

Question 33:  Owner is the Black Irrevocable Trust;

Question 36:  Relationship of owner is trust;

Question 40:  Relationship of the Black Irrevocable Trust is trust;

Question 62:  No Life insurance in force.

**JEFFERSON PILOT FINANCIAL**

Please check appropriate underwriting company:
☐ Jefferson Pilot Life Insurance Company, Service Office: PO Box 21008, Greensboro, NC 27420-2008
☐ Jefferson Pilot Financial Insurance Company, Service Office: PO Box 515, Concord, NH 03302-0515
(hereinafter referred to as "the Company")

## APPLICATION FOR LIFE INSURANCE — PART I

**I. PROPOSED INSURED**

| 1. Name of Proposed Insured  ☐ Male  ☐ Female (First, Middle, Last) | | 2. Date of Birth (mm/dd/yy) | 3. Place of Birth  4. |
|---|---|---|---|

| 5. | | | 7. Years At This Address |
|---|---|---|---|

| 8. Employer | 9. Business Address (Street, City, State, Zip Code) | |
|---|---|---|

| 10. Occupation/Duties | | 12. Business Telephone | 13. Citizen of (Country) |
|---|---|---|---|

**II. PROPOSED ADDITIONAL INSURED** – Complete for Survivorship Life Policy or Term Rider on Spouse/Other Insured for Individual Life Policy.

| 14. Name of Proposed Insured  ☐ Male  ☐ Female (First, Middle, Last) | 15. Date of Birth (mm/dd/yy) | 16. Place of Birth (State/Country) | 17. Social Security Number |
|---|---|---|---|
| | | | 18. Driver License # & State |

| 19. Home Address (Street, City, State, Zip Code) | | 20. Years At This Address |
|---|---|---|

| 21. Employer | 22. Business Address (Street, City, State, Zip Code) | |
|---|---|---|

| 23. Occupation/Duties | 24. Home Telephone | 25. Business Telephone | 26. Citizen of (Country) |
|---|---|---|---|

**III. COVERAGE INFORMATION**

27. Plan of Insurance (If Ensemble**, also complete Question 32)  28. Amount of Insurance $

29. (i) Death Benefit Option   ☐ Level   ☐ Increasing   ☐ Specified Amount plus premiums less withdrawals
(ii) Death Benefit Qualification Test - For IRS purposes, premiums will be tested using the Guideline Premium Test unless
☐ Cash Value Accumulation Test is checked (not available on all products). Cannot be changed after issue.

30. Additional   ☐ Waiver of Premium
Benefits*   ☐ Accidental Death Benefit $ _____   ☐ Term on Spouse/Other Insured Rider $ _____
☐ Guaranteed Insurability $ _____   ☐ Children's Rider $ _____ / Units
☐ Waiver of Specified Premium $ _____   (Complete Child's Supplement)
☐ Accelerated Benefit Rider   ☐ Other _____
☐ Supplemental Coverage /   ☐ Other _____
Additional Specified Amount Rider   ☐ Other _____

31. Automatic Premium Loan   ☐ Yes  ☐ No   (This question applies to Whole Life Nonpar products only.)

32. Complete only if applying for Variable Life Insurance with Jefferson Pilot Financial Insurance Company:
Submit Premium Allocation and Disclosure Form for Variable Universal Life with Application.
(i) Monthly insurance and administrative charges will be deducted from the General Account and divisions of the Separate Account on a pro-rata basis unless the box is checked below (not available on all VUL products):
☐ Deduct all charges from the _____ division (any single division or the General Account may be noted).

Exhibit 5
Page 71

### III. Suitability

|  | Yes | No |
|---|---|---|
| 1. Have you, the Proposed Insured(s) and the Owner, if other than the Proposed Insured(s), received a current Prospectus dated _____ for the policy applied for and have you had sufficient time to review it? | ☐ | ☐ |
| 2. Do you understand that the amount and duration of the death benefit may increase or decrease depending on the investment performance of funds in the Separate Account? | ☐ | ☐ |
| 3. Do you understand that the cash values may increase or decrease depending on the investment performance of the funds held in the Separate Account? | ☐ | ☐ |
| 4. With this in mind, do you believe that the policy applied for is in accord with your insurance objective and your anticipated financial needs? | ☐ | ☐ |

**CASH VALUES MAY INCREASE OR DECREASE IN ACCORDANCE WITH THE EXPERIENCE OF THE SEPARATE ACCOUNT. THE DEATH BENEFIT MAY BE VARIABLE OR FIXED UNDER SPECIFIED CONDITIONS.**

### IV. OWNER INFORMATION (Complete if Different from Proposed Insured(s))

33. Owner Name (First, Middle, Last) _____        Ii) Citizen of (Country?) _____

34. Owner Address _____

35. _____     36. Relationship to Proposed Insured(s) _____     37. Trust Date (only if Trust is Owner) _____

### V. BENEFICIARY DESIGNATION

| 38. Primary Beneficiary(ies) | 39. Social Security or Tax ID #: | 40. Relationship(s) to Proposed Insured(s): |
|---|---|---|
|  |  |  |

| 41. Contingent Beneficiary(ies) | 42. Social Security or Tax ID #: | 43. Relationship(s) to Proposed Insured(s) |
|---|---|---|
|  |  |  |

| 44. Beneficiary for Spouse/Other Insured Term Rider | 45. Relationship to Spouse/Other Insured |
|---|---|
|  |  |

45. Social Security or Tax ID #: _____

### VI. BILLING INSTRUCTIONS

47. Payment with Application $ _____     Was the Conditional Receipt Given?  ☐ Yes  ☐ No

48. Planned Premium $ _____     49. Lump Sum $ _____     ☐ 1035 Exchange

50. Premiums to be Paid:  ☐ Annually  ☐ Semi-Annually  ☐ Quarterly  ☐ Monthly  ☐ List Bill $ _____
☐ DRAFT/PAC  ☐ PDP (Complete Authorization)  ☐ Other _____

51. Premium Bill to be Sent to:  ☐ Proposed Insured at:  ☐ Other (*Care Of* Name and Mailing Address)
☐ Home Address
☐ Business Address @ _____
☐ Proposed Additional Insured at:  ☐ Other (*Care Of* Name and Mailing Address)
☐ Home Address
☐ Business Address @ _____
☒ Owner at address listed in #34

52. Special Instructions: _____

Exhibit 5
Page 72

Complete each question for the Proposed Insured and any Additional Insured.

| VII. PERSONAL FINANCE | Proposed Insured | Additional Insured |
|---|---|---|
| 53. Annual Earned Income | a) $ | b) $ |
| 54. Annual Unearned Income (if none, please indicate $0) | a) $ | b) $ |
| 55. Total Assets | a) $ | b) $ |
| 56. Total Liabilities | a) $ | b) $ |
| 57. Net Worth | a) $ | b) $ |
| 58. In the last 5 years have you filed for bankruptcy? If "Yes", COMPLETE the Financial Supplement. | a) ☐ Yes ☐ No | b) ☐ Yes ☐ No |

| VIII. LIFE INSURANCE IN FORCE | | |
|---|---|---|
| 59. Have you ever applied for life, health or disability insurance and been declined, postponed or charged an increased premium? | a) ☐ Yes ☐ No | b) ☐ Yes ☐ No |
| 60. Do you have any applications pending with any other life insurance company now? | a) ☐ Yes ☐ No | b) ☐ Yes ☐ No |

If answered "Yes" to question 59-60, please give details here for each Proposed Insured.

Proposed Insured:

Additional Insured:

61. i) Are you considering stopping premium payments, surrendering, replacing, forfeiting, assigning to the insurer or reducing your benefits under an existing policy or contract? ☐ Yes ☐ No
ii) Are you considering using or borrowing funds from your existing policies or contracts to pay premiums due on the new or applied for policy? ☐ Yes ☐ No

If yes to either question, please complete and sign all required replacement forms and complete Question 62.

62. List all insurance in force on any Proposed Insured. If none, check the box. ☐

| Insured's Name & Company | Face Amount | Policy Number | Issue Year | Replacement or Change of Policy? | Check here if 1035 Exchange |
|---|---|---|---|---|---|
| | $ | | | ☐ Yes ☐ No | ☐ |
| | $ | | | ☐ Yes ☐ No | ☐ |
| | $ | | | ☐ Yes ☐ No | ☐ |
| | $ | | | ☐ Yes ☐ No | ☐ |

| Complete each question for the Proposed Owner, the Proposed Insured (if other than Owner) and any Additional Insured. | Proposed Insured, if other than Owner | Additional Insured | Proposed Owner |
|---|---|---|---|
| 63. Have you been involved in any discussion about the possible sale or assignment of this policy to a life settlement, viatical or other secondary market provider? | a) ☐ Yes ☐ No | b) ☐ Yes ☐ No | c) ☐ Yes ☐ No |
| 64. Have you in the past two years sold a policy to a life settlement, viatical or other secondary market provider? | a) ☐ Yes ☐ No | b) ☐ Yes ☐ No | c) ☐ Yes ☐ No |

If answered "YES" to any part of question 63 or 64, please give details for each "YES" answer.

BJF01T34-2 (2/05)

Page 3 of 10
3/05

Exhibit 5
Page 75

| IX. GENERAL RISK INFORMATION | Proposed Insured | Additional Insured |
|---|---|---|
| 65. In the past 3 years, have you smoked a cigarette, cigar or pipe, chewed tobacco or used tobacco or nicotine in any form? | a) ☐ Yes ☐ No | b) ☐ Yes ☐ No |
| If "Yes", last used (form) | | |
| Month, Year | | |
| 66. Do you plan to travel or reside outside the US or Canada within the next 12 months? | a) ☐ Yes ☐ No | b) ☐ Yes ☐ No |
| 67. Are you a member of, or applied to be a member of, or received a notice of required service in, the armed forces, reserves or National Guard? | a) ☐ Yes ☐ No | b) ☐ Yes ☐ No |
| If "Yes", please list branch of service, rank, duties, mobilization category and current duty station. | | |
| 68. In the past 3 years, have you engaged in, or in the future do you plan to engage in flying in non-commercial aircraft, racing of any kind, skin or scuba diving, parachuting or sky diving, hang gliding, mountain, rock or technical climbing? | a) ☐ Yes ☐ No | b) ☐ Yes ☐ No |
| If "Yes", complete Aviation/Avocation Supplement? | | |
| 69. Have you ever been convicted of a felony or misdemeanor (except for a minor traffic violation)? | a) ☐ Yes ☐ No | b) ☐ Yes ☐ No |
| 70. In the past 5 years, have you been convicted of (i) two or more moving violations, (ii) driving under the influence of alcohol or other drugs, or (iii) had your driver's license suspended or revoked? | a) ☐ Yes ☐ No | b) ☐ Yes ☐ No |
| 71. Have you ever been diagnosed by or received treatment from a medical professional for Acquired Immunodeficiency Syndrome (AIDS)? | a) ☐ Yes ☐ No | b) ☐ Yes ☐ No |

If answered "Yes" to questions 65-71, please give details here for each Proposed Insured:
Proposed Insured:

Additional Insured:

## X. MEDICAL INFORMATION

Proposed Insured:

72.

b. Date and reason last consulted?

c. Treatment or medication prescribed?

73. Height _____ ft. _____ in.  Weight _____ lbs.

a. Has your weight changed by more than 10 pounds during the past 12 months? ☐ Yes ☐ No

b. If "Yes" by how many pounds? _____ ☐ Gain ☐ Loss

Additional Insured:

74. Name/address/phone number of your personal physician and/or health care facility (If none, indicate "None.")

a. Date and reason last consulted?

b. Treatment or medication prescribed?

75. Height _____ ft. _____ in.  Weight _____ lbs.

a. Has your weight changed by more than 10 pounds during the past 12 months? ☐ Yes ☐ No

b. If "Yes" by how many pounds? _____ ☐ Gain ☐ Loss

Medical Information questions continue on next page.

## X.  MEDICAL INFORMATION

**75.** Have you ever had, or been told by a medical professional to seek treatment because of, any of the following:

|  | | Proposed Insured | Additional Insured |
|---|---|---|---|
| i. | Chest pain, high blood pressure, heart attack, heart murmur, disease of the heart or blood vessels? | a) ☐ Yes ☐ No | b) ☐ Yes ☐ No |
| ii. | Cancer, tumor, leukemia, blood disorder (excluding HIV status), melanoma or lymphoma? | a) | b) ☐ Yes ☐ No |
| iii. | Diabetes or high blood sugar? | a) | b) ☐ Yes ☐ No |
| iv. | Shortness of breath, asthma, sleep apnea, emphysema, tuberculosis, or other lung disease? | a) | b) ☐ Yes ☐ No |
| v. | Disease of the nervous system, stroke, seizure, paralysis? | a) | b) ☐ Yes ☐ No |
| vi. | Mental or nervous disorder, depression, anxiety? | a) | b) ☐ Yes ☐ No |
| vii. | Hepatitis, cirrhosis, or other disease of the liver or pancreas? | a) | b) ☐ Yes ☐ No |
| viii. | Ulcer, colitis, or other disorder of the stomach or intestines? | a) | b) ☐ Yes ☐ No |
| ix. | Disease or disorder of the kidneys, bladder or prostate, or a sexually transmitted disease (excluding HIV status)? | a) | b) ☐ Yes ☐ No |
| x. | Arthritis, disease or injury of the muscles, bones, or joints? | a) | b) ☐ Yes ☐ No |
| xi. | Any other health impairment, congenital deformity or medically or surgically treated condition not mentioned above? | a) | b) ☐ Yes ☐ No |
| **77.** | Have you ever used or experimented with marijuana, cocaine, or other non-prescription stimulants, depressants, or narcotics? | a) | b) ☐ Yes ☐ No |
| **78.** | Have you ever been treated, or advised to receive treatment, for uses of alcohol or drugs? | a) | b) ☐ Yes ☐ No |
| **79.** | In the past 30 days, have you taken any medication or non-prescription drug? | a) | b) ☐ Yes ☐ No |
| **80.** | Are you now planning to seek medical advice or treatment for any reason? | a) | b) ☐ Yes ☐ No |

**Proposed Insured:**

**81.**

| Family Record | Age if Living | Present Health | Age at Death | Cause of Death |
|---|---|---|---|---|
| Father | | | | |
| Mother | | | | |
| Brothers | | | | |
| Sisters | | | | |

**Additional Insured:**

**82.**

| Family Record | Age if Living | Present Health | Age at Death | Cause of Death |
|---|---|---|---|---|
| Father | | | | |
| Mother | | | | |
| Brothers | | | | |
| Sisters | | | | |

If answered "Yes" to questions 75, 76-80, please give complete details including date of last treatment and name, address/phone number of the attending physician.

**Proposed Insured:**

**Additional Insured:**

## XI.  SERVICE OFFICE ENDORSEMENTS (Attach an additional sheet of paper, if necessary)

## AUTHORIZATION

Each of the undersigned declares that:

I authorize any licensed physician, medical practitioner, hospital, clinic or any other medically related facility, insurance support organizations, insurance company, Medical Information Bureau (MIB), state motor vehicle division, consumer reporting agency, employer, financial source or government agency that has any records or knowledge of:

Proposed Insured/Patient

Date of Birth

Proposed Additional Insured/Patient

Date of Birth

or the proposed insured's health, including but not limited to transaction records, employment records, financial records, and complete medical records (including information regarding insurance, demographics, referral documents and records from other facilities), motor vehicle information, or if other, indicate here:

to give all such information to Jefferson Pilot Life Insurance Company or Jefferson Pilot Financial Insurance Company (the Company), their licensed representatives and/or their reinsurers, MediConnect.net Inc. GIS, or if other, indicate here:

I understand that an authorization for release or disclosure of psychotherapy notes may not be combined with an authorization for release or disclosure of any other information; a separate Authorization Page must be completed for release or disclosure of psychotherapy notes.

I understand that the information obtained may be used by the Company to determine eligibility for insurance, or to administer my coverage. The Company may not give the information to any person or entity except: 1) a reinsurer, or other insurers to whom I have applied or may apply; 2) MIB; or 3) any other person or entity who performs business or legal services in connection with the administration of my insurance coverage. I understand that some of these people or entities may not be covered by federal or state privacy regulations and that the information they receive may be redisclosed; however the Company contractually requires them to protect the information we disclose to them. Information may be disclosed as allowed by law or regulation.

I have received a Privacy Practices Notice which details the method I must use to exercise my right to access, correct, and amend any information gathered about me or my children which relates to this application. I understand that I can provide written revocation of this Authorization to the Company at any time, except 1) if the Company has taken action in reliance on the Authorization; or 2) the Company is using the Authorization in connection with a contestable claim under my policy.

## AUTHORIZATION - CONTINUED

This is not authorization to release HIV-related information unless an HIV Consent Form with authorization for optional release of information to my personal physician has been signed by me.

I understand that if I refuse to sign this authorization to release my complete medical record, the Company may not be able to process my application.

I agree that a copy of this authorization shall be as valid as the original and this authorization shall be valid for 24 months from the date shown below. I may have a copy upon request.

☐ I elect to be interviewed if an Investigative Consumer Report is prepared.

### SIGNATORY SECTION



Signed at _____ this _____ day of _____ _____
                    (State)                        (Month)              (Year)

_____
Signature of Proposed Insured
(Parent or Guardian if under 16 years of age)

_____
Signature of Other Proposed Additional Insured (if coverage applied for)

_____
Signature of Owner (if other than Proposed Insured)

_____
Signature of Licensed Agent, Broker or Registered Representative

_____
Name of Licensed Agent, Broker or Registered Representative (Please Print)

### APPLICABLE TO VARIABLE LIFE ONLY

I have reviewed the Application, New Account Form and Premium Allocation and Disclosure Form and find the transaction suitable.

_____
Signature of Registered Principal of Broker/Dealer

_____
Name of Registered Principal of Broker/Dealer (Please Print)

JAN. 23. 2007  4:10PM    PORTAMEDIC                                NO. 6796   P. 2

~~Application Part 2 For ☒ AXA Equitable Life Insurance Company~~

### ☐ AXA Life and Annuity Company

Reason for submission of this form:  ☐ New Policy  ☐ Policy Change  ☐ Reinstatement

| 1. a. Proposed Insured (Please Print) | First Name | Middle Initial | Last Name | b. Height: |
|---|---|---|---|---|
| | ROY | | Black | d. Birth De |
| | | | | e. ☐ Male |

2. a. Name and address of personal physician (or medical facility used instead): (if none, so state)

b. Date and reason last consulted if within the last 5 years:

c. What treatment was given or recommended? (if none, so s

| (For all "Yes" answers to Questions 3-9, circle items that apply.) | Yes | No |
|---|---|---|
| **3.** Has Proposed insured ever had or been treated for: | | |
| a. Disease or disorder of eyes, ears, nose or throat? | | |
| b. Dizziness, fainting, convulsions; paralysis or stroke; psychiatric, psychological or emotional disturbance; mental or nervous disease or disorder? | | |
| c. Shortness of breath; blood spitting; bronchitis, asthma, emphysema, tuberculosis or other chronic respiratory disease or disorder? | | |
| d. Chest pain, palpitation, high blood pressure, rheumatic fever, heart attack, heart murmur or other disease or disorder of the heart or blood vessels? | | |
| e. Ulcer, hernia, colitis, intestinal bleeding; jaundice, hemorrhoids, or other disease or disorder of the stomach, intestines, liver or gallbladder? | | |
| f. Sugar, albumin, blood or pus in urine; stone or other disease or disorder of kidney or bladder? | | |
| g. Diabetes; cyst, tumor, or cancer; thyroid or glandular disorder; skin disease or disorder? | | |
| h. Neuritis, arthritis, gout, or disease or disorder of the muscles or bones, including the back, or joints? | | |
| i. Deformity, lameness or amputation? | | |
| j. Allergies; anemia; other blood or lymph disease or disorder? | | |
| k. Disorder of prostate, reproductive organs, breasts, menstruation or pregnancy? | | |
| **4.** Is Proposed Insured now under observation or taking treatment? | | |
| **5.** Has Proposed Insured, within the last 10 years, been: | | |
| a. Diagnosed by a member of the medical profession as having Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC)? | | |
| b. Treated by a member of the medical profession for AIDS or ARC? | | |
| **6.** Has Proposed Insured, within the last 10 years: | | |
| a. Used, except as legally prescribed by a physician, tranquilizers; barbiturates or other sedatives; marijuana, cocaine, hallucinogens or other mood-altering drugs; heroin, methadone or other narcotics; amphetamines or other stimulants; or any other illegal or controlled substances? | | |
| b. Received counseling or treatment regarding the use of alcohol or drugs? | | |
| **7.** Has Proposed Insured's weight changed by more than 10 pounds in the last 6 months? | | |

| | Yes | No |
|---|---|---|
| **8.** Other than as stated in answers to Questions 2-6, has Proposed Insured, within the last 5 years: | | |
| a. Consulted or been examined or treated by any physician or practitioner? | | |
| b. Had any illness, injury, or surgery? | | |
| c. Been a patient in or been examined or treated at a hospital, clinic, sanatorium, or other medical facility? | | |
| d. Had electrocardiogram, X-ray, other diagnostic test? | | |
| e. Been advised to have any diagnostic test, hospitalization, treatment or surgery which was not completed? | | |
| **9.** a. Has Proposed Insured, within the last 12 months: | | |
| (i) Smoked cigarettes? | | |
| (ii) Used any other form of tobacco (Give full details) | | |
| b. Has Proposed Insured, within the last five years: | | |
| (i) Smoked cigarettes? | | |
| (ii) Used any other form of tobacco (Give full details) | | |

| 10. Family History | Age if Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father | | | 75 |
| Mother | | | 74 |
| Brothers/Sisters | | | |

DETAILS FOR "YES" ANSWERS. Include: i. Question Number. ii. Diagnosis and Treatment. iii. Results. iv. Dates and Duration. v. Names and Addresses of all attending physicians and medical facilities. (If additional space is needed, please attach a separate sheet, dated, signed and witnessed as below.)

The above statements and answers are true and complete to the best of my knowledge and belief. I agree that such statements and answers shall be part of the application for insurance or request for policy change or reinstatement, as the case may be. The insurer may rely on them in acting on the application or making the policy change or reinstatement.

Dated at CARLSBAD, CA.    on 11 17 200

| City | State | Mo. | Day | Yr. | Signature of Proposed Insured |

Witness (Must be Examiner or Nurse/Technician):

180-M205N (10/00)      E5722                CAT. #12531                                    1.

Exhibit 5
Page 78

**JEFFERSON-PILOT**
**LIFE INSURANCE COMPANY**

Service Office:  100 North Greene Street
P.O. Box 21008
Greensboro, North Carolina 27420

When writing the Service Office, please give the policy
number, Insured's full name and Your address.

**Important Information**

This policy is a valuable asset.  Read it carefully and file it
with Your other valuable papers.

If You need any of the following services, contact Your
Jefferson-Pilot Life Insurance Company Agent or Our
Service Office at (800) 487-1485:

1.  Information about this policy.

2.  Preparation of claims papers, or other notices,
elections or requests.

3.  Examination of any proposal that You lapse or
surrender this policy – this is for Your own protection.

4.  Additional life insurance service.

**FLEXIBLE PREMIUM ADJUSTABLE LIFE INSURANCE POLICY**

**Proceeds payable at death. Adjustable Death Benefit. Flexible premiums payable to Insured's Attained Age 100.**
**Policy values may increase or decrease as determined by declared interest and risk rates.  Non-participating – No**
**Dividends.**

Exhibit 5743
Page 79

# EXHIBIT 6

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | **JURY TRIAL DEMANDED** |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No._____ |
| ) | |
| LYDIA CAPITAL, LLC, ) | |
| GLENN MANTERFIELD, and ) | |
| EVAN ANDERSON, ) | |
| ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission ("Commission") alleges the following in this emergency enforcement action against defendants:

### PRELIMINARY STATEMENT

1.     This matter involves an ongoing fraudulent investment scheme carried out by Defendant Lydia Capital, LLC ("Lydia" or the "Adviser") and its two principals, Defendants Glenn Manterfield ("Manterfield") and Evan Anderson ("Anderson"), involving sales to investors in Taiwan of "limited partnership interests" in an unregistered fund, Lydia Capital Alternative Investment Fund LP (the "Fund"), based in Boston.

2.     As further detailed below, Defendants are offering and selling hedge fund interests to investors and potential investors and not disclosing material facts and/or omissions to the investors, including, but not limited to the fact, that the Fund's principal underlying assets – i.e., life insurance policies – may be either worthless or virtually worthless.

Exhibit 6
Page 80



3.    As further detailed below, the Commission is seeking emergency relief because it learned today that Defendants may be seeking to transfer investor assets out of its brokerage account.

4.    As a result of the above, Defendants engaged in: (i) fraudulent or deceptive conduct in connection with the purchase or sale of securities, in violation of Section 10(b) of the Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder; (ii) fraudulent or deceptive conduct in connection with the offer or sale of securities, in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act") and (iii) fraudulent or deceptive conduct with respect to investment advisory clients, in violation of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act").

5.    Accordingly, the Commission seeks: (i) permanent injunctions prohibiting defendants from further violations of the relevant provisions of the federal securities laws; (ii) disgorgement of defendants' ill-gotten gains and unjust enrichment, plus pre-judgment interest; and (iii) the imposition of civil monetary penalties due to the egregious nature of defendants' violations.  In addition, because of the risk that defendants will continue violating the federal securities laws and the danger that any remaining investor funds will be dissipated or concealed before entry of a final judgment, the Commission seeks preliminary equitable relief to:  (i) prohibit defendants from continuing to violate the relevant provisions of the federal securities laws; (ii) freeze defendants' assets and otherwise maintain the status quo; (iii) require defendants to submit an accounting of investor funds and other assets in their possession; (iv) prevent defendants from destroying relevant documents; (v) prohibit defendants from continuing to

Exhibit 6
Page 81

accept or deposit investor funds; and (vi) authorize the Commission to undertake expedited discovery.

### JURISDICTION

6.    The Commission seeks a permanent injunction and disgorgement pursuant to Section 20(b) of the Securities Act [15 U.S.C. §77t(b)], Section 21(d)(1) of the Exchange Act [15 U.S.C. §78u(d)(1)], and Section 209(d) of the Advisers Act [15 U.S.C. §80b-9(d)]. The Commission seeks the imposition of a civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C.§77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. §80b-9(e)].

7.    This Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§77t(d), 77v(a)], Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), 78aa], and Sections 209(3) and 214 of the Advisers Act [15 U.S.C. §80b-9(d), 80b-14]. Venue is proper in this District because much of defendants' wrongful conduct occurred here and at least some of the defendants' ill-gotten gains remain within the District.

8.    In connection with the conduct described in this Complaint, defendants directly or indirectly made use of the mails or the means or instruments of transportation or communication in interstate commerce.

### DEFENDANTS

9.    **Lydia Capital, LLC** (SEC File Number 801-66292) is a Delaware limited liability company established in February 2006, and is headquartered in Boston, Massachusetts. Lydia Capital is a registered investment adviser to Lydia Capital Alternative Investment Fund

3

Exhibit 6
Page 82

("Fund"), L.P., an unregistered fund located in Boston, Massachusetts. The Fund, a Delaware

limited partnership, is engaged in buying and selling life settlements (or insurance policies).

10.    **Glenn Manterfield**, 44, is believed to be a resident of Sheffield, United

Kingdom, and is one of Lydia's two principals.

11.    **Evan Anderson**, 25, is believed to be a resident of Boston, Massachusetts, and is

one of Lydia's two principals.

## STATEMENT OF FACTS

12.    Lydia solicits investors for the Fund through a Private Placement Memorandum

("PPM"). The PPM states that the Fund purchases life insurance policies in the life settlement

aftermarket on insured individuals aged 65 or older with a life expectancy of between two and

ten years. Through finders and/or brokers in Asia, Lydia has raised approximately $33 million in

investments in the Fund from at least 57 investors in Taiwan.

13.    Contrary to statements in the PPM, Lydia's agents, SLS and Stamford Group,

solicit individual seniors to purchase life insurance policies by obtaining a medical underwriter's

evaluation of the life expectancy of those individuals prior to the individual applying for a life

insurance policy. On approximately half of the applications, the individuals falsely claimed that

they had no intention to sell their policies, when in fact, they obtained policies intending to sell it

to Lydia's agents (SLS or Stamford Group).

14.    Life insurance companies have a right to rescind the aforementioned policies

based on false representations in the application. Recision would render the policies nearly

worthless, and diminish or obliterate the value of the Fund. Lydia, Manterfield and Andersen

knew of this material risk because they set into motion the process whereby individuals would

4

Exhibit 6
Page 83

obtain the policies by making false statements and then the Defendants took possession of the policies and fraudulent applications upon the Fund's purchase of the policies from the individuals. The Fund's PPM misleads investors by omitting this significant risk, and by failing to disclose that the value of the Fund is dependent on numerous insurance policies that have been obtained through false statements. Lydia, Manterfield and Andersen used the fraudulent PPM to solicit actual and potential investors for the Fund.

15.    Further, Lydia's website contains false and misleading postings of the Fund's "NAV" appreciation. First, Lydia has no legitimate basis for such valuations of the Fund because the valuations it is posting are from non-independent sources - SLS and Stamford Group, the entities that sell the insurance policies to the Fund. In addition, the website states that the NAV appreciation for July 2006 was 1.69%, when in fact, the Fund held no assets until it purchased its first policy in August 2006. Lydia, Manterfield and Andersen knew that the July 2006 NAV appreciation was incorrect because they knew that the Fund had no actual assets upon which to obtain appreciation. Lydia, Manterfield and Andersen used the firm's website and the false statements therein to solicit actual and potential investors. The firms's website as of today still contains this misrepresentation. Lydia, Manterfied and Anderson have misappropriated assets from the Fund by drawing fees, compensation and expenses to which they were not entitled.

16.    The Fund's February 2007 newsletter to investors in the Fund, signed by Glenn Manterfield, repeats the false July 2006 appreciation and states that it was the "best ever" increase in NAV for the Fund.

5

Exhibit 6
Page 84

17.    Approximately $8.8 million in investor funds have been wired to a Smith Barney account in the name of Lydia that is controlled by Andersen and Manterfield. Apparent investors have wired money to this account as recently as April 11, 2007.

18.    The Commission staff learned today that Andersen wants to move the money out of the Smith Barney account.

19.    Further, investor funds are in accounts of an escrow agent for Lydia, including an account at National City Bank in Cleveland.

20.    As a result, the staff seeks the emergency relief sought below, including an ex parte temporary restraining order, preliminary injunction, and an asset freeze.

### FIRST CLAIM FOR RELIEF
### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5)

21.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-20 of the Complaint as if set forth fully herein.

22.    Defendants, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities:  (a) have employed or are employing devices, schemes or artifices to defraud; (b) have made or are making untrue statements of material fact or has omitted or is omitting to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) have engaged or are engaging in acts, practices or courses of business which operate as a fraud or deceit upon certain persons.

6

Exhibit 6
Page 85

23.     As a result, Defendants have violated and, unless enjoined, will continue to

violate Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17

C.F.R. §240.10b-5].

## SECOND CLAIM FOR RELIEF
### (Violation of Section 17(a) of the Securities Act)

24.     The Commission repeats and incorporates by reference the allegations in

paragraphs 1-20 of the Complaint as if set forth fully herein.

25.     By reason of the foregoing, defendants, directly or indirectly, in the offer or sale of

securities, by use of means or instruments of transportation or communication in interstate

commerce or by the use of the mails, in the offer or sale of securities:  (a) employed devices,

schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of

material fact or omissions to state material facts necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading; or (c) engaged in

transactions, practices or courses of business which operated as a fraud or deceit upon the

purchaser of securities in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

26.     As a result, Defendants have violated and, unless enjoined, will continue to

violate Section 17(a) of the Securities Act.

## THIRD CLAIM FOR RELIEF
### (Violation of Sections 206(1) and 206(2) of the Advisers Act)

27.     The Commission repeats and incorporates by reference the allegations in

paragraphs 1-20 of the Complaint as if set forth fully herein.

28.     Defendants were "investment advisers" within the meaning of Section 202(a)(11)

of the Advisers Act [15 U.S.C. §80b-2(a)(11)].

7

Exhibit 6
Page 86

29.    Defendants, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, acting intentionally, knowingly or recklessly: (i) have employed or are employing devices, schemes, or artifices to defraud; or (b) have engaged or are engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon a client or prospective client.

30.    As a result, Defendants have violated and, unless enjoined, will continue to violate Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§80b-6(1), (2)].

### PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.    Enter a temporary restraining order, order freezing assets and order for other equitable relief in the form submitted with the Commission's motion for such relief and, upon further motion, enter a comparable preliminary injunction, order freezing assets and order for other equitable relief;

B.    Enter a permanent injunction restraining Defendants and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of:

1.    Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5];

2.    Section 17(a) of the Securities Act [15 U.S.C. § 17q(a)];

3.    Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §80b-6(1), (2)];

8

Exhibit 6
Page 87

C.      Require Defendants to disgorge their ill-gotten gains and unjust enrichment, plus pre-judgment interest, with said monies to be distributed in accordance with a plan of distribution to be ordered by the Court;

D.      Order Defendants to pay an appropriate civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. §80b-9(e)];

E.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

F.      Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

Silvestre A. Fontes (BBO #627971)
       fontess@sec.gov
Martin F. Healey (BBO #227550)
       healeym@sec.gov
R. Daniel O'Connor (BBO #634207)
       oconnord@sec.gov
Senior Trial Counsel

Attorney for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
33 Arch Street
Boston, MA 02110
(617) 573-8991 (Fontes)
(617) 573-8952 (Healey)
(617) 573-8979 (O'Connor)
(617) 573-4590 fax

April 12, 2007

9

Exhibit 6
Page 88

# EXHIBIT 7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 07-cv-10712-RGS |
| | ) |
| LYDIA CAPITAL, LLC, | ) |
| GLENN MANTERFIELD, and | ) |
| EVAN ANDERSEN, | ) |
| | ) |
| | ) |
| Defendants. | ) |

## AMENDED COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges:

### PRELIMINARY STATEMENT

1.      During the period from June 2006 through April 2007 (the "Relevant Period"),

Defendants Glenn Manterfield ("Manterfield"), a convicted felon, and his business partner Evan

Andersen ("Andersen"), acting through their investment advisory firm, Defendant Lydia Capital,

LLC ("Lydia"), engaged in a scheme to defraud investors in a hedge fund, Lydia Capital

Alternative Investment Fund LP (the "Fund"). During the Relevant Period, more than 60

investors purchased approximately $34 million in limited partnership interests in the Fund. The

Defendants told investors that they intended to use the Fund's assets to acquire a portfolio of life

insurance polices in the life settlement market. The Defendants materially misled investors

about their operations and misappropriated millions dollars of investors' funds.

2.      Manterfield, Andersen, and Lydia sold limited partnership interests and retained

1

Exhibit 7
Page 89

investors in the Fund through a series of material misrepresentations and omissions, including but not limited to: (1) materially overstating, and in some instances completly fabricating the Fund's performance; (2) inventing business partners, offices, and investors in an attempt to legitimatize the firm and concealing the truth as to why key vendors and banks ceased relationships with the Defendants; (3) lying about Manterfield's significant criminal history, and failing to disclose a February 2007 criminal asset freeze in England; (4) lying about how the Fund planned to address certain material risks and failing to disclose others; and (5), misstating the nature of the Fund's assets and its investment process.

3.    In addition to making serious material misrepresentations and omissions, Defendants misappropriated millions of dollars of investors' funds. Defendants, because of the serious nature of their fraud, were not entitled to draw either performance or maintenance fees, and admit they drew none. Defendants, however, withdrew $8.16 million of investor funds, supposedly maintained in "safe" escrow accounts beyond Defendants' reach. The money was supposedly obtained as payment for mark-ups applied to assets sold to the Fund and reimbursement for other unidentified expenses. Even assuming that the Defendants' fraud had not negated their right to receive any compensation, which it did, the Defendants were, at best, entitled to receive a mark-up of approximately $1.58 million to $2.64 million plus some smaller amount for reimbursement of expenses. Moreover, because the withdrawal of the $8.16 million from escrow was in no way actually tied to the sale of assets to the Fund, Defendants' mark-up explanation on internal records was nothing more than an attempt to cover up their misappropriation of investors' cash.

4.    By engaging in the conduct alleged in this Complaint, Defendants Manterfield,

2

Exhibit 7
Page 90

Andersen, and Lydia violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15

U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15

U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5], and Sections 206(1) and

206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6 (1) and

80b-6 (2)].

     5.     Unless restrained and enjoined, Defendants are likely to commit further violations

in the future. Accordingly, the Commission seeks:  (i) entry of a permanent injunction

prohibiting Defendants from further violations of the relevant provisions of the federal securities

laws; (ii) disgorgement of Defendants' ill-gotten gains and unjust enrichment, plus pre-judgment

interest; and (iii) the imposition of civil monetary penalties due to the egregious nature of

Defendants' violations.  In addition, because of the risk that Defendants will continue violating

the federal securities laws and the danger that any remaining investor funds will be dissipated or

concealed before entry of a final judgment, the Commission seeks preliminary equitable relief to:

 (i) prohibit Defendants from continuing to violate the relevant provisions of the federal

securities laws; (ii) freeze Defendants' assets and otherwise maintain the status quo; (iii) require

Defendants to submit an accounting of investor funds and other assets in their possession; (iv)

prevent Defendants from destroying relevant documents; (v) require the repatriation of any and

all assets abroad that were obtained or derived from the violative securities transactions; (vi)

prohibit Defendants from continuing to accept or deposit investor funds; and (vii) other equitable

relief as necessary to prevent additional harm.

     6.     This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the

Securities Act [15 U.S.C. §§ 77t and 77v], Sections 21 and 27 of the Exchange Act [15 U.S.C.

3

Exhibit 7
Page 91

§§ 78u and 78aa], and Section 209 of the Advisers Act [15 U.S.C. § 80b-9]. The Commission

seeks the imposition of a civil monetary penalty pursuant to Section 20(d) of the Securities Act

[15 U.S.C.§77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)], and Section

209(e) of the Advisers Act [15 U.S.C. §80b-9(e)]. Many of the acts and transactions constituting

violations occurred primarily within the District of Massachusetts and at least some of the

Defendants' ill-gotten gains remain within the District.

### DEFENDANTS

7.      Lydia was a Delaware limited liability company established in February 2006,

with an office in Boston, Massachusetts. Lydia was registered as an investment adviser with the

Commission. Lydia was an investment adviser to and general partner of the Fund. The Fund, a

Delaware limited partnership, was a pooled investment vehicle set up to purchase and sell all

types of securities, with a focus on investing in interests in life insurance policies. Lydia's sole

employees, Manterfield and Andersen, are also its owners.

8.      Manterfield, age 44, is a resident of Sheffield, England and was one of Lydia's

two principals and a 50% owner of the firm. During the Relevant Period, Manterfield acted as

an investment adviser, and as such, Manterfield had a fiduciary duty to his advisory clients.

Manterfield traveled to the United States on several occasions in furtherance of the fraud alleged

herein and held himself out as a director of the Boston-based Lydia. Manterfield has an

extensive criminal record with arrests and convictions for fraud and theft felonies. He is under

investigation in England for acquiring criminal property, a potential felony charge, and on

February 1, 2007, an English court froze all assets that Manterfield controlled directly or

indirectly, but allowed Manterfield, to the extent that the was not imprison, to spend up to £300 a

4

Exhibit 7
Page 92

week towards his ordinary living expenses.

9.      Andersen, age 25, is a resident of Boston and is one of Lydia's two principals and

a 50% owner of the firm.  During the Relevant Period, Andersen acted as an investment adviser,

and as such, Andersen had a fiduciary duty to his advisory clients.  Andersen held himself out as

a director and chief compliance officer of Lydia, and worked primarily out of Boston.

### DETAILED ALLEGATIONS

**Defendants Misappropriated Investors' Funds**

10.      In addition to the making serious material misrepresentations and omissions,

Defendants misappropriated millions of dollars of investors' funds.  Defendants, because of the

serious nature of their fraud, were not entitled to draw either performance or maintenance fees,

and admit they drew none.  Defendants, however, withdrew investor funds supposedly

maintained in "safe" escrow accounts beyond Defendants reach.  Defendants withdrew $8.16

million of the Fund's assets from various escrow accounts as supposed payment for mark-ups

applied to assets sold to the fund and reimbursement for expenses.

11.      The June 2006 private placement memorandum provides that Lydia "intends to

purchase life insurance polices through its contacts and resell such policies to the [Fund] to

become a part of the [Fund's] portfolio.  Lydia intends to sell policies to the [Fund] for at a

minimum mark-up of 3% to 5% of the face value of the policy." Although the 3% to 5% is

described as a minimum fee, the Defendants never calculated a mark-up fee using a higher

amount, and to the extent they actually calculated a fee, they used 4%. In early January 2007,

Defendants announced to investors that Lydia would no longer charge a mark-up fee on the sale

of assets to the Fund, and modified the existing private placement memorandum to reflect the

5

Exhibit 7
Page 93

change.

12.    Defendants kept few if any records to show exactly when the Fund, or one of its indirect agents, acquired interests in insurance policies. At best, however, before announcing the change in early January 2007, the Fund acquired interests in thirteen insurance polices with a combined face value of $52,750,000. Using the 3% to 5% mark-up, Lydia would have been entitled to a fee of approximately $1.58 million to $2.64 million, not the $8.16 million that Defendants took out of the Fund's various escrow accounts. Moreover, Lydia's first two withdrawals from escrow accounts, totaling approximately $1.6 million, were made before the Fund or any agent had actually bought an interest in a single life insurance policy. Subsequent withdrawals also were not timed to match asset purchases by the Fund.

13.    Under the Limited Partnership Agreement and as stated in the various private placement memoranda, Lydia was entitled to receive reimbursement for certain expenses. Once again, however, Lydia's bookkeeping was deficient and not in keeping with its fiduciary duty or requirements imposed by the Advisers Act. Lydia did not incur reimbursable expenses that justify the $8.16 million withdrawn from the Fund, even if Lydia was entitled, and it was not, to receive a mark-up on certain assets acquired by the Fund.

14.    Of the $8.16 million wrongfully withdrawn from the Fund's escrow accounts, approximately $2.35 million was transferred to Manterfield's personal account and approximately $2.35 million was transferred to an account controlled by Andersen.

15.    Defendants' poor or nonexistent record keeping makes it impossible at this point in time to determine to the penny the amount of the misappropriations. The total outflows from Lydia's accounts, other than transfers to accounts controlled by Manterfield or Andersen, totaled

6

Exhibit 7
Page 94

to approximately $3.43 million. Even if all of these payments were for legitimate reimbursable expenses, which they were not, and Lydia was entitled to receive the maximum mark-up on assets sold to the Fund by early January 2007, which it was not, Lydia should have taken no more than $6.07 million, not $8.16 million. Thus, at a minimum, the Defendants have misappropriated at least $2.09 million of investor funds.

**Defendants' Misrepresentations and Omissions**

16.    In order to induce investors to purchase interests in the Fund, Defendants described the Fund's planned investment activities and supposed associated risks in a Confidential Private Placement Memorandum, dated June 2006 (the "June 2006 PPM"). Defendants stated in the June 2006 PPM that Lydia intended to use the Fund's assets to "purchase life insurance policies in the life settlement after-market on numerous insured individuals of sixty-five (65) years of age or older . . . who have a life expectancy of between two to ten years." The June 2006 PPM also provides that "[u]pon purchasing a policy in a life settlement after-market the [Fund] will be re-assigned all legal rights and responsibilities contained in the policy contract. Therefore, the [Fund] will legally assume all ownership rights to the policy and the death benefit, [and] the responsibility for future premium payments . . . ." The June 2006 PPM provides that the Fund's revenues would be derived from the death benefit of the underlying life insurance policy or gains from the sale of a policy in the secondary life market.

17.    In early August 2006, the Defendants amended the June 2006 PPM and under cover letter signed by Manterfield in early August 2006, reissued a revised private placement memorandum (the "August 2006 PPM") to all existing investors. For the remainder of 2006, the

7

Exhibit 7
Page 95

Defendants used the August 2006 PPM to describe the investment activities and risks of the Fund to actual and potential investors. In early January 2007, the Defendants amended the August 2006 PPM and reissued a new private placement memorandum (the "January 2007 PPM"). Except as explicitly stated herein, the June 2006 PPM, the August 2006 PPM, and the January 2007 PPM are virtually identical, and the misrepresentations and omissions found in June 2006 PPM, are also present in the subsequent versions.

18.     In addition to the private placement memorandum, Defendants communicated with investors in a variety of modes. For example, Lydia maintained a password protected website, www.lydiacapital.com, and provided login credentials to all 60+ investors. Lydia also sent login credentials to numerous other potential investors who provided simple background information indicating whether they would be qualified to invest in Lydia. Additionally, Andersen directly provided credentials to potential investors. The website, which was up and running from at least August 2006 through April 13, 2007, contained information related to Lydia, the Fund, Manterfield, and Andersen, and parts of it were updated frequently. The website included a chart showing the Fund's net asset valuation ("NAV") appreciation on a monthly basis starting in July 2006 and continuing through to March 2007. The site also displayed a twenty page Microsoft PowerPoint presentation entitled "Lydia Capital Investment Fund 2006" (the "2006 PowerPoint"), which provided background on the Fund, biographies of Andersen and Manterfield, and directs inquiries to Andersen, listing his phone number and email address.

19.     In addition to the website, Andersen and Lydia provided other Microsoft PowerPoint presentations to investors during the Relevant Period and used those presentations as

8

Exhibit 7
Page 96

a guide for oral conversations about the Fund, including one presentation entitled "Lydia Capital Investment Fund 2006/7 – Institutional Partnerships" (the "2006/7 PowerPoint"), and another one entitled "Lydia Capital Investment Fund 2007 – Institutional Partnerships" (the "2007 PowerPoint"). Andersen used the 2006/7 PowerPoint in at least thirty to forty meetings in person with potential investors in the United States, as well as additional meetings, via telephone, with Asian investors during the Relevant Period.

20.     Manterfield and Andersen also produced a newsletter that was sent to investors on a monthly basis by mail and/or email starting with a July 2006 edition and continuing through to March 2007. The newsletter was written by Manterfield and Andersen, with Manterfield doing most of the writing and with Andersen reviewing the material and approving it as chief compliance officer before its publication. Beginning in the fall of 2006, the newsletter was mailed from Singapore to investors in Asia after signoff by Manterfield and Andersen. Manterfield's name appears on the first page of all but one newsletter. The newsletters were sent to investors in the first few weeks of the following month (e.g., the September newsletter was sent out in mid-October).

21.     In addition to the private placement memorandum, PowerPoint presentations, and newsletters described above, Andersen and Manterfield engaged in frequent communications with potential and existing investors, as well as their representatives, via the telephone, email and written letters.

22.     From June 2006 through to February 2007, more than sixty investors purchased limited partnership interests totaling approximately $34 million. The subscriptions continued through the Relevant Period. In March and early April, several investors sent in another $8.7

9

Exhibit 7
Page 97



million but it is unclear whether this money was formally accepted for subscription.

23.    During the Relevant Period, Defendants used the previously described modes of communications, as well as others, to sell new partnership interests in the Fund and to maintain and to grow the size of the existing investors' accounts. This securities sales activity, as well as Defendants' role as fiduciary investment advisers, gave rise to a duty on the part of Defendants to disclose to the investors all material information related to the Fund's investment objectives and risks. As described more fully below, however, many of Defendants' communications to investors during the Relevant Period contained material misrepresentation and omissions.

**Fabrication & Material Overstatement of NAV Appreciation**

24.    The June 2006 PPM states that Lydia will calculate the Fund's indicative NAV on the last day of each calendar month and it will be "the value as of such date of all the <u>assets of the [Fund] . . . less all of the liabilities of the [Fund]</u> . . . ." Defendants told investors that the indicative NAV was subject to biannual audit and confirmation by an actuarial firm ("Actuary A") and the Fund's auditors ("Auditor A"), and that Lydia produced the monthly indicative NAV using portfolio valuation software based on that employed by Actuary A.

25.    In mid-August 2006, Manterfield calculated the Fund's NAV and published the percentage change in the Fund's indicative NAV that purportedly occurred in July 2006. The Defendants falsely reported that the Fund's NAV increased by 1.69% in the month of July. Defendants touted the false information to investors and potential investors by posting it on the Lydia website and included it in the July and later newsletters and other communications. The Defendants knew or recklessly disregarded the misleading nature of the reported July NAV increase because, as described below, they knew that it was based on valuing assets that the Fund

10

Exhibit 7
Page 98

did not own.

26.    The reported 1.69% increase in NAV during July 2006 was false and misleading. The Defendants knew that the Fund had not actually purchased any interests in the life insurance policies that were used to calculate July's NAV. Thus, at the end of July, the Fund's assets only included the cash it had received from investors, less expenses. Rather than calculate the Fund's NAV using its actual assets, Defendants improperly included the value of interests in life insurance policies that it hoped to purchase at some future date.

27.    In July 2006, the Defendants were using a broker in California to find interests in life insurance policies ("Broker A"), but by the end of July 2006, no interests had been purchased. Defendants, however, requested that Broker A prepare an analysis of the value of the interests in insurance policies for which Broker A, on behalf of Lydia, had made an oral offer to purchase. Andersen and Manterfield knew that no assets had been purchased by the Fund because they had not signed any agreements or authorized release of funds. The July 31, 2006 report from Broker A shows:

| | |
|---|---|
| Cash at Escrow | $5,063 104.78 |
| Cumulative Policy Market Value | $2,813,833.00 |
| Cumulative Policy Face Value | $10,000,000.00 |
| Asset Value for NAV Calculation | $7,876,937.78 |

28.    The Cumulative Policy Market Value in Broker A's July 31, 2006 report purports to be the market value of the interests in the insurance policies with $10,000,000 total face value, taking into account a number of actuarial variables such as the life expectancy of the insureds and the premium payment schedule. The Asset Value for NAV Calculation in Broker A's report

11

Exhibit 7
Page 99

was the sum of the Cash at Escrow (the money that will eventually be used to buy interests in policies) and the Cumulative Policy Market Value. The report was inaccurate, however, because neither the Fund nor its indirect agent, Broker A, owned any interests in insurance polices as of July 31, 2006. Manterfield knowingly or reckless used the inaccurate asset valuation from Broker A's July 31, 2006 report to calculate the Fund's NAV and its percentage increase, 1.69%, which the Defendants then published to existing and prospective investors. The 1.69% increase in NAV for July equates to a 20.28% annual return, a number that helped spur additional investment.

29.    Over the next several months, the Defendants followed a similar course of action and had Broker A complete a month-end report that purported to show the asset value of the interests in insurance policies that Broker A had acquired for the Fund. Like the July 31, 2006 report, Broker A's August and September reports, and possibly the October report, counted interests in policies that had not yet been purchased by the Fund or its indirect agent, and thus, the resulting asset values were substantially higher than they actually should have been.

30.    Broker A's August 31, 2006 report shows interests in insurance policies with a face value of $36,500,000, when at most, the Fund's indirect agent had used the Fund's assets to obtain interests in policies with face values totaling no more than $32,500,000 (and likely less). Using this false report, Manterfield calculated an increase in NAV for August of 1.44%, which the Defendants then published to investors on Lydia's website and newsletter. Similarly, Broker A's September 30, 2006 report shows interests in insurance policies with a face value of $36,500,000, when at most, the Fund's indirect agent had used the Fund's assets to obtain interests in policies with face values totaling no more than $35,250,000 (and likely less). Using

12

Exhibit 7
Page 100

this false report, Manterfield calculated an increase in NAV for September of 1.53%, which the

Defendants then published to investors on Lydia's website and newsletter.

      31.    In October 2006, the Defendants entered into a relationship with a new broker

based in Indiana ("Broker B"). Broker B took over the role of Broker A and went about finding

interests in insurance policies for the Fund. The Defendants continued the practice they had

established with Broker A, and had Broker B prepare a month end report starting in at least

December 2006 that purported to calculate the asset value associated with interests in insurance

policies that Broker B had acquired on behalf of the Fund. As was the situations with Broker A,

the monthly reports from Broker B were incorrect in that they valued interests in insurance

polices that had not yet been purchased.

      32.    Broker B's December 31, 2006 report shows interests in insurance policies with a

face value of $77,000,000, when at most, Broker B had used the Fund's assets to obtain interests

in policies with face values totaling no more than $12,500,000. Using this false report,

Manterfield calculated an increase in NAV for December 2006 of 1.66%, which the Defendants

then published to investors on Lydia's website and newsletter. Broker B's January 31, 2007

report shows interests in insurance policies with a face value of $102,000,000, when at most, the

Fund's indirect agent had used the Fund's assets to obtain interests in policies with face values

totaling no more than $49,150,000 (and likely less). Using this false report, Manterfield

calculated an increase in NAV for January of 1.48% and then the Defendants published this

information to investors on Lydia's website and newsletter. Broker B's February 28, 2007 report

shows interests in insurance policies with a face value of $142,000,000, when at most, the

Fund's indirect agent had used the Fund's assets to obtain interests in policies with face values

13

Exhibit 7
Page 101



totaling no more than $89,150,000 (and likely less), through the end of the month of February, 2007.  Using this false report, Manterfield calculated an increase in NAV for February of 1.68%, which the Defendants then published to investors on Lydia's website and newsletter.

**False Business Activities, Phantom Investors and Terminated Relationships**

33.    Defendants published materially false information about Lydia's business activities, the existence of investors from countries other than Taiwan, and other matters so as to falsely legitimize themselves to the Fund's investors.

34.    Lydia's July 2006 newsletter, prepared by Manterfield and reviewed prior to publication by Andersen, falsely stated that "[n]ew investors from Mexico, Austria, Israel, and the USA are expected to boost our purchasing power and increase our profit margin." Defendants knew, however, that that the only investors in the Fund were from Taiwan.

35.    Lydia's September 2006 newsletter, also prepared by Manterfield and reviewed by Andersen prior to publication, falsely stated that Lydia was opening new offices in Mexico and Singapore, when in fact the Defendants knew that the firm had no such offices.  The September newsletter also falsely stated that Lydia was "already welcoming new investors from South America, together from institutional investments from Funds-of-Funds in Europe . . . ."  In fact, Defendants knew that throughout the Fund's existence, all of its investors were from Taiwan.

36.    On October 24, 2006, Manterfield emailed a broker selling Fund interests in Taiwan and falsely stated that Lydia has been approached by a "Swedish Financial Institution" with a request to help package a structured note for their clients.  Later that day, Manterfield emailed the same broker to say that a "private Banking Organization in Sweden has agreed to

14

Exhibit 7
Page 102

'brand' a note linked 100% to Lydia Fund.  Nordic."  Manterfield identified the firm as Nordic

Mutual.  As described below, however, Nordic Mutual was not a real or separate entity, but

rather a creation of Manterfield and Andersen with a website and no real business.

      37.     Lydia's November 2006 newsletter contained further falsehoods about Nordic

Mutual, in that it stated that Lydia had "established links with a small Private Institution based in

Scandinavia.  Nordic Mutual is similar in structure to the US "Savings & Loan or Credit Union. .

. . Offering a range of financial services to its private members . . . Nordic Mutual has expressed

a desire to offer a 5 year Structure Note" tied to the Fund.  Manterfield and Andersen knew that

Nordic Mutual had no separate existence and they knew this because they bought the shell.

      38.     Lydia's December 2006 newsletter made many other false and misleading

statements about the relationship between Lydia and Nordic Mutual, noting in particular that the

purported structured note deal has been launched.

      39.     Nordic Mutual, however, was invented out of whole cloth by Manterfield and

Andersen.  On or about October 24, 2006, Lydia purchased the shell of a Swedish credit union

from a company in Panama, Overseas Clearing Corporation, that specialized in creating overseas

financial institutions.  Andersen and Manterfield bought "Nordic Mutual Savings and Loan" for

$38,000 in a package that included a credit union registration, certificates and bylaws in Swedish

and English, and other bits and pieces of veneer designed to make it look like a real and

substantial company.  In order to complete the fraudulent scheme, a website was created for

Nordic Mutual that purported to show a functioning financial institution offering banking

products to private clients, including a structured note tied to a hedge fund in the life settlement

industry.  In fact, Nordic Mutual was and remains nothing but a virtual company with no staff or

15

Exhibit 7
Page 103

physical location.

40.    On October 26, 2006, Manterfield wrote a letter and sent it via email to a Taiwanese corporate investor that had already made a $2 million investment in the Fund. Manterfield wrote to the investor to address a concern about redemption liquidity. Manterfield misled the investor by stating that Lydia had "negotiated credit-line collateralized financing with our colleagues at KBC Bank amongst others, and this will allow us to raise 90% of the market value of policies at 48 hours notice." In fact, Manterfield knew that Lydia had no such relationship with KBC Bank. Manterfield also knew that Lydia had no such relationship with any other institution which was willing to extend Lydia credit based on the value of the Fund's interests in insurance polices. After receiving Manterfield's misrepresentations, the corporate investor made and additional $1 million investment on November 2, 2006.

41.    In addition to lying about nonexistent business relationships, the Defendants knowingly or recklessly omitted telling investors about key vendor relationships that were terminated under less than favorable terms. In early February, Actuary A, a firm that had been hired by Lydia to audit its valuation of the Fund's assets, declined to continue engagement upon learning of Manterfield's criminal troubles in England. The Defendants did not disclose to investors the reason why the relationship was terminated, and instead noted in the February 2007 newsletter, published in early March 2007, that there had been several delays with Actuary A's work and serious failures to perform that led to the end of the relationship. This omission was material because the Defendants, basically since it first started soliciting funds, had been touting the relationship with the Actuary A, as well as the use of software based on its methodology to support its own calculations of NAV.

16

Exhibit 7
Page 104

42.    Shortly after Manterfield's January 2007 arrest, a number of financial institutions at which Lydia and the Fund had accounts terminated their relationships based on suspicious money flows and knowledge of Manterfield's arrest and/or criminal record. This forced the Defendants to seek out new banking relationships. Manterfield, Andersen and Lydia did not disclose to the Fund's investors the reason why the relationships were ended nor did they disclose the asset freeze, which had the potential to bring activities at the Fund to a halt. Defendants chose instead in their February 2007 newsletter to misrepresent the nature of the banking changes as a decision undertaken to improve and streamline the firms' processes.

43.    In late February and/or early March 2007, the Fund's auditors, Auditor A, met with Andersen and told him that, based on their review of the Fund's activities and the assets it held, that it could only provide a report with a disclaimer, which Auditor A forwarded to Andersen. The disclaimer said that the Fund was not "audited" and no "opinion" was provided by Auditor A. Mr. Andersen told Auditor A that the report was not acceptable. Auditor A responded by saying that he (Lydia) needed to find another auditor. Manterfield sent an e-mail to Auditor A afterwards noting his disappointment. Once again, Defendants decided not to disclose this material information to investors.

**Defendants hid Manterfield's Criminal History and Asset Freeze**

44.    Defendants' failure to disclose Manterfield's significant criminal history, as well as the February 2007 order freezing all of Manterfield's assets that he controlled directly and indirectly, which was issued by an English court in connection with a money laundering inquiry, was a material omission and a breach of their fiduciary duty to investors. Likewise, Lydia's Form ADV, which was publicly available to investors online, contained material

17

Exhibit 7
Page 105

misrepresentations in Item 11. In response to questions in Item 11 of the Form ADV about

whether any advisory affiliate, which includes Manterfield, had been convicted or charged with

any felony, or convicted or charged with a misdemeanor involving fraud, wrongful taking of

property or conspiracy to commit the same, Andersen checked the "no" boxes. Manterfield,

Andersen, and Lydia, likewise failed to amend and modify Item 11 as new information

developed.

45.     On or about June 12, 1992, Manterfield was convicted at the Sheffield Crown

Court in South Yorkshire, England on one charge of obtaining property by deception, a felony

for which he could have been sentenced to at least one year imprisonment, and was sentenced to

180 hours of community service.

46.     On or about March 25, 1996, Manterfield was convicted in the Leeds Crown

Court in West Yorkshire, England on four charges of conspiracy to defraud, a felony for which

he could have been sentenced to at least one year imprisonment, and was given a sentence of

incarceration for twelve months that was suspended for two years.

47.     On or about November 29, 1999, Manterfield was convicted in the Sheffield

Magistrates Court in South Yorkshire, England on three charges of shoplifting and was given a

twelve month conditional discharge.

48.     On or about December 5, 2006, Manterfield was convicted in the South East

Suffolk Magistrates Court in Ipswich, England on one charge of handling stolen goods, a felony

for which he could have been sentenced to at least one year imprisonment, and was fined £200.

Manterfield was initially arrested on May 16, 2000 and was charged in November 2000 with

three charges of theft and one charge of handling stolen goods. Manterfield was released on bail

18

Exhibit 7
Page 106

pending his court date. However, before the court date, Manterfield fled England and did not return for several years, thus violating his conditions of bail.

49.    On or about January 26, 2007, Manterfield was arrested in England on suspicion of acquiring criminal property, a potential felony charge. On February 5, 2007, in connection with this inquiry, an English court froze all assets that Manterfield controlled directly or indirectly, but allowed Manterfield, to the extent that the was not imprison, to spend up to £300 a week towards his ordinary living expenses. Because of his ownership of Lydia, the English freeze order covers all accounts for Lydia and the Fund. On March 26, the English court continued the February 5, 2007 order leaving the asset freeze in place.

50.    Throughout January, February and March 2007, the Defendants failed to make any substantive disclosure to investors as to the many negative events suffered by the firm and its principal. Instead the Defendants continued through the use of newsletters and other communications to portray the firm and the Fund as prosperous and growing, all while taking in substantial new and additional subscriptions from investors in Taiwan.

**Defendants Failed to Disclose Real and Serious Risks**

**False Bonding & Reinsurance Claims**

51.    The June 2006 PPM states that the "longevity risk" – the risk that the underlying insured will outlive his or her life expectancy – was one of the most important determiners as to the return that the Fund can expect on any given policy. The problem caused by an insured living past his or her life expectancy date is that receipt of the death benefit is delayed and additional premiums may be needed to keep the policy in force – meaning that the Fund needs to expend additional capital resulting in a lower return on its investment.

19

Exhibit 7
Page 107

52.     The Defendants falsely told investors in the June 2006 PPM that they intended to manage the longevity risk through, among other things, the use of bonding, and reinsurance. "Bonding" is a practice whereby the Fund pays a third party for a bond such that if the insured lives a specified period beyond his or her life expectancy, the bonding company purchases the bonded policy from the Fund at face value. "Reinsurance" is a practice whereby the Fund pays a third party and the third party agrees that if the insured lives a specified time past his or her life expectancy, the third party will pay all premiums to keep the policy in force. The Defendants knowingly or recklessly omitted to tell actual and prospective investors, however, that the Fund never purchased bonding or reinsurance, and in fact never discovered any company offering such products.

53.     The 2006 PowerPoint, which was posted on Lydia's website and made available to the hundreds of investors and potential investors that received website login credentials from Andersen and Manterfield, went further than the June 2006 PPM in misrepresenting how the Defendants intend to deal with the longevity risk. Page 3 of the 2006 PowerPoint stated that the Fund had obtained an "AAA-Rated Re-Insurance Package," and on page 12, investors are told, "[o]ur bonding solution carries a back-up guarantee from an AAA-Rated European Government." Those statements are simple falsehoods – the Fund had not purchased any reinsurance or bonds. Page 10 of the 2006 PowerPoint also fraudulently states:

> Our primary concern is longevity risk and we manage that risk in four ways [including]:
> 1.  Bonding. By purchasing a Settlement Bond we can effectively build-in a guaranteed maturity date. If the insured remains alive after this date the Bond issuer pays out the full value of the policy. . . .
> 3.  Re-insurance. This addition covers the payment of future premiums for the life of the insured, after the Life Expectancy date passes.

20

Exhibit 7
Page 108



54.     A fact sheet prepared by Lydia and distributed to investors in Taiwan during the Relevant Period contained similar falsehoods: "Margins are created by the deep initial discounts . . . creating an inherent growth rate, and the bulk of that rate is locked in by the purchase of Extended Longevity Risk Mitigation Insurance, which gives us a guaranteed worst-case maturity payout. [O]ur Extended Longevity Risk Mitigation Insurance with an AAA-Rated European Government Guarantee, cannot be matched anywhere."

**Suicide Exclusion Risk**

55.     The June 2006 PPM states that one of the "[k]eys to assuring the integrity and value of a life settlement transaction include[s] . . . assuring there is no suicide exclusion" in the insurance policies in which the Fund acquires an interest. "Suicide exclusions" are provisions in life insurance policies which state that if the insured commits suicide within two years of the issuance of the policy (the "contestable period"), the insurance company will not pay any death benefit and instead will only return any premiums paid. Such an occurrence, because of the Fund's substantial cost to acquire an interest in an insurance policy over and above the premiums it must also pay, would be a material negative event.

56.     Defendants, however, knowingly or recklessly omitted to tell investors that such provisions exist in every life insurance policy in which the Fund acquired an interest and in fact that no insurance companies sell life insurance without suicide exclusion clauses. Thus, Defendants knowingly or recklessly misled investors into thinking that they had a strategy to limit the risk posed by a suicide. The suicide risk was especially relevant to the investors in the Fund because all of the insurance policies in which the Fund owned an interest were still in the contestable period, and thus susceptible to losing the death benefit if suicide occurred.

21

Exhibit 7
Page 109

**Premium Payment Risk**

57.     In order to maintain the value of the Fund's interests in various life insurance policies, the premiums on the polices needed to continue to be paid or the policies will lapse and become worthless. The 2006/07 PowerPoint, falsely stated that the Defendants "avoid this risk by pre-paying premium payments up to and beyond the point at which we intend to package and re-sell a given portfolio." This misrepresentation was repeated on page 10 of the 2007 PowerPoint. The June 2006 PPM also falsely stated that "[f]uture premiums will be escrowed . . ." to avoid the premium payment risk.

58.     Contrary to the above, however, the Defendants had not prepaid premiums on all insurance policies beyond the point at which they intend re-sell (i.e. beyond the end of the contestable period); in fact, the premiums on some policies were being paid on a monthly or quarterly basis. Defendants' knew that the above statements were false because they tracked and authorized premium payments as they became due. Defendants also did not undertake any systematic attempt at escrowing necessary premiums, which will cost several million dollars on an annual basis. It appears as if Defendants were counting on new subscriptions for cash to pay the debt, rather than planning to pay for premiums in advance.

**Contestability Risk**

59.     Defendants focused the Fund on purchasing interests derivative of insurance polices that were still in the contestable period. The Defendants, however, knowingly or recklessly failed to adequately describe the special risks inherent in such an investment strategy. The Defendants instead tailored their disclosures on what they saw as the positive aspects that may come from the heightened returns associated with the deep discounts that the market

22

Exhibit 7
Page 110

imposed on the sale price of interests in contestable policies. The market imposes these discounts, however, because of the additional material risks that the Defendants failed to disclose to the Fund's investors.

60.     The significance of buying interests in policies that are still in the contestable period was that if an insured dies during this timeframe, the insurance company can investigate the matter and if it finds fraud in connection with the purchase of the policy, refuse to pay any death benefit. Rescission was a possibility if the insured makes misrepresentations or omissions on his or her insurance application related to, among other things, the insured's health, financial status, the existence of pending or granted insurance policies, or the intent to sell an interest in the policy. Depending on the nature of the fraud, an insurance company has two options. First it can seek rescission of the policy, at which point all that the Fund would be entitled to receive would be a return of premiums paid, with some small amount of interest. If the fraud is more severe, the insurance company can seek to have the policy declared void, at which point the insurer can obtain a setoff against paid premiums for damages. Either way, given the substantial acquisition costs that the Fund incured in obtaining an interest in an insurance policy, a simple return of premiums, even with interest, would result in a net loss for the Fund. Moreover, any delay and expense incurred in addressing concerns raised during an insurance company's review would also lower the Fund's return. The Defendants knew of these risks but failed to fully disclose them to investors, simply stating in the June 2006 PPM, without an explanation, that selling interests in contestable policies was a "riskier practice" than trading in non-contestable policies.

61.     Defendants also understood that the issue of contestability was not a remote one

23

Exhibit 7
Page 111

for the Fund.  In the 2007 PowerPoint, the Defendants stated that "within the two year

contestable period a percentage of the polices (around 27%) will actually mature," (i.e. the

insured will die).  The Defendants painted this as a positive fact for the Fund because the early

maturity generates a stronger return.  Defendants failed to disclose to investors, however, that

motivated insurance companies will work to try and avoid paying death benefits on contestable

polices because they represent a significant loss for the insurance companies.

     62.     The Defendants noted in the June 2006 PPM that there has been fraud in the life

settlement industry, and stated that there have been a "number of companies [in the life

settlement industry] considered less than reputable."  One of fraudulent practices described by

the Defendants in the June 2006 PPM was "clean sheeting," a colloquial term in the life

settlement industry related to the practice of an insured withholding negative information about

his or her health from an insurance company.  Defendants failed to disclose to investors,

however, how the Fund could suffer if it found itself dealing with a non-reputable firm or

insurance broker that was supplying "clean sheet" policies.

     63.     It is clear from the variety of purchase-related contracts that the Defendants and

their agents used during the Relevant Period to memorialize the Fund's interests in the insurance

policies that the Defendants' knew of the risks inherent in contestable policies.  The contracts

required representations that were aimed at helping to avoid issues that could lead to rescission

during the contestable period.  For example, the Assignment of Beneficial Interest Agreements

used in most if not all of these transactions, contained the following representation:

> [N]o statement, representation, warranty or information made or provided by
> Assignor or the Insured in any application, worksheet or supplemental document
> made or provided to the Insurer for the Policy, or otherwise made or provided by
> Assignor or the Insured to the Insurer, contained any untrue statement of fact, or

24

Exhibit 7
Page 112

omitted to stale any fact necessary to make such statement, representation or warranty not misleading, true and complete in all respects;

[A]ll personal, medical and financial information provided with respect to the Insured in connection with acquisition of the Policy and in connection with the sale of the Interest by Assignor to Assignee (including, without limitation, all medical records and other information provided to the medical or life expectancy underwriters) are true, correct and complete and do not fail to state a fact necessary to make such information not misleading.

64.    Defendants knew or recklessly disregarded the fact that rescission by reason of fraud in the procurement of insurance was a live issue for the Fund. In at least five instances, described in detail in paragraphs 65 and 66, the insurance applications and related documents of five insureds, all of which were in the possession of the Defendants, presented a strong possibility of fraud that could lead to rescission. The five insurance policies in question had a face value of $16.5 million, or just over ten percent of the total face value of all of the policies underlying the assets of the Fund.

65.    In four instances (a $1.5 million policy issued on CV, a $5 million policy issued on HG, a $2 million policy issued on RW, and a $3 million policy issued on RB) the insureds all answered "no" to the question on their applications asking whether they ever discussed the possible sale or assignment of their policy in a life settlement transaction. The Defendants possessed strong circumstantial evidence in documents that would or should have been reviewed as part of Defendants' deal diligence, indicating that the insureds' representations were incorrect. First, all of the insureds obtained independent life expectancy evaluations prior to applying for insurance – CV, HG, and RB did so within two to five weeks of submitting their applications. An independent life expectancy analysis was a critical piece of data that Defendants relied upon in pricing a life settlement transaction. On information and belief, such analyses were not

25

Exhibit 7
Page 113

typically obtained by individuals just seeking insurance coverage who were not also evaluating selling their policy in the secondary market.  Moreover, CV, HG, RW and RB sold interests in their policies to the Fund's indirect agents within approximately one to five weeks after applying for coverage.  Obtaining a life expectancy analysis before applying for insurance and then selling an interest in the policy within weeks of issuance together offer strong evidence that CV, HG, RW, and RB lied on their insurance applications in saying that they had not discussed such an eventuality.

66.    The fifth policy at risk of rescission was a $5 million policy issued on AL.  AL responded in the negative to a question on the application for the $5 million policy asking whether he had any other life insurance in force or applied for.  The Fund purchased interests in two life insurance polices issued on AL, the $5 million policy that he applied for on March 2, 2007, and a $9 million policy from another insurance company that he applied for on February 27, 2007.  Thus, it appears as if AL misrepresented the truth in his application for the $5 million policy.  Defendants possessed both of AL's applications and knew that the two polices were issued close in time.

67.    Based on straightforward information which Defendants possessed, and which they had a reason to review as part of their deal diligence and in fulfillment of the their fiduciary duties to evaluate the assets that the Fund purchased, if CV, HG, RW, RB, or AL were to die during the contestability period, the insurance company's inquiry could have lead to rescission efforts.  Defendants, however, knowingly or recklessly failed to make any disclosure to investors associated with these material risks.

68.    The unique risks posed by buy interests in contestable polices involve exposure to

26

Exhibit 7
Page 114

another illicit practice called "wet inking"  "Wet inking" involves the purchase of an insurance policy purely for the purpose of selling it in a life settlement transaction immediately after issuance, or while the ink on the policy is still "wet."  Insurance companies will not sell insurance policies to individuals for purposes of resale to strangers, nor will courts, for long standing public policy reasons, allow such insurance contracts to be validly enforced.  Such situations run afoul of a concept in insurance law know as "insurable interest" which requires that, at the time a policy is issued, the owner of the policy (i.e. the beneficiary) have an interest in seeing the insured survive rather than immediately die.

69.    Defendants, by focusing on contestable policies issued on high net worth individuals over the age of seventy-five, participated in a process whereby it was probable that individuals would be obtaining life insurance for the purpose of immediate sale into the secondary market, and thereby giving rise to a risk that the policies would be subject to a challenge on insurable interest grounds.  Defendants were aware of the "wet ink" issue.  For example, the Defendants' agents often required insureds to sign consents and undertakings that included the following language:

> I certify that no formal or informal agreement, arrangement, understanding to sell or assign ownership of any beneficial interest in the Policies was arranged prior to the Policies being placed in force.

70.    While Defendants were aware of the risk posed by "wet ink" policies, they knowingly or recklessly omitted to describe the risk to investors.  Moreover, a review of the timing of key events related to policies underlying the Fund pointed to a strong possibility that many of the policies may in fact have been procured by "wet inking," and thus, subject to a possible insurable interest challenge if the insured died during the contestable period.  For

27

Exhibit 7
Page 115

example, interests in fourteen of the thirty-three polices in the Fund, with a total face value of

$68.4 million, were transferred to Lydia's agent less than four weeks after the policies were

issued.  Eight of these fourteen transfers happened less than ten days after issuance. Once again,

Defendants knowingly or recklessly failed to make any disclosure to investors associated with

these material risks.

**Defendants Misstated the Nature of Its Investment Process and the Underlying Assets**

71.    Throughout the June 2006 PPM and of the various PowerPoint presentations,

newsletters, and other communications, Defendants represented that they utilized the services of

various escrow agents in order to provide false assurance to investors that the Defendants will

would not have an opportunity to misappropriate investors' funds.  For example, the 2006

PowerPoint, specifically states:

> All investments are wired directly to the Fund's US-Onshore Bank Account at JP
> Morgan.  The sole signatories to this account are our administrators, [DL]. They
> in turn wire the deposit to escrow with Morgan Stanley, and only when policies
> have been received by them with details amended to reflect the [Fund] as the new
> and sole beneficiary, is any capital released by Morgan Stanley.  This structure
> has been devised to deliver peace of mind and allay any fears regarding potential
> misappropriation of funds.

72.    While investors' funds were initially placed into an account over which the

Fund's administrator had sole signatory power, Manterfield and Andersen then had the funds

moved to other accounts over which they had direct or indirect control.  For example,

Manterfield and Andersen were signatories on the Morgan Stanley escrow account described in

the 2006 PowerPoint.  Thus, once the investors' money was transferred into the Morgan Stanley

account, Manterfield simply withdrew funds as he saw fit.  Moreover, in addition to the Morgan

Stanley account, Defendants used several other "escrow" accounts, to which they likewise

Exhibit 7
Page 116

enjoyed easy access though direct or indirect control of the various escrow agents. Through this process, Defendants were able to misappropriate millions of investors' funds.

73.    Defendants also made knowing or reckless material misrepresentations during the Relevant Period about the assets that they were buying for the Fund. For example, a one page fact sheet that Lydia distributed to investors in Asia during the Relevant Period indicated that the Fund owned interests in life insurance policies issued by highly rated and commonly known insurance companies, New York Life, Metropolitan Life, and Mass Mutual, when in fact, the Fund never owned any interests in policies issued by these companies. Defendants knew that the fact sheet was false and misleading because they approved or at least ratified all of the transactions in which interests in insurance polices were purchased, and thus, knew the names of the companies involved.

74.    Defendants also knowingly or recklessly provided materially false information to investors with respect to the manner in which they selected life insurance interests for the Fund. The June 2006 PPM, the 2006/7 PowerPoint, as well as the July and August 2006 newsletters, contain representations about the Fund's purported "Policy Selection Criteria," including the following requirements: (1) expectancy reports from at least two firms completed within ninety days of closing; (2) annual premium rates set at no more than 5% of face value; and, (3) life expectancies of between five and ten years with a preference towards expectancies of between five to nine years.

75.    Defendants knowingly or recklessly disregarded the fact that these selection guidelines were rarely used. In fact, material variations from the published parameters were tolerated without disclosure to investors. For example, less than half of the insureds had two life

29

Exhibit 7
Page 117

expectancy analyses completed prior to closing and, in most instances, the reports were

completed more than ninety days before closing (i.e. they were stale).  Defendants also

knowingly or recklessly disregarded the fact that more than twenty of the thirty-three policies in

which the Fund held interests have annual premiums that are greater than 5% of face value.

Similarly, there were more than nine policies, with a combined face value of greater than $40

million, where the insured's life expectance was estimated at greater than 10 years.  Both of

these issues, higher premiums and longer life expectancies, created a risk of lower than projected

returns, and should have been disclosed to investors.

### FIRST CLAIM FOR RELIEF
#### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5)

76.    The Commission repeats and incorporates by reference the allegations in

paragraphs 1-75 of the Amended Complaint as if set forth fully herein.

77.    Defendants, directly or indirectly, acting intentionally, knowingly or recklessly,

by the use of means or instrumentalities of interstate commerce or of the mails, in connection

with the purchase or sale of securities:  (a) have employed or are employing devices, schemes or

artifices to defraud; (b) have made or are making untrue statements of material fact or have

omitted or are omitting to state a material fact necessary to make the statements made, in the

light of the circumstances under which they were made, not misleading; or (c) have engaged or

are engaging in acts, practices or courses of business which operate as a fraud or deceit upon

certain persons.

78.    As a result, Defendants have violated and, unless enjoined, will continue to

violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17

C.F.R. § 240.10b-5].

30

Exhibit 7
Page 118

## SECOND CLAIM FOR RELIEF
### (Violation of Section 17(a) of the Securities Act)

79.    The Commission repeats and incorporates by reference the above allegations in of the Amended Complaint as if set forth fully herein.

80.    By reason of the foregoing, Defendants, directly or indirectly, in the offer or sale of securities, by use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices or courses of business which operated as a fraud or deceit upon the purchaser of securities in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

81.    As a result, Defendants have violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act.

## THIRD CLAIM FOR RELIEF
### (Violation of Sections 206(1) and 206(2) of the Advisers Act)

82.    The Commission repeats and incorporates by reference the above allegations in of the Amended Complaint as if set forth fully herein.

83.    Defendants were investment advisers within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)].

84.    Defendants, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, acting intentionally, knowingly or recklessly: (i) have

31

Exhibit 7
Page 119

employed or are employing devices, schemes, or artifices to defraud; or (b) have engaged or are

engaging in transactions, practices, or courses of business which operate as a fraud or deceit

upon a client or prospective client.

85.     As a result, Defendants have violated and, unless enjoined, will continue to

violate Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1), (2)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission requests that this Court:

A.     Enter a preliminary injunction, order freezing assets and order for other equitable

relief in the form submitted with the Commission's motion;

B.     Enter a permanent injunction restraining Defendants and each of their agents,

servants, employees and attorneys and those persons in active concert or participation with them

who receive actual notice of the injunction by personal service or otherwise, including facsimile

transmission or overnight delivery service, from directly or indirectly engaging in the conduct

described above, or in conduct of similar purport and effect, in violation of:

1.     Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5

thereunder [17 C.F.R. '240.10b-5];

2.     Section 17(a) of the Securities Act [15 U.S.C. § 17q(a)];

3.     Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1), (2)];

C.     Require Defendants to disgorge their ill-gotten gains and unjust enrichment, plus

pre-judgment interest, with said monies to be distributed in accordance with a plan of

distribution to be ordered by the Court;

32

Exhibit 7
Page 120

D.    Order Defendants to pay an appropriate civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)];

E.    Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

F.    Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

Plaintiff hereby requests that this matter be tried before a jury.

/s/ R. Daniel O'Connor
R. Daniel O'Connor (BBO #634207)
    oconnord@sec.gov
Silvestre A. Fontes (BBO #627971)
    fontess@sec.gov
Martin F. Healey (BBO #227550)
    healeym@sec.gov
Attorney for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
33 Arch Street
Boston, MA  02110
(617) 573-8991 (Fontes)
(617) 573-8952 (Healey)
(617) 573-8979 (O'Connor)
(617) 573-4590  fax

May 1, 2007

33

Exhibit 7
Page 121